# EXHIBIT 1

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| | |
|---|---|
| **NOTICE TO DEFENDANT:**<br>*(AVISO AL DEMANDADO):*<br>MERCK & CO., INC., a New Jersey Corporation; MERCK SHARP & DOHME<br>CORP. a New Jersey Corporation;  ORGANON & CO., a Delaware Corporation;<br>ORGANON LLC, a Delaware Limited Liability Company; and DOES 1-10, Inclusive,<br><br>**YOU ARE BEING SUED BY PLAINTIFF:**<br>*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*<br>SPENCER BUENO, an individual, and RICHARD PARKER, an individual, | **FOR COURT USE ONLY**<br>*(SOLO PARA USO DE LA CORTE)*<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br><br>**03/03/2022** at 08:58:36 PM<br><br>Clerk of the Superior Court<br>By Regina Chanez,Deputy Clerk |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* San Diego Superior Court<br>330 W. Broadway, San Diego, CA 92101<br>Central Division - Hall of Justice | **CASE NUMBER:**<br>*(Número del Caso):* 37-2022-00008253-CU-PL-CTL |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Shehnaz M. Bhujwala, SBN# 223484, Boucher LLP, 21600 Oxnard St., Suite 600, Woodland Hills, CA  91367
(818) 340-5400

| DATE: 03/04/2022<br>*(Fecha)* | Clerk, by<br>*(Secretario)* | *R. Chanez*<br>R. Chanez | , Deputy<br>*(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* MERCK & CO., INC., a New Jersey Corporation

under: ☒ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):

Shehnaz M. Bhujwala (SBN 223484)
Boucher LLP, 21600 Oxnard St., Suite 600, Woodland Hills, CA 91367

TELEPHONE NO.: (818) 340-5400   FAX NO. (Optional): (818) 340-5401
E-MAIL ADDRESS: bhujwala@boucher.la
ATTORNEY FOR (Name): Plaintiffs Spencer Bueno, et al.

FOR COURT USE ONLY

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**03/03/2022** at 08:58:38 PM
Clerk of the Superior Court
By Regina Chanez, Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 330 W. Broadway
MAILING ADDRESS:
CITY AND ZIP CODE: San Diego, CA 92101
BRANCH NAME: Hall of Justice

CASE NAME: Bueno v. Merck & Co., Inc., et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 37-2022-00008253-CU-PL-CTL |
|---|---|---|
| [x] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: Judge Eddie C Sturgeon<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[x] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

2. This case [x] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [x] Large number of separately represented parties
b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [x] Substantial amount of documentary evidence
d. [x] Large number of witnesses
e. [x] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [x] monetary b. [ ] nonmonetary; declaratory or injunctive relief c. [x] punitive
4. Number of causes of action (specify): Six
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)
Date: March 3, 2022

Shehnaz M. Bhujwala
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California    **CIVIL CASE COVER SHEET**    Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; Cal. Standards of Judicial Administration, std. 3.10

# INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
　Asbestos Property Damage
　Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
　Medical Malpractice– Physicians & Surgeons
　Other Professional Health Care Malpractice
Other PI/PD/WD (23)
　Premises Liability (e.g., slip and fall)
　Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
　Intentional Infliction of Emotional Distress
　Negligent Infliction of Emotional Distress
　Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
　Legal Malpractice
　Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
　Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
　Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
　Negligent Breach of Contract/ Warranty
　Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
　Collection Case–Seller Plaintiff
　Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
　Auto Subrogation
　Other Coverage
Other Contract (37)
　Contractual Fraud
　Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
　Writ of Possession of Real Property
　Mortgage Foreclosure
　Quiet Title
　Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
　Writ–Administrative Mandamus
　Writ–Mandamus on Limited Court Case Matter
　Writ–Other Limited Court Case Review
Other Judicial Review (39)
　Review of Health Officer Order
　Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
　Abstract of Judgment (Out of County)
　Confession of Judgment *(non-domestic relations)*
　Sister State Judgment
　Administrative Agency Award *(not unpaid taxes)*
　Petition/Certification of Entry of Judgment on Unpaid Taxes
　Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
　Declaratory Relief Only
　Injunctive Relief Only *(non-harassment)*
　Mechanics Lien
　Other Commercial Complaint Case *(non-tort/non-complex)*
　Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
　Civil Harassment
　Workplace Violence
　Elder/Dependent Adult Abuse
　Election Contest
　Petition for Name Change
　Petition for Relief From Late Claim
　Other Civil Petition

For your protection and privacy, please press the Clear

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**03/03/2022** at 09:58:36 PM

Clerk of the Superior Court
By Regina Chanez, Deputy Clerk

1  Kevin P. Roddy, CA State Bar No. 128283
   *kroddy@wilentz.com*
2  WILENTZ, GOLDMAN & SPITZER, P.A.
   90 Woodbridge Center Drive, Suite 900
3  Woodbridge, New Jersey 07095
   Tel:   (732) 855-6402
4
   Kimberly Beck, *Pro Hac Vice*
5    *kim@becklawcenter.com*
   BECK LAW CENTER
6  201 E. 5th Street, Suite 1900
   Cincinnati, Ohio
7  Tel:   (888) 434-2912

8  Shehnaz M. Bhujwala, CA State Bar No. 223484
   *bhujwala@boucher.la*
9  BOUCHER LLP
   21600 Oxnard Street, Suite 600
10 Woodland Hills, California 91367-4903
   Tel:   (818) 340-5400
11 Fax:   (818) 340-5401

12 *Attorneys for Plaintiffs*

13      **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14           **COUNTY OF SAN DIEGO**

15

16 SPENCER BUENO, an individual, and
   RICHARD PARKER, an individual,
17
          Plaintiffs,
18
         v.
19
   MERCK & CO., INC., a New Jersey
20 Corporation; MERCK SHARP & DOHME
   CORP. a New Jersey Corporation;
21 ORGANON & CO., a Delaware Corporation;
   ORGANON LLC, a Delaware Limited
22 Liability Company; and DOES 1-10, Inclusive,
23
         Defendants.
24

Case No.   37-2022-00008253-CU-PL-CTL

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1. **STRICT LIABILITY - DESIGN DEFECT**
2. **STRICT LIABILITY - FAILURE TO WARN**
3. **NEGLIGENCE**
4. **NEGLIGENT MISREPRESENTATION**
5. **BREACH OF EXPRESS WARRANTY**
6. **BREACH OF IMPLIED WARRANTY**

1    Plaintiffs SPENCER BUENO, an individual, and RICHARD PARKER, an individual,

2    (hereinafter collectively "Plaintiffs"), allege the following facts and claims for relief against

3    Defendants MERCK & CO., INC. a New Jersey Corporation, MERCK SHARP & DOHME CORP.,

4    a New Jersey Corporation, (collectively referred to as "Merck Defendants" or "Merck"), Organon

5    & Co., a Delaware Corporation, and Organon LLC, a Delaware Limited Liability Company

6    (collectively referred to as "Organon Defendants" or "Organon") and DOES 1 through 10, inclusive,

7    (all collectively referred to herein as "Defendants") and requests a trial by jury of all issues and

8    causes of action so triable:

9                                **INTRODUCTION**

10

11    1.    Plaintiffs have developed neuropsychiatric injuries as a result of ingesting

12    Defendants' prescription pharmaceutical product, Singulair®, indicated for: a) prophylactic and

      chronic treatment of asthma; b) acute prevention of exercise- induced bronchoconstriction (EIB);

13    and c) relief of symptoms of allergic rhinitis.

14

15    2.    Merck Defendants knew or should have known of the risks of neuropsychiatric

16    injuries prior to the time they began selling Singulair® in 1998. In 1996, Defendant Merck &

      Co., Inc. filed a patent application for montelukast, the active ingredient in Singulair®,

17    acknowledging montelukast's possible effects on cerebral spasm. Further, montelukast has been

18    tested extensively starting prior to 1998, and continuing through today. Many of these studies have

19    demonstrated a correlation—and some show causation—between Singulair® usage and the

20    development of neuropsychiatric events. Merck Defendants have ignored these studies.

21    3.    Originally, the Singulair® label contained no warnings regarding neuropsychiatric

22    events. Over the past 24 years Merck Defendants have slowly and belatedly added grossly

23    insufficient warnings regarding neuropsychiatric events to the product label. Finally, on March 4,

24    2020, the Food & Drug Administration (FDA) required Merck Defendants to add a Black Box

25    Warning, the strongest type of warning, to Singulair®'s label, regarding neuropsychiatric events.

26    FDA also required a new Medication Guide.

27    4.    The new Black Box warning provides "serious neuropsychiatric events have been

28

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

reported in patients taking Singulair®." These include:

> agitation, aggressive behavior or hostility, anxiousness, depression, disorientation, disturbance in attention, dream abnormalities, dysphagia (stuttering), hallucinations, insomnia, irritability, memory impairment,obsessive-compulsive symptoms, restlessness, somnambulism, suicidal thoughts and behavior (including suicide), tic, and tremor…

> Psychiatric disorders: agitation including aggressive behavior or hostility, anxiousness, depression, disorientation, dream abnormalities, hallucinations, insomnia, irritability, restlessness, somnambulism, suicidal thinking andbehavior (including suicide), tremor *[see Warnings and Precautions (5.4)]*.[1]

The new warning goes on to state "the benefits of Singulair® may not outweigh the risks…".

5.    Merck Defendants also modified the drug labeling Section 5.1 to disclose some neuropsychiatric events that were reported after Singulair® discontinuation as well as acknowledge montelukast, the active ingredient in Singulair®, distribution into the brain in rats. In addition, Merck Defendants modified Section 12.3 to remove the word 'minimal' from the description of montelukast distribution into the brain.

6.    In its March 4, 2020, press release FDA noted that "many patients and health care professionals are not fully aware of these risks." Further, by requiring the addition of the Black Box warning, the FDA "aims to make sure patients and medical providers have the information available to make informed treatment decisions."

## PARTIES

7.    Plaintiffs are competent individuals over the age of 18. Plaintiffs are citizens and residents of San Diego County, California. At all times relevant herein, Plaintiffs were citizens and residents of California. At all relevant times herein, Plaintiffs were prescribed Singulair® in California. Plaintiffs ingested Singulair® in California and sustained injuries therefrom in California.

---

[1] Merck Sharp & Dohme Corp., a subsidiary of Merck & Co., Inc., "Full Prescribing Information: Singulair® (montelukast sodium) Tablets, Chewable Tablets, and Oral Granules [US Patent No. 5,565,473]," Reference ID: 3106826 (Whitehouse Station, NJ: Merck & Co., Inc., 1998, revised Mar. 2012): 3-4, § 5.4: Neuropsychiatric Events; 6-7, § 6.2: Post-Marketing Experience. Accessed at https://www.accessdata.fda.gov/drugsatfda_docs/label/2012/021409s036lbl.pdf.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

8.     Plaintiff Spencer Bueno was prescribed Singulair from 2019 to 2021.  His prescriptions were filled with brand and/or generic Singulair.  He used Singulair as prescribed.  As a direct and proximate result of ingesting Singulair®, Plaintiff Spencer Bueno suffered neuropsychiatric injury including depression, anxiety, and suicidality.

9.     Plaintiff Richard Parker was prescribed Singulair from 2018 to 2020.  His prescriptions were filled with brand and/or generic Singulair.  He used Singulair as prescribed.  As a direct and proximate result of ingesting Singulair®, Plaintiff Richard Parker suffered neuropsychiatric injury including suicidality, depression, and a suicide attempt.

10.    Plaintiffs became symptomatic while using Singulair®.

11.    Had Plaintiffs or the prescribers known that Singulair® could cause Plaintiffs to suffer neuropsychiatric events, theprescriber would not have prescribed Singulair® and Plaintiffs would not have ingested Singulair®. Plaintiffs have incurred medical expenses and will continue to incur expenses in connection with medical treatment as a result of these injuries, which were caused by Defendants' conduct withrespect to Singulair®'s design, labeling, manufacture, marketing, and sale. Plaintiffs have endured and will continue to endure pain, suffering, mental anguish, trauma, and loss of enjoyment of life as a result of these injuries, have suffered lost earnings and/or a loss of earning capacity, and other injuries and damages to be proven at trial.

12.    On information and belief, Merck Defendants are, and at all relevant times herein were, multi-national pharmaceutical corporations organized under the laws of New Jersey, with their principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033, and doing business in California. On information and belief, Merck Sharp & Dohme Corp. is, and at all relevant times was, registered with the California Secretary of State to do business in California.

13.    Merck Defendants had exclusivity with respect to Singulair® and were the exclusive manufacturers, distributors, and sellers of Singulair® from 1998 to mid-2012.  Merck Defendants have maintained control of brand name Singulair® at least into 2020 and possibly still maintain control.

14.    On information and belief, the Merck Defendants "spun off" Singulair to their subsidiary, Organon & Co., sometime after the FDA ordered Merck to add the Black Box warning

1    to Singulair's label. On information and belief, Organon & Co. is, and at all relevant times herein

2    was, a corporation organized under the laws of Delaware, with a principal place of business at 30

3    Hudson Street, Floor 33, Jersey City, New Jersey 07302, and doing business in California. On

4    information and belief, Organon LLC is a subsidiary of Organon & Co. that distributed Singulair to

5    Californians, including Plaintiffs. On information and belief, Organon LLC is, and at all relevant

6    times herein was, a Delaware limited liability company with a principal place of business at 30

7    Hudson Street, Floor 33, Jersey City, New Jersey 07302. On information and belief, Organon & Co.

8    and Organon LLC ("Organon") are, and at all relevant times were, registered with the California

9    Secretary of State to do business in California.

10        15.    On information and belief, subject to discovery regarding the relationship of the

11    Merck Defendants to Organon, either Merck Defendants or Organon may be liable for injuries

12    caused by Singulair after FDA directed a black box warning to be added to Singulair before it was

13    added and physicians, pharmacists and patients were appropriately notified.

14        16.    Plaintiffs are informed and believe, and thereon allege that, at all relevant times, the

15    Merck Defendants and after transfer of the Singulair NDAs to it, Organon, conducts and at all

16    relevant times conducted substantial, continuous business in California.

17        17.    The Merck defendants manufactured, marketed and sold millions of Singulair pills,

18    including the actual Singulair pills that Plaintiffs used in California during and prior to 2012.

19        18.    Since 2012, the Merck defendants have continued to manufacture, market, and sell

20    Singulair in California at least into 2020 and either the Merck Defendants or Organon did so after

21    2020.

22        19.    On information and belief, Merck Defendants and/or Organon may have

23    subsequently manufactured, marketed and sold the actual Singulair pills used by Plaintiffs in

24    California.

25        20.    Merck defendants engaged in an extensive campaign to educate physicians in

26    California about the alleged benefits of Singulair, and further misrepresented the safety of Singulair

27    to physicians in California during this campaign.

28        21.    Merck Defendants engaged in extensive Direct-to-Consumer advertising in

1 | California including print ads in magazines sold in California as well as television advertising on
2 | television channels airing in California.

3 |      22.     Plaintiffs are ignorant of the true names and capacities of defendants sued herein as
4 | Does 1 through 10 and therefore sue these defendants by such fictitious names pursuant to California
5 | Code of Civil Procedure section 474. Plaintiffs are informed and believe, and upon such information
6 | and belief, alleges, that each of the defendants designated as a Doe are legally responsible in some
7 | manner for the events and happenings and caused damages, as alleged herein. Plaintiffs will seek
8 | leave of the Court to amend this Complaint to show the true names and capacities of the defendants,
9 | designated as Does, when the same has been ascertained.

10 |      23.     Plaintiffs are informed and believe, and on that basis allege, that at all times
11 | mentioned herein, there existed a unity of interest and ownership among Defendants and each of
12 | them, such that any individuality and separateness between Defendants, and each of them, ceased
13 | to exist. Defendants and each of them, were the successors-in-interest and/or alter egos of the other
14 | Defendants, and each of them, in that they purchased, controlled, dominated and operated each other
15 | without any separate identity, observation of formalities, or other manner of division. To continue
16 | maintaining the façade of a separate and individual existence between and among Defendants, and
17 | each of them, would allow Defendants to perpetrate a fraud and an injustice.

18 |      24.     Plaintiffs are informed and believe, and on that basis allege, that at all times
19 | mentioned herein, Defendants and each of them were the agents, representatives and/or employees
20 | of each and every other Defendant. In doing the things hereinafter alleged, Defendants and each of
21 | them, were acting within the course and scope of said alternative personality, capacity, identity,
22 | agency, representation and/or employment and were within the scope of their authority, whether
23 | actual or apparent. Plaintiffs are informed and believe, and on that basis allege, that at all times
24 | mentioned herein, Defendants and each of them were the trustees, partners, servants, joint venturers,
25 | shareholders, contractors, and/or employees of each and every other Defendant, and the acts and
26 | omissions herein alleged were done by them, acting individually, through such capacity and within
27 | the scope of their authority, and with the permission and consent of each and every other Defendant
28 | and that said conduct was thereafter ratified by each and every other Defendant, and that each of

1    them is jointly and severally liable to Plaintiffs.

2                              **JURISDICTION AND VENUE**

3        25.     Venue is proper in this Court because Plaintiffs are citizens and residents of San

4    Diego County, California, and during and prior to 2012, Plaintiffs purchased and used Merck

5    Defendants' Singulair in San Diego County, California that caused Plaintiffs' injuries in that county.

6    Further on information and belief, Defendants made misrepresentations regarding the safety of

7    Singulair to physicians in San Diego County, California.

8        26.     The California Superior Court has jurisdiction over all Defendants because, based on

9    information and belief, each is a corporation and/or entity and/or person organized under the laws

10   of having its principal place of business in the State of California, a foreign corporation or

11   association authorized to do business in California and registered with the California Secretary of

12   State, or that has sufficient minimum contacts in California, is a citizen of California, or otherwise

13   intentionally avails itself of the California market so as to render the exercise of jurisdiction over it

14   by the California courts consistent with traditional notions of fair play and substantial justice.

15       27.     Further, Defendants have each purposefully availed themselves of the benefits and

16   protections of the laws within the State of California. Collectively, Defendants conduct substantial,

17   continuous, and systemic business in California and have had sufficient contact with California such

18   that the exercise of jurisdiction would be consistent with the traditional notions of fair play and

19   substantial justice.

20                              **FACTUAL ALLEGATIONS**

21   **A. Merck's Discovery of Montelukast**

22       28.     Merck Defendants discovered the anti-asthmatic properties of montelukast, the

23   active ingredient in Singulair® and were granted U.S. Patent No. 5,565,473 on October 15, 1996,

24   which expired on August 3, 2012. FDA first approved Singulair® for clinical use in 1998.

25       29.     Singulair® has become a ubiquitous monotherapy treatment as an alternative to, and

26   as an add-on therapy to inhaled corticosteroids (ICS) such as fluticasone. Approximately 9.3 million

27   patients received a dispensed montelukast prescription from U.S. outpatient pharmacies in 2018,

28

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    with 2.3 million of these being children younger than 17 years.[2]

2           30.    Singulair® (montelukast) is a leukotriene receptor antagonist that binds with high

3    affinity and selectivity to the cysteinyl leukotriene receptor-1 (CysLTR1) in order to prevent this

4    receptor from interacting with leukotrienes, which are inflammatory mediators. Such binding

5    consequently assists in inhibiting many of the physiological actions elicited by CysLTs at the

6    receptor which could have facilitated asthma or allergic rhinitis. As an example, montelukast

7    modulates expression of CysLTR1 and CysLTR2 in airway eosinophilic (i.e., high count of white

8    blood cells) inflammation of OVA-induced asthmatic mice because the drug functions in bodies as

9    a CysLT1 receptor antagonist.[3]

10          31.    Cysteinyl leukotrienes (CysLT) are eicosanoids (i.e., signaling molecules) that are

11   released by various types of cells, including mast cells and eosinophils, both of which are implicated

12   in allergy and anaphylaxis as well as the immune system. When these CysLT bind to their

13   corresponding CysLT receptors (e.g., CysLT binding to CysLT1R), they may act to up- or down-

14   regulate the receptor and its coordinating effect. For example, CysLT1 binding to CysLT1 receptors

15   found on smooth muscle cells in respiratory airways simulates specific cell activities that then

16   facilitate the underlying pathophysiology of asthma and allergic rhinitis.

17          32.    Facilitating    conditions    for    asthma    include    CysLT-mediated    airway

18   bronchoconstriction, vascular permeability, occluding mucous secretion, and eosinophil

19   recruitment. In allergic rhinitis, nasal mucosa release CysLTs when exposed to allergens like pollen

20   during both early- and late-phase reactions and then participate in eliciting the prototypical

21   symptoms of allergic rhinitis like a congested nose and congested airway. Simply put, if allergens

22

23   [2] U.S. Food and Drug Administration, Drug Safety Communications, *FDA requires Boxed Warning about serious
     mental health side effects for asthma and allergy drug montelukast (Singulair®); advises restricting use for allergic
24   rhinitis; Risks may include suicidal thoughts or actions*," 3-4-2020 FDA Drug Safety Communication (Mar. 4, 2020)
     (citing IQVIA Total Patient Tracker™. Year 2018. Data extracted June 2019). Accessed at
25   https://www.fda.gov/media/135840/download.

26   [3] Zhang YJ, Zhang L, Wang SB, Shen HH, Wei EQ. Montelukast modulates lung CysLT(1) receptor expression and
     eosinophilic inflammation in asthmatic mice. *Acta Pharmacol Sin*. 2004;25(10):1341-1346 (Finding that montelukast
27   inhibited the up-regulation of the CysLT1 receptor in airway eosinophilic inflammation of ovalbumin- induced (i.e.,
     egg whites) asthmatic mice.

28

1    (e.g., dust and pollen) are the gasoline and CysLTs are the gas pedal that drive the asthma and

2    allergies engine, Singulair® hits the brakes.

3              **B.  Singulair Crosses the Blood-Brain-Barrier and Causes Neuropsychiatric Events.**

4                        **a.  Introduction to the Blood-Brain-Barrier**

5              33.     Montelukast crosses the blood-brain barrier (BBB), which is a semi-permeable

6    (i.e., partial porous) membrane of endothelial cells (blood and lymphatic vessel lining) that is highly

7    selective in preventing solutes in circulating blood from non-selectively entering the extracellular

8    fluid (e.g., cerebrospinal fluid) and thereby interacting with neurons in the central nervous system

9    (CNS). The CNS influences activity within all of the parts of the body and is constituted primarily

10   by the brain and spinal cord. Neurons function to communicate with other cells via connections

11   called synapses. Neurons are like telephones in that they receive signals and synapses are similar to

12   telephone lines that carry signals.

13             34.     The function of the BBB is to protect the brain from circulating pathogens and

14   thereby render bloodborne brain infections rare. No antibodies, only certain antibiotics, and

15   exceedingly few drugs in general may pass the BBB and thereby have an impact on the CNS.

16             35.     The clinical significance of the BBB is due to its difficulty as a drug target to

17   overcome. Difficulty may be attributed to its 100% exclusion of large-molecule neurotherapeutics

18   and 98% exclusion of all small-molecule drugs (e.g., anti-depressants like Prozac, anxiolytics like

19   Xanax).[4] In terms of size and rough complexity, if a small-molecule druglike aspirin (21 Daltons)

20   were a bicycle (~ 20 lbs), a large-molecule drug or small biologic like human growth hormone

21   (~3,000 Daltons) would be a Toyota Prius (~ 3,000 lbs), and a large biologic like immunoglobulin

22   G antibody (~ 25,000 Daltons) would be an F-16 fighter jet (~ 25,000 lbs without fuel).[5]

23

---

24   [4] See, e.g., Pardridge, William M. "The Blood-Brain Barrier and Neurotherapeutics." *NeuroRx.* 2005 Jan; 2(1): 1—
     Doi: 10.1602/neurorx.2.1.1; Pardridge. "The Blood-Brain Barrier: Bottleneck in Brain Drug Development." *NeuroRx.*
25   2005 Jan; 2(1): 3—14. Doi: 10.1602/neurorx.2..3

26
     [5] Deepak Gupta et al. "A CMO Perspective on Quality Challenges for Biopharmaceuticals," *BioProcess Int'l* (Oct. 1,
27   2013,      9:00      AM),      accessed at      http://www.bioprocessintl.com/manufacturing/ antibody-non- antibody/a-
     cmo-perspective-on-quality-challenges-for-biopharmaceuticals-347335; *See also,* McNally, Eugene J., and Jayne E.
28   Hastedt. "Development of Drug Products: Similarities and Differences Between Protein Biologics and Small Synthetic

---

                        COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

36.     Small molecules are considered anything less than 900 Daltons. A molecular weight of 400 Daltons or less increases a drug's chances of penetrating the CNS.[9] Montelukast weighs 608.18 Daltons.

37.     Additionally, molecules with less than 8 hydrogen bonds have an increased likelihood of penetrating the BBB. These are weak intermolecular (i.e., between molecules) bonds between a lone pair electron "donor" and an electron "acceptor." If the "acceptor" is the team, the lone pair "donor" is the person who is getting picked last. Montelukast has 4 hydrogen bond acceptors and 2 hydrogen bond donors. Rendering the drug capable of having only 6 hydrogen bonds. Because of this, montelukast has an inherent increased likelihood of penetrating the BBB.

38.     In order to deliver neurotherapeutic drugs to the brain to treat illnesses such as depression, schizophrenia, and obsessive-compulsive disorder, they must be able to cross the BBB. More lipid soluble or lipophilicity molecules are better able to penetrate the CNS.[6] Montelukast has been proven more lipid soluble than its sister class drug, Zafirlukast. In other words, because montelukast "likes" dissolving in fats or oils more than zafirlukast, montelukast is better able to cross the BBB.[7]

39.     Because montelukast crosses the BBB, it exerts a systemic effect upon the CNS that results in, among other things, adverse neuropsychiatric events.

**b.  Singulair Crosses the Blood-Brain-Barrier**

40.     Montelukast crosses the BBB and thereby accumulates in the central nervous system (CNS), which is constituted by the brain and spinal cord. This drug accumulation occurs with both oral and intravenous doses, and in both humans and animals:

Most importantly, **in a human subject taking 10 mg per day montelukast, that is, the approved dose to treat asthma, we detected [oral] montelukast in the**

---

Molecules." In *Protein Formulation and Delivery*, 2[nd] ed. Edited by Eugene J. McNally and Jayne E. Hastedt. Drugs and the Pharmaceutical Sciences, Vol. 175 (Boca Raton, FL: CRC PressTaylor & Francis Group, 2008): 327—333, 328—329.

[6] E.g., Pardridge, William M., "Drug transport across the blood-brain barrier," J Cereb Blood Flow Metab. 2012 Nov; 32(11): 1959–1972. Published online 2012 Aug 29. doi: 10.1038/jcbfm.2012.126

[7] See Mougey, Edward B.; Hua Feng; Mario Castro, Charles G. Irvin, and John J. Lima, "Absorption of Montelukastis Transporter Mediated: a Common Varient of OATP2B1 is Associated with Reduced Plasma concentrations and Poor Response," [Author manuscript; available in *PMC* 2010 Feb 1] *Pharmacogenet Genomics*, 2009 Feb; 19(2): 129–138. doi: 10.1097/FPC.0b013e32831bd98c.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**serum and in the CSF** in a similar concentration as in the rats (Supplementary Fig. 1a), suggesting that the standard 10 mg per day dose in humans is sufficient to reach a therapeutic dose in the CSF. In addition, a re-analysis of the original CNS pharmacology data of montelukast27indicates a significant BBB penetrance of the drug (Supplementary Fig. 1b). **These data clearly demonstrate that orally administered montelukast does cross the BBB in a therapeutic dose,** and that age-dependent differential BBB integrity does not affect the capacity of montelukast to enter the brain...

Remarkably, montelukast serum levels [following intravenous drug administrations in rats] were almost identical to the maximum plasma concentrations in humans after oral administration of the clinical dose of 10 mg montelukast daily... illustrating that the animals were treated with montelukast in adose that pharmacologically resembles the one that is approved forits use in humans.[8]

41.    Studies show that expression of the CysLTR1 (including that bound with montelukast) is not limited to the lungs. Instead, it occurs in different cells in the brain, including microvascular endothelial cells—components of the blood brain barrier. Pre- clinical studies of human and animal model tissue implicate CysLTR1 antagonists (e.g., Singulair®/montelukast, Onon/pranlukast, and Accolate/zafirlukast) as exerting effects upon traumatic brain injuries (TBI), ischemic brain injuries (e.g., stroke, TIA), cold-induced brain injuries, multiple sclerosis, auto- immune encephalomyelitis, Alzheimer's disease, and Parkinson's disease.[9] Activation of CysLTR1 is associated in animals with facilitating pathogen entry into the brain by disrupting the Blood Brain Barrier (BBB).[10]   Among these pathogens are HIV-1 and *Escherichia coli*-mediated meningitis.[11]   Furthermore, "[i]t has been demonstrated that [Singulair®] could increase the proliferation of neuronal precursor cells in vitro through the receptors CysLT1R and GPR17 [(G

---

[8] Marschallinger, J., Schäffner, I., Klein, B. *et al.* Structural and functional rejuvenation of the aged brain by an approved anti-asthmatic drug. *Nat Commun* 6, 8466 (2015), 4, 10. https://doi.org/10.1038/ncomms9466. (Emphasesadded).

[9] Ghosh A, Chen F, Thakur A, Hong H (2016). "Cysteinyl Leukotrienes and Their Receptors: Emerging Therapeutic Targets in Central Nervous System Disorders". CNS Neuroscience & Therapeutics. 22 (12): 943-951. doi: 10.1111/cns.12596. PMC 6492851. PMID 27542570.

[10] Bertin J, Jalaguier P, Barat C, et al. Exposure of human astrocytes to leukotriene C4 promotes a CX3CL1/fractalkine-mediated transmigration of HIV-1-infected CD4 + T cells across an in vitro blood–brain barriermodel. Virology 2014;454–455:128–138.

[11] Zhu L, Maruvada R, Sapirstein A, et al. Arachidonic acid metabolism regulates Escherichia coli penetration of the blood-brain barrier. Infect Immun 2010;78:4302–4310.

11

1  protein-coupled receptor 17)]."[12] Accordingly, although "expression of the CysLT1R in the normal

2  human brain is very low/non-existent," montelukast blockades GPR17 and thereby "strongly

3  elevate[s] neural stem and progenitor proliferation."[13] In other words, montelukast affects nerve cell

4  growth by expressing the activity of receptors.

5       42.    Singulair® accumulates in the brain at a rate that is higher than its accumulation in

6  the lungs:

> Although montelukast was so far always considered as a drug with only limited
> CNS penetration, careful re-analysis of the original pharmacokinetic report on
> montelukast reveals that one hour after i.v. drug administration, a substantial
> amount of radioactive equivalents of [C14] montelukast (~1/10 of the plasma
> levels) had reached the brain (Supplementary Fig. 1b). Most remarkably, while in
> plasma (and most other organs, for example, lung and muscle) montelukast levels
> strongly decreased within 24 h, the amount of montelukast in the brain increased.
> As a consequence, **24 h after drug injection, montelukast levels in the brain
> were even higher than in plasma** (Supplementary Fig. 1b), suggesting the
> existence of an active transport mechanism for montelukast through the BBB.

7       43.    Singulair® accumulates in the brain because of its binding affinity to a BBB

8  transporter:

> Indeed, montelukast is taken up from the intestine into the blood stream by the
> organic anion-transporting polypeptide (OATP)2B1, a transporter that is
> expressed also by endothelial cells of brain capillaries. Also, **the majority (99%)
> of montelukast in plasma is bound to proteins, mainly albumin, providing a
> BBB transport mechanism as albumin has been shown to act as a carrier
> through the BBB. The potential of montelukast to enter the CNS is further
> strongly supported by our present pharmacokinetic results obtained from rats**
> (Supplementary Fig. 1a).

9       44.    Pre-clinical data also provide ample evidence of how montelukast enters into the

10 brain:

> Strikingly, montelukast was also detected in the CSF in a human asthma patient,
> who was on the approved 10 mg per day dose of montelukast, and levels in serum
> and CSF were almost identical to the concentrations found in rats treated with

---

[12] Yohanna Eriksson, Martina Boström, Asa Sandelius Kaj Blennow, Henrik Zetterberg, Georg Kuhn, and Marie Kalm, The anti-asthmatic drug, montelukast, modifies the neurogenic potential in the young healthy and irradiated brain, *Cell Death and Disease* 9:775 (2018), 5. Doi 10.1038/s41419-018-0783-7. (citing Huber, C. et al. Inhibition of leukotriene receptors boosts neural progenitor proliferation. *Cell. Physiol. Biochem.* 28, 793-804 (2011). doi: 10.1159/000335793.).

[13] Sansing-Foster, Veronica V., Ivone E. Kim, Dipti Kalra, Efe Eworuke, Lockwood G. Taylor, Lisa M. Harinstein, and Monica Munoz, "Neuropsychiatric Events with Use of Montelukast in Pediatric Patients," *FDA Briefing Document: Pediatric Advisory Committee Meeting*, (Sept. 27, 2019), p. 14, § 1.4.4. Accessed at https://www.fda.gov/media/131035/download.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

10 mg kg$^{-1}$ montelukast (Supplementary Fig. 1a). **Entry of montelukast into the CNS is further supported by the plethora of preclinical data on the effects of systemic montelukast treatment on brain structure and function.** In various animal models of neurodegenerative diseases, including a model of kainic acid-induced loss of memory function, an acute Huntington's disease model of quinolinic acid and malonic acid injection-induced degeneration of striatal neurons, and a β-amyloid injection model of Alzheimer's disease, treatment with montelukast attenuated behavioural deficits, which was accompanied by structural brain changes such as inhibition of neuroinflammation and reduced neuronal cell death.[14]

45.     Animal studies demonstrate that Singulair® administered orally can be found in the brain and cerebrospinal fluid (CSF) found in the subarachnoid space between the two innermost (arachnoid mater and pia mater) of three protective membranes covering the brain and spinal cord:

> The biologic mechanisms underlying the neuropsychiatric events associated with montelukast treatment are currently not well understood. However, evidence from animal studies suggests that montelukast could act directly on cells in the brain. Orally administered montelukast (10 mg/kg/day, 7 days) was **detectable in brain tissue and cerebrospinal fluid (CSF)** in rats, providing evidence for its **ability to cross the blood-brain barrier**.[15]

These studies' findings were cited within the FDA's Briefing Document re: Singulair®.[16] Thus, taking Singulair® results in the accumulation of its active ingredient, montelukast, in brain tissue and cerebrospinal fluid.

---

[14] Marschallinger (2015), 10 (Emphases added); see also, Zhang WP, Hu H, Zhang L, et al. Expression of cysteinyl leukotriene receptor 1 in human traumatic brain injury and brain tumors. *Neurosci Lett.* 2004;363(3):247-251; LenzQF, et al., *Neuroscience*, 2014). Doi: 10.1016/j.neulet.2004.03.088.

[15] Zhao R, Shi WZ, Zhang YM, et al. Montelukast, a cysteinyl leukotriene receptor-1 antagonist, attenuates chronic brain injury after focal cerebral ischaemia in mice and rats. *J Pharm Pharmacol.* 2011;63(4):550-557; Zhang CT, Lin JR, Wu F, et al. Montelukast ameliorates streptozotocin-induced cognitive impairment and neurotoxicity in mice. *Neurotoxicology.* 2016;57:214-222 (Emphasis added). This study was also cited during the FDA hearings regarding Singulair®. Aladdin, Meena M., Ph.D., Health Researcher, Public Citizen's Health Research Group, "Testimony Before the FDA's Pediatric Advisory Committee and Drug Safety and Risk Management Advisory Committee – Neuropsychiatric Events with Use of Montelukast in Pediatric Patients," FDA.gov (Sept. 27, 2019). Accessed at https://www.fda.gov/media/131487/download. (quoting Food and Drug Administration. Guidance for industry: Warnings and precautions, contraindications, and boxed warning sections of labeling for human prescription drug and biological products — content and format. October 2011. https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM075096.pdf. Accessed September 26, 2019).

[16] FDA Briefing Document, p. 14, § 1.4.4 (citing Volpe C, Kalra D, A. N. *Pharmacovigilance Review of Neuropsychiatric and Churg-Strauss Syndrome* (Feb. 21, 2014); Kalra D, Gatti J, T P. *Pediatric Postmarketing Pharmacovigilance and Drug Utilization Review of Montelukast* (September 2, 2014)).

### c.   Because Singulair® (Montelukast) Crosses the Blood-Brain-Barrier, It Can and Does Cause Neuropyschiatric Events.

46.    The risk of new neuropsychiatric events is greater in pediatric patients who take Singulair®. "Children with asthma who experienced suicidality (i.e., suicidal thoughts), depression, tics, tremors, stuttering, agitation, and night terrors. A new-onset neuropsychiatric event [have] nearly twice the odds of having been prescribed montelukast in the year before their event."[20] Furthermore, "children prescribed montelukast for asthma management hadnearly twice the odds of neuropsychiatric events, compared with those on other asthma maintenance medications.[21]

47.    Additionally, a 2016 retrospective analysis of Individual Case Safety Reports (ICSRs) recorded up to January 1, 2015, in the World Health Organization's (WHO) database (VigiBase®), pulling from over 20 million reports of global suspected adverse effects ofmedicines. Their findings were as follows:

> Neuropsychiatric disorders as side effects of montelukast were more frequently reported for children than for adults. Infants andchildren seem to be more prone to sleep disturbances, whereas adolescents present symptoms of depression/anxiety and psychotic reactions more often. Suicidal behavior and completedsuicide appear to be more frequently reported than previously thought in practice...Practitioners should be aware of the risk of neuropsychiatric events associated with montelukást use, andshould advise the patient and report new cases.[17]

Thus, the neuropsychiatric dangers posed by Singulair® are much greater for children than for adults. Children with new onset neuropsychiatric events are twice as likely to have taken Singulair®, and children who are taking Singulair® are twice as likely to have neuropsychiatric events when compared with those taking other drugs (e.g., inhaled corticosteroids). This is significant because inhaled corticosteroids are known to have "**severe adverse psychological effects including psychosis**"[18] which can also "manifest in cognitive disorders, behavioral changes, and

---

[17] Ana Aldea Perona, Mar García-Sâiz, Emilio Sanz-Álvarez. Psychiatric Disorders and Montelukast in Children: A Disproportionality Analysis of the VigiBase®. *Drug Safe.* (Springer, 2016: New York, NY) 39:69-78, 69; see 76. Doi: 10.1007/s40264-015-0360-2. (n = 14,670 ICSRs, 2,630 neuropsychiatric events in people aged <18 years).

[18] Glockler-Lauf SD, Finkelstein Y, Zhu JQ, Feldman LY, To T. "Montelukast and Neuropsychiatric Events inChildren with Asthma: A Nested Case-Control Study. *Journal of Pediatrics.* 2019;209:176-182.e4. doi: 10.1016/j.jpeds.2019.02.009. (n = 898 NAE, 3,497 matched controls, p = 0.01).

1    frank psychiatric disease."[19]

2         48.    The risk of neuropsychiatric events associated with taking Singulair® are greater than

3    those associated with taking ICS (e.g., albuterol). "In the real-life setting, children initiated on

4    montelukast experience **a notable risk of neuropsychiatric ADRs leading to drug cessation**, that

5    is significantly higher than that associated with [inhaled corticosteroids] ICS."[20]

6         49.    Suicidality (i.e., suicidal thoughts) and suicide are a very real risk of taking

7    Singulair®. "Suicidal behavior and completed suicide appear to be more frequently reported than

8    previously thought in practice…Practitioners should be aware of the risk of neuropsychiatric events

9    associate with montelukast use and should advise the patient and report new cases." (n = 14,670

10   Individual Case Safety Reports for montelukast).[21] Additional studies have found,

11        "[M]ontelukast is associated with neuropsychiatric adverse drug reactions such as
         depression and aggression [and nightmares in children]."[27] Additionally, "[adverse
12       drug reactions in published case reports] included agitation, anxiety, depression,
         sleep disturbance, hallucinations, **suicidal thinking and suicidality, tremor**,
13       drowsiness, neuropathies, and seizures." Further, immune system, induction of
         hypersensitivity reactions, and hepatobiliary/pancreatic/uropoietic disorders "**are
14       characterized by severe prognosis (i.e., neurological deficit and fatal
         hepatotoxicity.**[22]
15
         50.    Singulair® causes a decrease in neuronal proliferation (nerve growth) in the
16
     hippocampal neurogenic zone (part of the brain largely involved in things from short-term memory
17
     to long-term memory, and spatial memory). Montelukast can cause **"negative effects both acutely**
18

19

20

21   [19] Linda B. Drozdowicz and J. Michael Bostwick, "[Review:] Psychiatric Adverse Effects of Pediatric Corticosteroid
     Use," *Mayo Clin Proc.* June 2014: 817—834. Doi: http://dx.doi.org/10.1016/j.mayocp.2014.01.010.
22   [20] Benard B, Bastien V, Vinet B, Yang R, Krajinovic M, Ducharma FM. "Neuropsychiatric adverse drug reactions in
     children initiated on montelukast in real-life practice." *Eur Respir J.* 2017 Aug 17;50(2). Doi: 10.1183/13993003.00148-
23   2017. Print 2017 Aug. (n = 12; ci = 95%) (Cited by 5 other articles) (Emphasis added).

24   [21] Aldea Perona A, García-Sáiz M, Sanz Álvarez E. "Psychiatric Disorders and Montelukast in Children: A
     Disproportionality Analysis of the VigiBase (®)." *Drug Saf.* 2016 Jan;39(1):69-78. Doi: 10.1007/s40264-015- 0360-2.
25   (Cited by 8 other articles) (Emphasis added); *See* Aladdin, Menna M. "Testimony Before the FDA's Pediatric Advisory
     Committee and Drug Safety and Risk Management Advisory Committee – Neuropsychiatric Events with Use of
26   Montelukast in Pediatric Patients." Sept 27, 2019. Accessed at https://www.fda.gov/media/131487/download.
     [22] Calapai G, Casciaro M, Miroddi M, Calapai F, Navarra M, Gangemi S. "Montelukast-induced adverse drug reactions:
27   a review of case reports in the literature." *Pharmacology.* 2014;94(1-2):60-70. Doi: 10.1159/000366164. (Emphasis
     added).

28

and after 2 weeks of daily administration of montelukast."[23]  In short, giving Singulair® to healthy children can delay their nerve growth in the part of the brain that is most important to short-term memory, long-term memory, and spatial memory. Furthermore, alterations in the hippocampus have been linked to a variety of cognitive pathologies such as anxiety, depression, addiction and neurodegenerative diseases such as Parkinson's.[24]

C. **Defendants Knew the Risks of Neuropsychiatric Events but Failed to Warn Prescribers, Parents or Patients of the Risks, and Even Misrepresented the Safety of Singulair.**

51.     When Singulair was originally approved by the FDA, it had no warnings regarding neuropsychiatric events.

52.     Merck knew that Singulair crosses the blood-brain-barrier from pre-clinical trials, conducted prior to original approval.

53.     Specifically, Merck Defendants misled the FDA with purpose and intent in its original New Drug Application (NDA) 20.829 and 20.830 which were used to obtain FDA approval for Singulair®5mg intravenous dosing. The footnotes to Table 4 of said NDAs state "only trace amounts were detected in the brain" and "radioactivity in all tissues declined with time, and the remaining radioactive equivalents in tissues were very low at 24 hour post dose". However, Table 4 in factdemonstrates the amount of radiolabeled drug in the brain increased over time and when lookedat as a ratio of brain:plasma, 0.041:0.142, **the 24 hour interval the level in the brain is 3.46 times or 346% greater than in the plasma.** Furthermore, from 1 hour post administration to the 24 hour interval the radioactive level of drug in the **plasma decreased by 96.64%,** whereas the radioactive level of drug in the **brain increased by 21.36% if you are just looking at volume in each specific tissue and not a ratio of brain: plasma.** Despite this data being statistically significant, Merck Defendants neglected to study the effects on the brain in clinical trials and misled

---

[23] *Id* at 6.

[24] See 5. Sapolsky R. M., "Glucocorticoids and hippocampal atrophy in neuropsychiatric disorders," *Arch Gen Psychiatry.* 2000;57:925–935. Doi: 10.1001/archpsyc.57.10.925.

1   the FDA in the way they reported their data.[25]

2       54.    Two years before it was permitted to sell Singulair® in the United States, Defendant

3   Merck obtained a patent for montelukast. In the patent application, ***DefendantMerck claimed that***

4   ***montelukast is "useful in treating …cerebral spasm,"[26]*** admitting that at least by 1996, Merck

5   Defendants knew montelukast could affect the brain. Nonetheless, the Singulair® label from the

6   day Merck Defendants began sales in 1998 contained no warning of Singulair®'s possible effect on

7   the brain, let alone of neuropsychiatric events.

8       55.    Two and a half years after approval, on August 2, 2001, the "Post-Marketing

9   Experience" section of Singulair's label was changed to state that "dream abnormalities and

10  hallucinations, drowsiness, irritability, agitation including aggressive behavior, restlessness [and]

11  insomnia" have been observed.

12      56.    This label change should have occurred earlier through the Changes Being Effected

13  ("CBE") Process. Merck had Newly Acquired Information ("NAI"), which would have permitted

14  Merck to make this label change under the CBE.

15      57.    Specifically, Merck should have conducted new analysis of clinical and preclinical

16  testing data. The NAI would have been derived from the new analysis.

17      58.    On June 23, 2004, the term "insomnia" was changed to "trouble sleeping." Merck

18  made this change using the "Changes Being Effected" process.

19      59.    Just five days after Merck changed "insomnia" to "trouble sleeping," Merck

20  overhauled Singulair's label using CBE.

21      60.    "Psychomotor hyperactivity" was added to the overdose section of the label on June

22  27, 2005.

23      61.    The 2005 revision should have been made earlier through the CBE process through

24  reanalysis of existing preclinical and clinical data.

25

---

26  [25] Merck, "Table 4: Radioactive Equivalents ("ug/g or ug/ml) of 1[14]C|Montelukast in the Tissues of Rats Receiving 5 mg/kg i.v. (Mean ± SD; n=3) [Sponsors Table 17 Ref. G-1 Vol. 29 pp. G-65]" [brackets original], *NDA 20.829 and*

27  *20.830*, 13.

28  [26] U.S. Patent No. 5,565,473

62.   Through the CBE process, Merck added the term "suicide" and replaced "psychomotor hyperactivity" with the "anxiousness" in the "Post-Marketing Experience" subsection of the Package Insert and the "Less Common Side Effects" section of the patient package insert.

63.   The NAI information that enabled Merck to add the term "suicide" on information and belief, would have also enabled Merck to add the term "suicidality," which should have been added and explained.

64.   This should have triggered Merck to engage in reanalysis of the data already submitted to the FDA or conduct additional tests to determine the extent of the dangers of neuropsychiatric injuries.  Upon information and belief, Merck did not conduct a reanalysis or additional testing.

65.   When Merck added the terms "suicide" and "anxiousness" through the CBE, Merck should have made the warnings regarding those injuries stronger.

66.   On August 19, 2009, FDA approved revisions to the PRECAUTIONS and ADVERSE REACTIONS sections of the label.

67.   These revisions should have been made earlier and when made should have been more pronounced based on information Merck knew or should have known from reanalysis of preclinical and clinical trials.

68.   These revisions should have been more strongly worded based on the increasing body of publicly available scientific literature regarding montelukast.

69.   These revisions should have been more strongly worded based on post-marketing surveillance information available to the Merck Defendants.

70.   Merck used the CBE to add the term "disorientation" to the "Warnings, Precautions and Adverse Events" section of the label on April 14, 2010.

71.   Again, using CBE Merck added the term "tic" to the "Post-Marketing Experience" and "Neuropsychiatric Events" sections of the Prescribing Information.  On the same date, using the CBE, Merck added "uncontrolled muscle movements" to the Patient Information Leaflet.

72.   These revisions should have been more strongly worded, more pronounced, and

1  should have been made sooner based on all the "newly acquired information" available to Merck,
2  including but not limited to reanalysis of clinical and preclinical studies, publicly available
3  articles, and post-marketing information.

4      73.    In June 2018, through CBE, Merck added the term "obsessive-compulsive
5  symptoms" to several sections of the label.

6      74.    On information and belief, using the CBE process, Merck should have strengthened
7  all of the neuropsychiatric warnings, including those involving obsessive-compulsive symptoms
8  prior to that time.

9      75.    "Dysphemia (stuttering)" was added to the Singulair label on February 13, 2019,
10 through CBE.

11     76.    In November 2017, several patient advisory groups petitioned the FDA to strengthen
12 Singulair's warnings with regard to neuropsychiatric events.

13     77.    On September 27, 2019, the Pediatric Advisory Committee and the Drug Safety and
14 Risk Management Advisory Committee of the FDA held a hearing to discuss the patient advisory
15 groups' requests.

16     78.    Following that hearing, the FDA required the Merck defendants to add a black box
17 warning to the Singulair label.

18     79.    Merck Defendants and/or Organon revised the label to include the black box
19 warning.

20     80.    These revisions should have been made much sooner based on adverse event and
21 other post-marketing information as well as reanalsysis of existing studies and scientific literature.

22     81.    All of these revisions should have been made earlier and when made should have
23 been more pronounced and should have included stronger language based on information Merck
24 knew or should have known from reanalysis of preclinical and clinical trials.

25     82.    All of these revisions should have been made earlier and when made should have
26 been more pronounced and should have included stronger language based on information Merck
27 knew or should have known from the increasing body of publicly available articles regarding
28 montelukast.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

83.     All of these revisions should have been made earlier and when made should have been more pronounced and should have included stronger language based on information Merck knew or should have known from post-marketing surveillance information available to the Merck Defendants.

84.     For example, by 2015, over a quarter of the adverse events reported to the FDA included neuropsychiatric adverse events, including serious adverse events, such as homicidal and suicidal ideation, psychosis, and hallucinations, totaling thousands of such reports and over 25% of the total adverse events reported. Furthermore, the United States General Accounting Office has testified before Congress that, "Experts believe that FDA's [Adverse Event Reporting System (AERS) system [only] includes a n estimated 1 to 10 percent of adverse reactions."

85.     Indeed, every year since Singulair®'s launch in 1998, neuropsychiatric adverse event reports involving children two months to 17 years of age have been filed with the FDA in connection with Singulair®. In 1998 alone, 10 neuropsychiatric adverse events involving children were reported. In 1999, an additional 83 adverse events were reported. Sixty-six more children using Singulair® suffered neuropsychiatric adverse events in 2000. By 2020, a total of 3,135 children suffered such events, as reported to the FDA, including242 children under 24  months of age. Furthermore, the United States General Accounting Office has testified before Congress that, "Experts believe that FDA's [Adverse Event Reporting System (AERS) system [only] includes a n estimated 1 to 10 percent of adverse reactions."[27]

86.     Plaintiffs would not have used Singulair if they knew the risks of neuropsychiatric events.

**D. The NDA Holder (aka "Brand") is Responsible for Label Revisions.  The ANDA Holders (aka "Generics") Must Make the Label on Generic Drugs Substantially the Same as the Brand.[28]**

---

[27] Janet Heinrich (Assoc. Dir. Health Fin. And Pub. Health Issues, Health and Human Serv. Div.), "Adverse Drug Events: Substantial Problem but Magnitude Uncertain [GAO/T-HEHS-00-53]," *Testimony: Before the Committee on Health, Education, Labor, and Pensions, U.S. Senate* (United States General Accounting Office:Tues Feb. 1, 2000), 6. Accessed at https://www.gao.gov/new.items/he00053t.pdf.
[28] "Defendants" in this section refer to the Merck Defendants at least until 2020, and thereafter if the Merck

87.     In August 2012, Merck's United States patent expired for Singulair. Immediately thereafter, the FDA approved a number of generic forms of Singulair for sale in the United States. Notwithstanding the availability of generic forms of Singulair Merck has continued to manufacture, distribute, and market Singulair in its brand-named form throughout the United States, including in California.

88.     As the brand-name manufacturer of Singulair, Defendants had and have a duty to maintain the accuracy and adequacy of the label for Singulair for as long as the drug is on the market. As the brand-name manufacturer of Singulair, Defendants were not only in the best position to warn of Singulair's harmful effects, but were also the only manufacturers with the unilateral authority under federal law to issue such a warning.

89.     Generic manufacturers for the bioequivalent of Singulair have only the duty to ensure their labels for generic bioequivalent to Singulair are the same as the label used by the brand name manufacturer, here, Defendants. Indeed, such sameness is required. As such, Defendants exercised complete control over the contents of the generic drug label attached to any generic Singulair Plaintiffs may have used.

90.     As a result, Defendants knew that any deficiencies in the label for Singulair would be perpetuated in the label of its generic bioequivalent. Accordingly, it is foreseeable that the warnings included or omitted on the brand-name drug label would influence dispensing of the generic drug.

91.     As the brand name manufacturer of Singulair, Defendants had and have a duty to update its warning label "as soon as there is a reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved." 21 C.F.R. § 201.80(e).

92.     As the brand name manufacturer of Singulair, Defendants could have, at any time, unilaterally updated the Singulair label without waiting for FDA preapproval in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction" under the "changes being effected" regulation. 21 C.F.R. § 314.70(c)(6)(iii)(A). As the brand name manufacturer of Singulair,

---

Defendants continued to hold the NDA.  If the NDA was transferred to Organon in 2020, these allegations apply to the Merck Defendants up to the time of transfer and to Organon thereafter.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  a part of Defendants' business was to give information about Singulair to the public and medical

2  community upon which the safety of patients like Plaintiffs, depend.

3      93.     Insurance is available to a brand name manufacturer, like Defendants, to insure

4  against· liability arising from their failure to· adequate warn of the risks associated with

5  Singulair/Montelukast that Defendants knew or reasonably should have known.

6                          **TOLLING STATUTES OF LIMITATIONS**

7                              **Discovery-Rule Tolling**

8      94.     Within the period of any applicable statute of limitations, Plaintiffs could not have

9  discovered through the exercise of reasonable diligence that Singulair® caused a significantly

10  increased risk of adverse neuropsychiatric events.

11      95.     Plaintiffs did not discover, and did not know of, facts that would have caused a

12  reasonable person to suspect that his injuries were caused by Defendants' concealment and

13  suppression of the fact that individuals who ingested Singulair® were at significantly increased risk

14  of developing neuropsychiatric events.

15      96.     Plaintiffs could not have reasonably discovered the true extent of Defendants'

16  deception or suppression about Singulair®'s safety until the FDA required the Boxed Warning about

17  the serious mental health side effects for Singulair® and the advisement on the restriction of use of

18  Singulair®.

19      97. ·    For these reasons, all applicable statutes of limitations have been tolled byoperation

20  of the discovery rule.

21  **A. Estoppel**

22      98. · Defendants were under a continuous duty to adequately disclose to and inform

23  Plaintiffs of the risk of developing neuropsychiatric events with Singulair®.

24      99.     Defendants knowingly, affirmatively, and actively concealed, suppressed, ignored,

25  or recklessly disregarded the true risks ·of developing neuropsychiatric events associated with

26  Singulair® and never updated the drug's label to adequately disclose this risk.

27      100.    Based on the. foregoing, Defendants are estopped from relying on any statutes of

28  limitations in defense of this action.

**B. Continuing Tort**

101.   The continuing tort doctrine applies when there is a repeated or continuous injury and the tort is not completed until the last injury is inflicted or the wrongdoing ceases. In cases of continuing torts, the statutes of limitations do not begin to run until the date of the last tortious act.

102.   Plaintiffs used Singulair® over extended periods. Each time Plaintiffs ingested Singulair®, it constituted a continuing tort.

103.   The time period associated with Plaintiffs' statute of limitations did not begin to run until, at the earliest, Plaintiffs' last use of Singulair®.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## STRICT LIABILITY - DESIGN DEFECT

## (Against Merck Defendants and DOES 1-10, Inclusive)

104.   Plaintiffs incorporate by reference each preceding and succeeding paragraphs as though set forth fully at length herein.

105.   At all times relevant, Defendants tested, developed, designed, labeled, manufactured, marketed, sold, distributed, advertised, and promoted Singulair®.

106.   Singulair® is defective because it causes neuropsychiatric events.  The risk of neuropsychiatric events from Singulair® ingestion, including but not limited to (a) agitation, aggressive behavior, or hostility; (b) attention problems; (c) bad or vividdreams; (d) depression; (e) disorientation or confusion; (f) feeling anxious; (g) hallucinations (seeing or hearing things that are not really there); (h) irritability; (i) memory problems; (j) obsessive-compulsive symptoms; (k) restlessness; (l) somnambulance (sleepwalking); (m) stuttering; (n) suicidal thoughts (suicidality) and actions; (o) tremor or shakiness; (p) trouble sleeping; and (q) uncontrolled muscle movements (tics) were actually known to and foreseeableto Merk Defendants at all times during the period which they manufactured and sold Singulair®.

107.   The risks of neuropsychiatric injuries posed by Singulair® were reasonably foreseeable to Defendants.

108.   The Singulair® used by Plaintiffs was defectively designed in that (1) its risks

1  outweighed its utility, and (2) safer, feasible alternative designs are and were at all times available.

2  These safer alternative designs include (a) modifying montelukast itself to make it less likely to pass

3  the BBB, (b) modifying Singulair® without modifying montelukast to make it less likely that

4  montelukast would pass the BBB, (c) modifying Singulair®'s dosing regimen to enable prescribers

5  to prescribe the lowest therapeutic dose, (d) modifying Singulair®'s instructions to enable

6  prescribers to prescribe the lowest therapeutic dose, and instruct patients to take Singulair® when it

7  is less likely to cross the BBB.

8       109.   As further described above, the scientific community expressed concern about

9  the propensity of montelukast to cause an increased risk of neuropsychiatric events when ingested.

10  From the time of Singulair®'s launch until the present day, various scientific literature, as further

11  discussed above, has expressed concerns about an increased risk of adverseneuropsychiatric events

12  in patients who ingest Singulair® (montelukast). Plaintiffs were unaware of this scientific literature,

13  but Defendants were aware of it.

14       110.   The risk of Singulair® outweighs its benefits.

15       111.   Specifically, the benefit of Singulair® is, at best, the treatment and/or prevention of

16  asthma and hay fever symptoms.  This benefit is significantly outweighed by the risks posed by

17  Singulair®--the risk of permanent neuropsychiatric effects, and possibly even death.

18       112.   Plaintiffs and Plaintiffs', prescribers had many alternatives, including other

19  leukotriene receptor antagonists, inhaled corticosteroids, antihistamines, and a host of other

20  pharmaceutical and non-pharmaceutical options to Singulair®.  No reasonable consumer would

21  select, from a slew of equally effective, or possibly more effective products, the one that causes

22  neuropsychiatric effects.

23       113.   Additionally or in the alternative, there are feasible alternative designs to Singulair®.

24       114.   Singulair® is and at all times was defective, unreasonably dangerous, and unsafefor

25  its intended purpose because, when ingested, it causes an increased risk of adverse neuropsychiatric

26  events.

27       115.   The risks of Singulair® causing neuropsychiatric injuries exist in part because

28  montelukast crosses the blood-brain-barrier.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

116.    Defendants could have modified Singulair® in such a manner that it would not pass the blood-brain-barrier unabated.

117.    They could have done this by changing the chemical montelukast itself.

118.    Defendants had options, like modifying montelukast to be less lipid-soluble or modification of the hydrogen bonds to make passing the BBB more difficult.

119.    This alternative design is feasible.  Any of the three occasions when Merck Defendants requested approval of a new NDA, they could have presented this alternative to FDA.

120.    Defendants also had options to modify Singulair® without modifying montelukast.

121.    For example, Defendants could have added a faster acting anti-inflammatory to make the BBB less permeable, or could have made an extended release tablet to decrease the amount of montelukast assaulting the BBB at any one time.

122.    This alternative is feasible.  Many drugs include two otherwise approved active ingredients, one of which is frequently anti-inflammatory.  Further, the capsules of approved drugs are often designed for extended release.

123.    Additionally, the dosing regimen of Singulair® was defectively designed.

124.    Defendants could have created dosing options that would have allowed prescribers to prescribe the lowest therapeutic dose, but did not do so.

125.    Singulair® is available in three "sizes": 4mg, 5mg, and 10mg.  In other words, Merck's testing revealed that there is some significant difference in as small as one mg increments, yet it did not provide a one mg option.  Even though Merck is aware of some significant difference in adding just one mg to a patient's dose (as in increasing from 4mg to 5mg), Merck made it impossible for a prescriber to increase a patient's dosage by just one mg in most circumstances.  For example, if a prescriber wants to increase a dose from 5mg, the prescriber must double the dose to 10mg.

126.    Simply creating additional dosing options is a feasible alternative design, as evidenced by the fact that Merck already created three doses.  There is no reason to believe a fourth dosing option would be infeasible.

127.    Furthermore, the instructions to prescribers were designed deficiently.

128.    For example, Merck instructed prescribers to consider only a person's age when determining dosage, disregarding entirely weight, stage of development, severity of symptoms, and any other consideration.

129.    Instructing prescribers to consider severity of symptoms and weight is the norm. It is feasible for Singulair®'s dosing regimen to fit the norm.

130.    By way of another example, Merck also instructs prescribers to have patients ingest Singulair® before bed, even though the BBB is more susceptible when a person is sleeping.

131.    Modifying instructions is feasible.

132.    Thus, at the time Singulair® left Defendants' control, there were practical, technically feasible, and safer alternative designs, that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' medications for asthma and allergic rhinitis.

133.    Defendants' omission of any alternative designs renders Singulair® not reasonably safe.

134.    Singulair®'s design defects existed at the time Singulair® left Defendants' possession and control.

135.    Singulair® reached the intended consumers, handlers, and users throughout the United States, including Plaintiffs, without substantial change in its condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

136.    Plaintiffs ingested Singulair® for an approved purpose and experienced neuropsychiatric injuries as a result.

137.    Plaintiffs ingested Singulair® without adequate knowledge of Singulair®'s dangerous characteristics.

138.    At all times relevant, Plaintiffs used Singulair® in an intended or reasonably foreseeable manner without knowledge of Singulair®'s dangerous characteristics.

139.    Plaintiffs could not have reasonably discovered the defects and risks associated with Singulair® or montelukast-containing products before or at the time of ingestion and useas a result of Defendants' suppression of, failure to obtain, or failure to provide scientific information linking

1 | montelukast to neuropsychiatric events.

2 |     140.   The defects in Singulair® were substantial and contributing factors in causing

3 | Plaintiffs' injuries, harms, losses, and damages and, but for Defendants' misconduct and omissions,

4 | Plaintiffs would not have sustained injuries, harms, losses, and damages.

5 |     141.  Had Plaintiffs known of the defects in Singulair®, Plaintiffs would not have taken

6 | Singulair®. Instead, Plaintiffs would have taken a safer alternative to Singulair® that would not

7 | have exposed Plaintiffs to neuropsychiatric events.

8 |     142.   Plaintiffs' injuries, harms, losses, and damages were directly and proximately caused

9 | by Singulair® and Singulair®'s defect while Plaintiffs purchased and used Singulair® in a

10 | reasonably foreseeable manner for which recovery is sought.

11 |     143.   The benefits of Singulair®'s design are outweighed by the design's inherent riskof

12 | danger in causing neuropsychiatric events.

13 |     144.   Defendants knowingly designed Singulair® with the design defect that causes

14 | Singulair® to cause an increased risk of neuropsychiatric events when ingested to maximize profits.

15 |     145.  Defendants are therefore strictly liable for the damages caused to Plaintiffs.

16 | **SECOND CAUSE OF ACTION**

17 | **STRICT LIABILITY - FAILURE TO WARN**

18 | **(Against Merck Defendants, Organon and DOES 1-10, Inclusive)**

19 |     146.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as

20 | though set forth fully at length herein.

21 |     147.   "Defendants" in this cause of action refers to Merck while it held the NDA and if it

22 | did so, to Organon during the period it held the NDA.

23 |     148.   Defendants tested, developed, designed, labeled, manufactured, marketed, sold,

24 | distributed, advertised, and promoted Singulair® during the periods set forth above.

25 |     149.   At all times relevant, Defendants had a duty to properly test, develop, design,

26 | manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide

27 | proper warnings, and take such steps as necessary to ensure Singulair® did not cause users and

28 | consumers to suffer from unreasonable and dangerous risks.

150.    At all times relevant, Defendants had a continuing duty to warn Plaintiffs and Plaintiffs' prescribers of the dangers associated with Singulair® use.

151.    At all times relevant, Defendants could have provided adequate warnings or instructions regarding the full and complete risks of Singulair® and its active ingredient montelukast because Defendants knew or should have known of the unreasonable risks of harm associated with the use of Singulair® and montelukast. Such warnings could have been adequately disclosed in circumstances not limited to Singulair®'s labeling.

152.    At all times relevant, Defendants failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of Singulair® and to those who would foreseeably prescribe, use, or be harmed by Singulair®, including Plaintiffs.

153.    Despite the fact that Defendants knew or should have known that Singulair® posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerousrisks associated with its use. The dangerous propensities of Singulair® and its active ingredient, montelukast, as described above were either known to Defendants or scientifically knowable to Defendants through appropriate research and testing by known methods at the time Defendants distributed, supplied, or sold Singulair® and not adequately known to prescribing healthcare providers and end users and consumers, such as Plaintiffs.

154.    Defendants knew or should have known that Singulair® created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn prescribing healthcare providers and consumers, i.e., the reasonably foreseeable users, of the risks of ingesting Singulair®. Upon information and belief, Defendants wrongfully concealed or suppressed information concerning the dangerous nature of Singulair® and its active ingredient, montelukast, and further made false and/or misleading statements concerning the safety of Singulair® and montelukast.

155.    Singulair® is and at all times was defective and not reasonably fit, suitable, or safe for its intended purpose because Defendants designed Singulair® in a defective manner and failed to give adequate warnings or instructions at the time Singulair® left Defendants' control and after.

156.    Defendants failed to provide adequate warnings of the dangers regarding the factthat

1  Singulair® caused an increased risk of adverse neuropsychiatric events in individuals who ingested
2  Singulair®.

3      157.   Defendants failed to provide adequate warnings of the dangers regarding the fact that
4  Singulair® ingestion increased the risk suffering from neuropsychiatric events, including but not
5  limited to (a) agitation, aggressive behavior, or hostility; (b) attention problems; (c) bad or vivid
6  dreams; (d) depression; (e) disorientation or confusion; (f) feeling anxious; (g) hallucinations
7  (seeing or hearing things that are not really there); (h) irritability; (i) memory problems; (j)
8  obsessive-compulsive symptoms; (k) restlessness; (l) somnambulance (sleepwalking); (m)
9  stuttering; (n) suicidal thoughts (suicidality) and actions; (o) tremor or shakiness; (p) trouble
10  sleeping; and (q) uncontrolled muscle movements (tics).

11      158.   Singulair®'s failure-to-warn defects existed at the time Singulair® left Defendants'
12  control.

13      159.   Defendants distributed Singulair® without sufficient warnings to notify Plaintiffs'
14  prescribers or Plaintiffs of the dangers inherent in ingesting Singulair®.

15      160.   Defendants knew or should have known that most physicians who prescribed
16  Singulair® did not know or fully appreciate the seriousness of the risks associated with Singulair®
17  or montelukast.

18      161.   Plaintiffs ingested Singulair® for an approved purpose and experienced
19  neuropsychiatric events as a result of his Singulair® use.

20      162.   Defendants knew or should have known that the minimal warnings disseminated
21  with Singulair® were inadequate, failed to communicate adequate information on the dangers and
22  safe use of Singulair®, and failed to communicate warnings and instructions that were appropriate
23  and adequate to render the product safe for its ordinary, intended, and reasonably foreseeable uses.

24      163.   Had Plaintiffs or Plaintiffs' physicians known of the defects in Singulair®, Plaintiffs
25  would have been prescribed and would have ingested a safer alternative to Singulair® that would
26  not have exposed him to increased risks of suffering neuropsychiatric events.

27      164.   Plaintiffs ingested Singulair® without knowledge of its dangerous characteristics.

28      165.   Plaintiffs' injuries, harms, losses, and damages were directly and proximately caused

29
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  by Singulair®, including the lack, insufficiency, or adequacy of warning of Singulair®'s
2  unreasonable dangers as set forth above while Plaintiffs used Singulair® in a reasonably foreseeable
3  manner for which recovery is sought.

4      166.    Defendants had a duty to properly warn Plaintiffs and Plaintiffs' physicians of the
5  risks of Singulair® during the time when Plaintiffs' prescriptions were being filled with Defendants'
6  Singulair®. Defendants' breach of this duty proximately caused the injuries described herein.

7      167.    Defendants' misrepresentations proximately caused Plaintiffs' injuries.

8      168.    Defendants are therefore strictly liable for the damages caused to Plaintiffs.

9      169.    Defendants' conduct, as described above, is also oppressive and malicious.
10  Defendants regularly risked the health and lives of consumers and users of Singulair®, including
11  Plaintiffs, with knowledge of Singulair®'s dangers. Defendants have made conscious decisions not
12  to voluntarily sell Singulair without re-design, re-labeling, adequately warning, or adequately informing
13  physicians and the public, including Plaintiffs of the increased risk of developing neuropsychiatric
14  events when ingesting Singulair®. Defendants are guilty of oppression, in that their conscious
15  disregard for Plaintiffs' rights subjected Plaintiffs to cruel and unjust hardship of suffering
16  neuropsychiatric injury, as described above. Further, Defendants are guilty of malice because their
17  despicable conduct was willful or done with conscious disregard of the rights and safety of
18  consumers, including Plaintiffs. Defendants' misconduct therefore warrants an award of exemplary
19  damages.

THIRD CAUSE OF ACTION
NEGLIGENCE
(Against Merck Defendants, Organon and DOES 1-10, Inclusive)

23      170.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as
24  though set forth fully at length herein.

25      171.    "Defendants" in this cause of action refers to Merck while it held the NDA and if it
26  did so, to Organon during the period it held the NDA.

27      172.    At all times relevant, Defendants had a duty to exercise reasonable care in the
28  design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and

30

1  distribution of Singulair®, including the duty to take all reasonable steps necessary to manufacture,

2  promote, advertise, and/or sell a medication that was not unreasonably dangerous to consumers and

3  users of the medication.

4          173.   At all times relevant, Defendants had a duty to exercise reasonable care in the

5  marketing, advertisement, and sale of Singulair®. Defendants' duty of care owed to consumers and

6  the general public included providing accurate, true, and correct information concerning the risks of

7  using Singulair® and appropriate, complete, adequate, and accurate warnings concerning the

8  potential adverse effects of ingestion of Singulair® and its active ingredient, montelukast.

9          174.   At all times relevant, Defendants knew or, in the exercise of reasonable care, should

10 have known of the hazards and dangers of Singulair® and specifically its increased risk of

11 neuropsychiatric events when ingested.

12         175.   Accordingly, at all times relevant, Defendants knew or, in the exercise of reasonable

13 care, should have known that use of Singulair® could cause or be associated with Plaintiffs' injuries,

14 and thus, created a dangerous and unreasonable risk of injury to the users of Singulair®, including

15 Plaintiffs.

16         176.   Defendants also knew or, in the exercise of reasonable care, should have known that

17 users and consumers of Singulair® and their prescribing physicians and healthcare providers were

18 unaware of or did not know or fully appreciate the seriousness and magnitude of the risks associated

19 with use of Singulair® and montelukast.

20         177.   Defendants breached their duty of reasonable care and failed to exercise ordinary

21 care in the design, research, development, manufacture, testing, marketing, supply, promotion,

22 advertisement, packaging, sale, and distribution of Singulair®  in that  Defendants manufactured

23 but and produced a medication containing montelukast, knew or had reason to know of the defects

24 inherent in Singulair® or had reason to know that a user's or consumer's ingestion of Singulair®

25 created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or

26 adequately warn of these risks and injuries.

27         178.   Defendants were negligent in their promotion of Singulair® by failing to adequately

28 disclose material risk information as part of their promotion and marketing of Singulair®, including

1    the internet, television, and print advertisements. Nothing preventedDefendants from being honest

2    in their promotional activities, and in fact, Defendants had a dutyto disclose the truth about the risks

3    associated with Singulair® in their promotional efforts outside of the of the context of labeling.

4         179.    Defendants had and have the ability and means to investigate, study, and test their

5    products and to provide adequate warnings, and Defendants failed to do so. Upon information and

6    belief, Defendants have wrongfully concealed information and have further made false and/or

7    misleading statements concerning the safety of Singulair® and montelukast.

8         180.    Defendants' negligence included:

9

10             a)  Manufacturing, producing, promoting, formulating, creating, developing,

11                 designing, selling, advertising, and/or distributing Singulair® without

12                 thorough and adequate pre- and post-market testing;

13             b)  Manufacturing, producing, promoting, formulating, creating, developing,

14                 designing, selling, advertising, and/or distributing Singulair® while

15                 negligently and/or intentionally concealing and failing to disclose the

16                 results of trials, tests, and studies of ingesting Singulair® and specifically

17                 its active ingredient, montelukast, and, consequently, the risk of serious

18                 harm associated with ingestion of Singulair®;

19             c)  Failing to undertake sufficient studies and conduct necessary tests to

20                 determine whether Singulair® was safe for its intended use;

21             d)  Failing to use reasonable and prudent care in the design, research,

22                 manufacture, and development of Singulair® so as to avoid the risk of

23                 serious harm associated with the ingestion of Singulair®;

24             e)  Failing to design and manufacture Singulair® so as to ensure it was at

25                 least as safe and effective as other medications on the market treating the

26                 same and/or similar conditions;

27             f)  Failing to provide adequate instructions, guidelines, and safety

28                 precautions to those persons Defendants could reasonably foresee would

prescribe and use Singulair®;

g) Failing to adequately disclose to Plaintiffs, Plaintiffs' physicians, users/consumers, and the general public that use and ingestion of Singulair® presented severe risks of developing neuropsychiatric events;

h) Failing to adequately warn Plaintiffs, Plaintiffs' physicians, users/consumers, and the general public that Singulair®'s risk of harm was unreasonable and that there were safer and effective alternative medications available to Plaintiffs, prescribing physicians, and other consumers and Systematically suppressing or ignoring contrary evidence about the risks, incidence, and prevalence of the side effects of Singulair® and montelukast- containing medications;

i) Representing that Singulair® was safe for its intended use when, in fact, Defendants knew or should have known that Singulair® was not safe or presented serious risks when used for its intended purpose;

j) Declining to make or propose any changes to Singulair®'s labeling or other promotional materials that would alert consumers, physicians, and the general public of the seriousness and magnitude of the risks of ingesting Singulair® and its active ingredient, montelukast;

k) Advertising, marketing, and recommending the use of Singulair® while concealing or failing to adequately disclose or warn of the dangers known by Defendants to be associated with or caused by the use of Singulair® and montelukast;

l) Continuing to disseminate information to consumers and physicians that indicates or implies that Singulair® is safe for use; and

m) Continuing the manufacture and sale of Singulair® with the knowledge that it was unreasonably unsafe and dangerous.

181.    Defendants knew and/or should have known that it was foreseeable that individuals such as Plaintiffs would suffer injuries as a result of Defendants' failure to exercise ordinary and

1    reasonable care in the manufacturing, marketing, labeling, distribution, and sale of Singulair®.

2        182.    Plaintiffs and Plaintiffs' prescribers did not know the nature and extent of the injuries

3    that could result from the intended use of Singulair® or its active ingredient, montelukast. Absent

4    Defendants' negligence, Plaintiffs would not have developed neuropsychiatric events.

5        183.    As a direct and proximate result of Defendants placing Singulair® into the stream of

6    commerce, Plaintiffs suffered injuries, harms, losses, and damages.

7        184.    Defendants are therefore liable for Plaintiffs' damages arising from Defendants'

8    negligence.

9        185.    Defendants' conduct, as described above, was not only negligent but it was also

10    oppressive and malicious. Defendants regularly risked the health and lives of consumers and users

11    of Singulair®, including Plaintiffs, with knowledge of Singulair®'s dangers. Defendants have made

12    conscious decisions not to voluntarily re-design, re-label, adequately warn, or adequately inform

13    physicians and the public, including Plaintiffs of the increased risk of developing neuropsychiatric

14    events when ingesting Singulair®. Defendants are guilty of oppression, in that their conscious

15    disregard for Plaintiffs' rights subjected Plaintiffs to cruel and unjust hardship of suffering

16    neuropsychiatric injury, as described above. Further, Defendants are guilty of malice because their

17    despicable conduct was willful or done with conscious disregard of the rights and safety of

18    consumers, including Plaintiffs. Defendants' misconduct therefore warrants an award of exemplary

19    damages.

20                             **FOURTH CAUSE OF ACTION**

21                       **NEGLIGENCE MISREPRESENTATION**

22          **(Against Merck Defendants, Organon and DOES 1-10, Inclusive)**

23        186.    Plaintiffs incorporate by reference each preceding and succeeding paragraphs as

24    though set forth fully at length herein.

25        187.    "Defendants" in this cause of action refers to Merck while it held the NDA and if it

26    did so, to Organon during the period it held the NDA.

27        188.    At all relevant times, Defendants designed, manufactured, tested (or not), packaged,

28    labeled, marketed, advertised, promoted, supplied, distributed, sold, and/or otherwise placed

1 Singulair/montelukast into the stream of commerce, and therefore owed a duty of reasonable care

2 to avoid causing harm to those that consumed Singulair/montelukast, such as Plaintiffs.

3      189.   Defendants were negligent, reckless, and careless and owed a duty to Plaintiffs to

4 make accurate and truthful representations regarding Singulair/montelukast, Defendants breached

5 their duty, thereby causing Plaintiffs to suffer harm.

6      190.   Defendants represented to Plaintiffs, their physicians, and their prescribers via the

7 media, advertising, website, social media, packaging, and promotions, among other

8 misrepresentations described herein that Singular/montelukast was both safe and effective;

9 consumption of Singulair/montelukast would not result in neuropsychiatric side effects; and

10 Singulair/montelukast was safe for their intended use when, in fact, Defendants knew or should have

11 known the product was not safe for its intended purpose.

12      191.   These representations were false. Because Singulair/montelukast crosses the blood-

13 brain-barrier, it can and does cause negative neuropsychiatric events. The side effects were so

14 significant that the FDA required a Black Box warning on Singulair.

15      192.   Defendants knew or should have known these representations were false and

16 negligently made them without regard for their truth. Defendants had a duty to accurately provide

17 this information to Plaintiffs. In concealing this information from Plaintiffs, Defendants breached

18 their duty. Defendants also gained financially from and as a result of their breach.

19      193.   Defendants intended for Plaintiffs, their physicians, and their prescribers to rely on

20 these representations.

21      194.   Each of these misrepresentations were material at the time they were made. In

22 particular, each of the misrepresentations concerned material facts that were essential to the analysis

23 undertaken by Plaintiffs as to whether to purchase or consume Singulair/montelukast.

24      195.   Plaintiffs, their physicians, and their prescriber reasonably relied on these

25 representations and were harmed as described herein. Plaintiffs' reliance on Defendants'

26 representation was a substantial factor in causing Plaintiffs' harms. Had Defendants told Plaintiffs

27 the truth about the safety and composition of Singulair/montelukast, Plaintiffs would not have

28 consumed or purchased them.

1    196.    Defendants' acts and omissions as described herein were committed in reckless

2    disregard of Plaintiffs' rights, interests, and well-being to enrich Defendants.

3    197.    Plaintiffs was injured as a direct and proximate result of Defendants' negligent

4    misrepresentations regarding Singulair/montelukast as described herein. These injuries were, or

5    should have been, reasonably foreseeable to Defendants.

6    198.    Defendants are therefore liable for Plaintiffs' damages arising from Defendants'

7    misrepresentations.

8    ### FIFTH CAUSE OF ACTION

9    ### BREACH OF EXPRESS WARRANTY

10   **(Against Merck Defendants, Organon and DOES 1-10, Inclusive)**

11   199.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as

12   though set forth fully at length herein.

13   200.    "Defendants" in this cause of action refers to Merck while it held the NDA and if it

14   did so, to Organon during the period it held the NDA.

15   201.    At all relevant times, Defendants engaged in the business of testing, developing,

16   designing, manufacturing, marketing, selling, distributing, and promoting Singulair®, which is

17   defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing

18   Singulair® into the stream of commerce.

19   202.    Defendants had a duty to exercise reasonable care in the research, development,

20   design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion,

21   sale, and release of Singulair®, including a duty to:

22        a.    ensure that its products did not cause the user unreasonably dangerous side
23              effects;

24        b.    adequately warn of dangerous and potentially fatal side effects; and,

25        c.    adequately disclose adverse material facts, such as the true risks associated
26              with the use of Singulair®, when making representations to consumers and the
27              general public, including Plaintiffs.

28   203.    The ability of Defendants to properly disclose those risks associated with Singulair®

is not limited to representations made on the labeling.

204.    At all relevant times, Defendants expressly represented and warranted to the purchasers of their products, by and through statements made by Defendants in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Singulair® was safe to human health, effective, fit, and proper for its intended use. Defendants advertised, labeled, marketed, and promoted Singulair® representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Singulair® would conform to the representations.

205.    These express representations include incomplete or inadequate warnings and instructions that purport, but fail, to adequately include the complete array of risks associated with use of Singulair®. Defendants knew and/or should have known that the risks expressly included in Singulair® warnings and labels did not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendants expressly represented that Singulair® products were safe and effective, that they were safe and effective for use by individuals such as Plaintiffs, and/or that they were safe and effective as a medication.

206.    The representations about Singulair®, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

207.    Defendants placed Singulair® into the stream of commerce for sale and recommended its use to consumers and the public without adequately warning of the true risks of developing the injuries associated with the use of Singulair®.

208.    Defendants breached these warranties because, among other things, Singulair® was defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with its use, and were not merchantable or safe for its intended, ordinary, and foreseeable use and purpose. Specifically, Defendants breached the warranties in the following ways:

      i.    Defendants represented through their labeling, advertising, and

1    marketing materials that Singulair® was safe, and intentionally or negligently withheld and

2    concealed information about the risks of serious injury associated with use of Singulair® and by

3    expressly limiting or ignoring the risks associated with use within its warnings and labels; and

4                                ii.      Defendants represented that Singulair® was safe for use and

5    intentionally or negligently concealed information that demonstrated that use of Singulair®

6    created an increased risk of developing and causing NSEs, and that Singulair®, therefore, was not

7    safer than alternatives available on the market.

8         209.    Plaintiffs detrimentally relied on the express warranties and representations of

9    Defendants concerning the safety and/or risk profile of Singulair® in deciding to purchase and

10   obtain the product. Plaintiffs reasonably relied upon Defendants to accurately and adequately

11   disclose known defects, risks, dangers, and side effects of Singulair®. Plaintiffs would not have

12   purchased or used Singulair® had Defendants properly disclosed the risks associated with the

13   product, either through advertising, labeling, or any other form of disclosure.

14        210.    Defendants had sole access to material facts concerning the nature of the risks

15   associated with Singulair®, as expressly stated within Singulair® warnings and labels, and knew

16   that consumers and users such as Plaintiffs could not have reasonably discovered that the risks

17   expressly included in Singulair® warnings and labels were inadequate and inaccurate.

18        211.    Plaintiffs had no knowledge of the falsity, incompleteness, or inadequacy of

19   Defendants' statements and representations concerning Singulair®.

20        212.    Plaintiffs used Singulair® as researched, developed, designed, tested, manufactured,

21   inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the

22   stream of commerce by Defendants.

23        213.    Had the warnings, labels, advertisements, or promotional material for Singulair®

24   accurately and adequately set forth the true risks associated with the use of Singulair®, Plaintiffs'

25   injuries, rather than expressly excluding such information and warranting that the product was safe

26   for its intended use, Plaintiffs could have avoided the injuries, harms, losses, and damages

27   complained of herein.

28        214.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiffs

1 have sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum
2 of this Court.

3     215.   As a proximate result of Defendants' breach of express warranty, as alleged herein,
4 there was a measurable and significant interval of time during which Plaintiffs suffered great mental
5 anguish and other personal injury harms, losses, and damages.

6     216.   As a proximate result of Defendants' breach of express warranty, as alleged herein,
7 Plaintiffs sustained a loss of income and/or loss of earning capacity and/or other damages.

8     217.   Defendants are therefore liable for Plaintiffs' damages arising from Defendants'
9 breach of warranty.

10                          **SIXTH CAUSE OF ACTION**

11                       **BREACH OF IMPLIED WARRANTY**

12         **(Against Merck Defendants, Organon and DOES 1-10, Inclusive)**

13     218.   Plaintiffs incorporate by reference each preceding and succeeding paragraph as
14 though set forth fully at length herein.

15     219.   "Defendants" in this cause of action refers to Merck while it held the NDA and if it
16 did so, to Organon during the period it held the NDA.

17     220.   At all relevant times, Defendants engaged in the business of testing, developing,
18 designing, manufacturing, marketing, selling, distributing, and promoting Singulair®, which was
19 and is defective and unreasonably dangerous to consumers, including Plaintiffs, thereby placing
20 Singulair® into the stream of commerce.

21     221.   Before the time Plaintiffs purchased Singulair®, Defendants impliedly warranted to
22 its consumers, including Plaintiffs, that Singulair® was of merchantable quality and safe and fit
23 for the use for which it was intended; specifically, as a medication.

24     222.   Defendants failed to adequately disclose that Singulair® has dangerous
25 propensities when used as intended and that use of Singulair® carries an increased risk of
26 developing severe injuries, including Plaintiffs' injuries.

27     223.   Plaintiffs were some of the intended beneficiaries of the implied warranties made
28 by Defendants to purchasers of Singulair®.

1     224.   Defendants expected Singulair® to reach, and Singulair® did in fact reach,

2  consumers and users, including Plaintiffs, without substantial change in the condition in which it

3  was manufactured and sold by Defendants.

4     225.   At all relevant times, Defendants were aware that consumers and users of their

5  products, including Plaintiffs, would use Singulair® as marketed by Defendants, which is to say

6  that Plaintiffs were foreseeable users and purchasers of Singulair®.

7     226.   Defendants intended that Singulair® be used in the manner in which Plaintiffs, in

8  fact, used it and which Defendants impliedly warranted to be of merchantable quality, safe, and fit

9  for this use, even though Singulair® was not adequately tested or researched.

10    227.   In reliance upon Defendants' implied warranty, Plaintiffs purchased and used

11  Singulair® as instructed and labeled and in the foreseeable manner intended, recommended,

12  promoted, and marketed by Defendants.

13    228.   Plaintiffs could not have reasonably or adequately discovered or known of the risks

14  of serious injury associated with Singulair®.

15    229.   Defendants breached their implied warranty to Plaintiffs in that Singulair® was not

16  of merchantable quality, safe, or fit for its intended use, or adequately tested. Singulair® has

17  dangerous propensities when used as intended and can cause serious injuries, including those

18  injuries complained of herein.

19    230.   The harm caused by Singulair® far outweighed its benefit, rendering the product

20  more dangerous than an ordinary consumer or user would expect and more dangerous than

21  alternative products.

22    231.   As a direct and proximate result of Defendants' breach of implied warranty,

23  Plaintiffs have sustained pecuniary loss and general damages in sums exceeding the jurisdictional

24  minimum of this Court.

25    232.   As a proximate result of the Defendants' breach of implied warranty, as alleged

26  herein, there was a measurable and significant interval of time during which Plaintiffs suffered

27  great mental anguish and other personal injury and damages.

28    233.   As a proximate result of Defendants' breach of implied warranty, as alleged herein,

1  Plaintiffs sustained a loss of income and/or loss of earning capacity and/or other damages.

2      234.    Defendants are therefore liable for Plaintiffs' damages arising from Defendants'

3  breach of warranty.

4                          **RELIEF REQUESTED**

5      WHEREFORE, PLAINTIFFS prays for judgment against Defendants, and each of them,

6  as follows:

7      1.    Past and future general damages, the exact amount of which has yet to be

8            ascertained, in an amount which will conform to proof at time of trial;

9      2.    Past and future economic and special damages according to proof at the time of

10           trial;

11     3.    Loss of earnings and impaired earning capacity according to proof at the time of

12           trial;

13     4.    Medical expenses, past and future, according to proof at the time of trial;

14     5.    Punitive or exemplary damages according to proof at the time of trial;

15     6.    Attorney's fees, as allowable by law;

16     7.    For costs of suit incurred herein;

17     8.    For pre-judgment interest as provided by law; and

18     9.    For such other and further relief as the Court may deem just and proper.

19

20

21

22

23

24

25

26

27

28

1

2

3  DATED:  March 3, 2022

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

BOUCHER LLP


By: _____
SHEHNAZ M. BHUJWALA

WILENTZ, GOLDMAN & SPITZER
KEVIN P. RODDY

BECK LAW CENTER
KIMBERLY BECK

Attorneys for Plaintiffs

1

**DEMAND FOR JURY TRIAL**

2          PLAINTIFFS hereby demand a trial by jury as to all claims and issues in this action that

3    are so triable.

4                                                        Respectfully submitted,

5                                                        BOUCHER LLP

6    DATED:  March 3, 2022

7

8                                           By:    _____

9                                                        SHEHNAZ M. BHUJWALA

10                                                      WILENTZ, GOLDMAN & SPITZER
                                                         KEVIN P. RODDY
11

12                                                      BECK LAW CENTER
                                                         KIMBERLY BECK
13

14                                                      Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

| | |
|---|---|
| STREET ADDRESS: | 330 West Broadway |
| MAILING ADDRESS: | 330 West Broadway |
| CITY, STATE, & ZIP CODE: | San Diego, CA 92101-3827 |
| BRANCH NAME: | Central |

FOR COURT USE ONLY

PLAINTIFF(S):   Spencer Bueno et.al.

DEFENDANT(S):  MERCK & CO INC et.al.

SHORT TITLE:   BUENO VS MERCK & CO INC [E-FILE]

| **STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR)** | CASE NUMBER: 37-2022-00008253-CU-PL-CTL |
|---|---|

Judge: Eddie C Sturgeon                                           Department: C-67

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution (ADR) process.  Selection of any of these options will not delay any case management timelines.

☐ Mediation (court-connected)                    ☐ Non-binding private arbitration

☐ Mediation (private)                                   ☐ Binding private arbitration

☐ Voluntary settlement conference (private)    ☐ Non-binding judicial arbitration (discovery until 15 days before trial)

☐ Neutral evaluation (private)                       ☐ Non-binding judicial arbitration (discovery until 30 days before trial)

☐ Other (specify e.g., private mini-trial, private judge, etc.): _____

_____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

_____

_____

Alternate neutral (for court Civil Mediation Program and arbitration only): _____

Date: _____                    Date: _____

_____             _____
Name of Plaintiff                                                    Name of Defendant

_____             _____
Signature                                                             Signature

_____             _____
Name of Plaintiff's Attorney                                   Name of Defendant's Attorney

_____             _____
Signature                                                             Signature

If there are more parties and/or attorneys, please attach additional completed and fully executed sheets.

It is the duty of the parties to notify the court of any settlement pursuant to Cal. Rules of Court, rule 3.1385.  Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court.

**IT IS SO ORDERED.**

Dated:  03/04/2022

_____
JUDGE OF THE SUPERIOR COURT



**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**

**ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION**

CASE NUMBER: 37-2022-00008253-CU-PL-CTL          CASE TITLE: BUENO vs MERCK & CO INC [E-FILE]

**NOTICE:** All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:
>       (1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),
>       (2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359), *and*
>       (3) the Notice of Case Assignment form (SDSC form #CIV-721).

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

**Potential Advantages and Disadvantages of ADR**
ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

| Potential Advantages | Potential Disadvantages |
|---|---|
| • Saves time | • May take more time and money if ADR does not resolve the dispute |
| • Saves money | |
| • Gives parties more control over the dispute resolution process and outcome | • Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable |
| • Preserves or improves relationships | |

**Most Common Types of ADR**
You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at http://www.sdcourt.ca.gov/adr.

**Mediation:**  A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:**  A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:**  A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

**Other ADR Processes:** There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute. Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

## Local ADR Programs for Civil Cases

**Mediation:** The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

On-line mediator search and selection: Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005). The Civil Mediation Panel List, the Available Mediator List, individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:** The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that: (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:** The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. Refer to SDSC Local Rules Division II, Chapter III and Code Civ. Proc. § 1141.10 et seq or contact the Arbitration Program Office at (619) 450-7300 for more information.

More information about court-connected ADR: Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:** The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):
* In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
* In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:** To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

## Legal Representation and Advice

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at *www.courtinfo.ca.gov/selfhelp/lowcost*.