1  Lynne M. Kizis, *Pro Hac Vice*
     lkizis@wilentz.com
2  Kevin P. Roddy, CA State Bar No. 128283
     kroddy@wilentz.com
3  WILENTZ, GOLDMAN & SPITZER, P.A.
   90 Woodbridge Center Drive, Suite 900
4  Woodbridge, New Jersey 07095
   Tel: (732) 855-6402
5
6  Kimberly Beck, *Pro Hac Vice*
     kim@becklawcenter.com
7  BECK LAW CENTER
   201 E. 5th Street, Suite 1900
   Cincinnati, Ohio
8  Tel: (888) 434-2912

9  *Attorneys for Plaintiff*

10 Shehnaz M. Bhujwala, CA State Bar No. 223484
     bhujwala@boucher.la.com
11 BOUCHER LLP
   21600 Oxnard Street, Suite 600
12 Woodland Hills, CA 91367-4903
   Telephone: (818) 340-5400
13

14 *Local Counsel for Plaintiff*
15

16               **UNITED STATES DISTRICT COURT**

17               **SOUTHERN DISTRICT OF CALIFORNIA**

18 SPENCER BUENO, an individual,          Case No. 3:22-cv-00522-H-BLM

19                        Plaintiff,      **PLAINTIFF'S OPPOSITION TO
                                          DEFENDANTS' MOTION FOR
20          vs.                           SUMMARY JUDGMENT OR
                                          PARTIAL SUMMARY JUDGMENT
21 MERCK & CO., INC., a New Jersey        [DOC. NOS. ---]**
   Corporation; MERCK SHARP &
22 DOHME CORP., a New Jersey
   Corporation; ORGANON & CO., a
23 Delaware Corporation; ORGANON LLC,     Action Filed:    March 3, 2022
   a Delaware Limited Liability Company;  Action Removed: April 15, 2022
24 and DOES 1-10, Inclusive,              Trial Date:      November 12, 2024

25                        Defendants.

26

27

28
                                                    Case No. 3:22-cv-00522-H-BLM

# Contents

I. INTRODUCTION ...................................................................................... 1

II. STATEMENT OF THE FACTS ............................................................ 2

    A.    DEFENDANTS ................................................................................. 2

    B.    SINGULAIR ................................................................................. 3

    C.    PLAINTIFF SPENCER BUENO .................................................. 10

    D.    PLAINTIFF'S PRESCRIBER – DR. PABLO ARANGO ... 11

III. RELAVENT PROCEDURAL HISTORY ........................................ 12

IV. ARGUMENT ......................................................................................... 13

    A.    TAKING SINGULAIR CAUSED MR. BUENO TO DEVELOP DEPRESSION, RAGE AND SUICIDALITY .. 13

    B.    PLAINTIFFS' NEGLIGENCE AND NEGLIGENT MISREPRESENTATION CLAIMS ....................................... 13

        1.    CALIFORNIA LAW APPLIES TO THIS CASE ................................................................................ 13

        2.    MERCK BREACHED ITS DUTY TO PROVIDE ADEQUATE WARNINGS OF THE RISKS IT KNEW OR SHOULD HAVE KNOWN TO PLAINTIFF'S PRESCRIBERS 14

        3.    MERCK COULD HAVE MADE THE WARNING ADEQUATE ..................................... 16

        4.    MERCK'S FAILURE TO PROVIDE ADEQUATE WARNINGS TO PLAINTIFF'S PRESCRIBER CAUSED PLAINTIFF'S INJURIES ............................................................. 16

    C.    MERCK'S PREEMPTION AFFIRMATIVE DEFENSE FAILS ........................................................................ 21

        1.    FEDERAL LAW DOES NOT PREEMPT CALIFORNIA LAW IN THIS CASE. .............. 22

        2.    ALL PARTIES IN THIS CASE AGREE THAT MERCK COULD HAVE CHANGED ITS LABEL IF IT COULD COMPLY WITH THE CHANGES BEING EFFECTED REGULATION ...................................... 24

    D.    THERE IS EVIDENCE OF MALICIOUS BEHAVIOR, JUSTIFYING PUNITIVE DAMAGES, IN THAT MERCK

Case No. 3:22-cv-00522-H-BLM

BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

HAS NOT PROVIDED ALL INFORMATION TO FDA. .. 32

V. CONCLUSION .......................................................................... 33

Case No. 3:22-cv-00522-H-BLM

BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

**Cases**

Burton v. Abbvie, Inc., No. CV 22-5920 FMO (MARx), 2023 U.S. Dist. LEXIS 170907 (C.D. Cal. Sep. 25, 2023)................................................................31

Carlin v. Suprerior Court, 13 Cal. 4th 1104, 56 Cal. Rptr. 2d 162, 920 P. 2d 1347 (Cal. 1996) .........................................................................................13

Chen v. L.A. Truck Ctrs., LLC, 42 Cal. App. 5th 488, 255 Cal. Rptr. 3d 559 (2019)..13

Himes v. Somatics, LLC, No. S273887, 2024 Cal. LEXIS 3274 (June 20, 2024) passim

Holley v. Gilead Scis., Inc., 379 F. Supp. 3d 809 (N.D. Cal. 2019).......................25, 28

Howe v. Diversified Builders, Inc., 262 Cal. App. 2d 741, 69 Cal. Rptr. 56 (1968) ....13

In re Aredia & Zometa Products Liab. Litig. (White), 3:06-MD-1760, 2009 U.S. Dist. LEXIS 72098, 2009 WL 2497692 (M.D. Tenn. Aug. 13, 2009) ............................18

In re Incretin-Based Therapies Prods. Liab. Litig., 524 F. Supp. 3d 1007 (S.D. Cal. 2021) ......................................................................................................28

Knox v. Brnovich, 907 F.3d 1167 (9th Cir. 2018)................................................21

Krantz v. Regeneron Pharms., Inc., No. 2:23-cv-08034-WLH-MRW, 2024 U.S. Dist. LEXIS 75979 (C.D. Cal. Apr. 24, 2024) ............................................29

Mahnke v. Bayer Corp., 2020 U.S. Dist. LEXIS 76572, 2020 WL 2048622 (C.D. Cal. 2020) ...............................................................................................29

Merck Sharp & Dohme Corp. v. Albrecht, 587 U.S. 299, 312, 139 S. Ct. 1668 (2019) ...............................................................................................21

Mut. Pharm. Co. v. Bartlett, 570 U.S. 472, 488, 133 S. Ct. 2466 (2013).....................21

Nelson v. F. Hoffmann-La Roche, Inc., 642 F. Supp. 3d 1115 (N.D. Cal. 2022)..........12

Puente Arizona v. Arpaio, 821 F.3d 1098 (9th Cir. 2016)......................................21

Rayes v. Novartis Pharms. Corp., No. 21-55723, 2022 U.S. App. LEXIS 7130 (9th Cir. Mar. 18, 2022)........................................................................................28

Stanley v. Novartis Pharms. Corp., 11 F. Supp. 3d 987 (C.D. Cal. 2014) ............................................................................................................18

Stevens v. Parke, Davis & Co. (1973) 9 Cal.3d 51[107 Cal. Rptr. 45, 507 P.2d 653 ...13

T.H. v. Novartis Pharms. Corp., 4 Cal. 5th 145, 226 Cal. Rptr. 3d 336, 407 P.3d 18 (2017)........................................................................................ 13, 14, 23

Wendell v. GlaxoSmithKline LLC, 858 F.3d 1227 (9th Cir. 2017).............................16

Whaley v. Merck, No. 3:21-cv-01985-H-BLM, 2022 U.S. Dist. LEXIS 73391 (S.D. Cal. Apr. 11, 2022) ..............................................................................31

BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Wyeth v. Levine, 555 U.S. 555, 129 S. Ct. 1187 (2009)........................................ passim

**Regulations**

21 CFR 314.3 ....................................................................................................26

21 CFR 314.70 (1998) .......................................................................................24

21 CFR 314.70 (2005) .......................................................................................25

21 CFR 314.70 (2008) .......................................................................................24

FR 49604 ...........................................................................................................27

**Other Authorities**

[Wyeth v. Levine 555 U.S. 55] Pet Br. at 62 ...........................................23, 27

Case No. 3:22-cv-00522-H-BLM

BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

This is a product liability case arising from Defendants' failure to adequately warn Plaintiff Spencer Bueno's prescribers of the risks of neuropsychiatric injuries of Defendants' prescription drug, Singulair and its generic equivalent, montelukast. Plaintiff Spencer Bueno brought suit against several Merck Pharmaceuticals entities and Organon, a spin off of Merck, in 2022 (hereinafter all defendants referred to as "Merck" or "Defendants"), following his use of both brand name Singulair and generic montelukast. He has decided to pursue only his claims related to his generic montelukast use. Those claims are negligence and negligent misrepresentation. He also continues to seek punitive damages. All other causes of action are hereby dismissed.

Plaintiff Spencer Bueno is able to put forth evidence to support all elements of negligence and negligent misrepresentation. He can also demonstrate that he is entitled to recover punitive damages. Further, Defendants have not carried their burden to show that California law is preempted by federal law. Defendants' motion for summary judgement as to negligence, negligent misrepresentation and the prayer for punitive damages should, therefore, be denied.

# I. INTRODUCTION

Plaintiff, Spencer Bueno, suffered neuropsychiatric injuries, including a suicide attempt because the label on Defendants' prescription drug Singulair was inadequate. Merck could have made its label strong enough to protect Plaintiff. However, Merck instead (1) admittedly designed studies not to identify neuropsychiatric events; (2) declined to conduct any clinical trials at all on how montelukast effects the brain even though they knew that it passed the blood brain barrier in rats, (3) watched adverse event reports of neuropsychiatric events pile up in their database (apparently without reporting all appropriate adverse events to FDA), (4) ignored several explicit warnings that there were no well-designed studies to determine whether montelukast causes neuropsychiatric injuries, and (5) manipulated the limited data on neuropsychiatric events that they had. At best, Merck stayed willfully blind to the risks of

neuropsychiatric events with monelukast use.  A review of the evidence could also lead a reasonable mind to conclude that Merck maliciously avoided providing appropriate warnings.

Plaintiff can point to evidence that Merck knew or should have known that their top-selling drug, montelukast, was causing neuropsychiatric injuries from the late 1990s – even before FDA originally approved Singulair for sale in the United States. Merck never – of their own accord – made any meaningful changes to the label. Instead, they added a word here or there and rearranged some terms in section 5.3 of the prescribing information.

Merck had numerous chances to make meaningful label changes.  For example, Merck could have accepted FDA's suggestion that to add a warning that states that the adverse event reports are consistent with a drug-induced effect.  Further, Merck could have added a contraindication for people who were prescribed Singulair for allergic rhinitis and experienced suicidality while taking Singulair.

Plaintiff can further show that but for Merck's faulty label, he never would have taken Singulair and thus, never would have suffered his injuries.

Merck says even if Plaintiff can put forth every element of negligence and negligent misrepresentation, he should lose anyway, because this Court should hold that California law is void as preempted in this case.  However, despite Defendants protestations to the contrary, California law continues to exist.  State law is preempted only if it is impossible to comply with both federal and state law.  Merck may or may not have done everything federal law **required** of it but failed to do everything federal law **permitted** it to do to strengthen its warnings to comply with California law.  As such, Plaintiff's claims are not preempted.

## II. STATEMENT OF THE FACTS

### A.   DEFENDANTS

Defendants Merck & Co., Inc., Merck Sharp & Dohme Corp., Organon & Co., and Organon LLC (hereinafter "Defendants" or "Merck") are members of Merck

Group.  SOF ¶ 1.  With approximately 72,000 employees, Merck Group is ranked 67 of the Fortune 100.  SOF ¶ 2.  That means it has about four times as many employees as the FDA. SOF ¶ 3.

## B.  SINGULAIR

### PRECLINICAL TRIALS

Merck began preclinical testing (animal tests) on a molecule called montelukast in the early 1990s.  A study on rats showed that montelukast passed the blood-brain-barrier, and that the amount of montelukast in the rat brain increases over time.  SOF ¶ 4.  Even George Philip, Executive Director, Medical Affairs at Merck, admits that he "would like to see a second study attempting to reproduce these findings or not…One study does not necessarily tell the whole story, especially when there are data hard to explain."  SOF ¶ 5.  Merck did not, however, conduct this second study.  SOF ¶ 5.  Defendants originally denied the findings that montelukast crosses the blood brain barrier, but eventually Merck admitted to the FDA that montelukast, when ingested orally, entered the brain.  SOF ¶ 6.

A different rat study involved giving rats an intentionally toxic dose of montelukast to understand which part of the body fails at the toxic dose.  SOF ¶ 7.  For montelukast, it is the Central Nervous System.  SOF ¶ 8.  Despite these findings, Merck began clinical trials (human tests) without conducting further testing to determine potential effects of montelukast on the brain.  SOF ¶ 8.

### CLINICAL TRIALS

Through the course of the pre-marketing clinical trials (trials on people) on montelukast, Merck never conducted any trials for the purpose of determining what effect montelukast had on the brain, nor did they conduct any trials for the purpose of determining whether people who were given montelukast suffered an increase incidence of neuropsychiatric events.  SOF ¶ 9.  Instead, the clinicians were instructed to only ask sopen-ended questions to study participants such as "how are you doing?" or "how are you feeling?"  SOF ¶ 10.

BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

According to one of Merck's experts, on any given day 5% of adult Americans suffer from depression. SOF ¶ 11. The rate of depression is even higher for asthmatics. SOF ¶ 11. However, only 0.4% of study participants in the placebo group and 0.36% of people in the montelukast group reported to clinicians that they were experiencing depression. SOF ¶ 12. Nonetheless, Merck never modified its study protocols to make study participants more comfortable reporting depression. SOF ¶ 13.

A review of the study protocols reveals that typically "people with clinically significant neuropsychiatric illness….." were excluded from entering the clinical trials. SOF ¶ 14. Dr. Philip agrees that if people with psychiatric illness are excluded from the clinical trials "we would not be able to measure a worsening of that condition in the clinical trial." SOF ¶ 15. In other words, Merck simply did not undertake clinical trials to determine whether montelukast use exacerbates preexisting psychiatric illness. Although FDA did not require additional testing, it would not have prevented Merck from conducting additional testing. SOF ¶ 16.

## SINGULAIR HITS THE MARKET AND IT IS A BIG SELLER

In 1998, FDA approved montelukast for sale in the United States, under the brand name Singulair, indicated for "prophylaxis and chronic treatment of asthma, seasonal or perennial allergic rhinitis, and for the prevention of exercise-induced bronchoconstriction." SOF ¶ 17. Singulair was a very successful drug for Defendants with worldwide sales as high as 1.2 billion dollars per year by 2001. SOF ¶ 18.

## ADVERSE EVENT REPORTS

FDA's Office of Safety and Epidemiology ("OSE") maintains the Federal Adverse Event Reporting System ("FAERS"), which is a system that allows individuals, doctors, or drug manufacturers to report potential adverse events. SOF ¶ 19. Merck maintains a similar system, previously known as MARRS and now known as WAES, which allows Merck to take in reports of adverse events from individuals or physicians. SOF ¶ 20.

Case No. 3:22-cv-00522-H-BLM
BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Adverse event reports ("AERs") are used to identify a signal that there could be a connection between a drug and an adverse event. SOF ¶ 21. Once a signal has been identified it's up to the manufacturer to evaluate it further. SOF ¶ 22.

As early as 1999, FDA began receiving reports in FAERS stating that someone used Singulair and experienced a neuropsychiatric injury. SOF ¶ 23. Merck also began receiving reports indicating that a particular person was using montelukast and suffered a neuropsychiatric injury. SOF ¶ 24. Merck has an obligation to report AERs it receives to the FAERS through an electronic system or as part of a package of "Periodic Adverse Event Reports" that Merck is required to submit to the Office of Safety and Epidemiology on a regular schedule. SOF ¶ 25. The only exception to this rule is that Merck is not required to report to the FDA "non-serious" events that are already on the Singulair label if the adverse event happened to someone outside of the United States. SOF ¶ 26.

However, there is evidence that Merck did not provide all AERs to the FDA office of Surveillance and Epidemiology. In a report drafted in 2014 for The Non-Prescription Advisory Committee of the FDA (not a part of the Office of Safety and Epidemiology), the committee discovered that there were 46,527 cases reported in Merck's adverse event reporting system. SOF ¶ 27. There were only 8,815 cases reported in the FAERS and 5,342 cases reported to the World Health Organization ("WHO"). SOF ¶ 28. The Non-Prescription Advisory Committee report questioned why there was such a large discrepancy between the total amount of reports Merck had received and those that regulatory bodies have received, considering Merck's obligation to send most of its reports to FAERS. SOF ¶ 28.

Adverse Event Reports continued to come into both FDA and Merck. As of May 31, 2019, 19,685 adverse events for montelukast were reported in FAERS (still considerably fewer than Merck had in 2014). SOF ¶ 29. Of those, 52%, or 10,209 included at least one adverse event in the nervous system disorder system organ class

or psychiatric disorder system organ class.  SOF ¶ 30.

<u>**LABEL HISTORY PRIOR TO 2008**</u>

According to Merck's regulatory expert, manufacturers go to the FDA quite often to update their label.  The FDA only goes to the manufacturer if FDA wants to add a black box warning or something like that.  SOF ¶ 31.  Dr. Lydia Gilbert-McClain, Merck's regulatory affairs expert testified that the manufacturer should suggest label revisions based on the adverse event reports they obtain.  SOF ¶ 32. "It's really the best judgment of the Merck personnel" to determine what changes should be made to the Singulair label.  SOF ¶ 33.

As alleged in the Motion for Summary Judgment, Merck went to the FDA numerous times to add a word, rearrange terms, or to replace a term with a synonym.  For example, the September 12, 2001, CBE submission involves, in part, changing the word "seizure" to "seizures."  SOF ¶ 34.

Through the Changes Being Effected Regulation ("CBE") (Merck was permitted to make changes to the Singulair label, while simultaneously notifying FDA that it changed its label.  Between 1998 and 2008, Merck submitted these CBE notifications to FDA with very little explanation.  For example, Doc A, which is Exhibit 6 to Defendants' Statement of Facts states only that the revisions were made "based on WAES reports" and that the WAES reports were attached.  SOF ¶ 35.

<u>**2008 CITIZEN'S PETITION**</u>

In 2008, FDA received a Citizen's Petition from Parents United for Pharmaceutical Safety and Accountability.  SOF ¶ 36.  The Petition stated:

> We have serious concerns about the safety of Singulair.  Based on our own children's adverse experiences with this drug, a review of thousands of adverse reaction posts on medications.com, a review of 1726 FDA AERs Reported for Singulair published on patientsville.com, and review of case histories published in medical journals, we believe that the risks of Singulair outwight its benefits and FDA should not continue to allow its use in

children.

SOF ¶ 37.  The petition asked FDA to require the following updates and changes to Singulair's warnings – none of which are similar to those sought by Plaintiff here:

(1) Revise Singulair's labeling to include additional language regarding psychiatric disorders and symptoms, including the addition of a "black box" warning (boxed warning) about psychiatric disorders and the link to suicide;

(2) Require the distribution of a Medication Guide containing the information regarding psychiatric disorders and the link to suicide;

(3) Mandate "Dear Doctor" letters that discuss psychiatric disorders with Singulair use, including the link to suicide;

(4) Require signatory acknowledgement, between the physician and patient, of the risks associated with Singulair use before issuing a prescription;

(5) Require pharmacies to provide patients with information identical to FDA-approved labeling;

(6) Require physicians to report adverse events regarding Singulair; and

(7) Ensure all updated product labeling is communicated to consumers, physicans and patients.

SOF ¶ 37.  FDA denied the Petition as to Requests 1-6, but granted the Petition as to Request 7.  SOF ¶ 38.

## FDA ASKS MERCK TO WARN "SOME ADVERSE EVENT REPORTS ARE CONSISTENT WITH A DRUG-INDUCED EFFECT" IN 2009

In 2009, FDA asked Merck to change the label to say "some post-marketing reports involving Singulair **are** consistent with a drug-induced effect."  SOF ¶ 39. Merck convinced the FDA to allow Merck to say "some post-marketing reports involving Singulair **appear** consistent with a drug-induced effect."  SOF ¶ 40.

## THE 2009 META-ANALYSIS

In 2009, Merck prepared a meta-analysis of the information about

neuropsychiatric adverse events that its clinical trials captured, despite the fact that they were not designed to capture neuropsychiatric events. SOF ¶ 41. Merck conducted a complex 400-page analysis of that to the FDA and also submitted an article containing the same information for publication. SOF ¶ 42. Merck concluded that there was no increased risk of developing a neuropsychiatric injury in people who used montelukast. SOF ¶ 43. Indeed, Merck reported that Singulair was often safer that placebo. SOF ¶ 44.

One of the comments that a Merck employee made on a draft of the proposed publication said "it seems that the manuscript may have a focus to downplay the FDA position too much." Dr. Philip did not agree. SOF ¶ 45. The article was submitted for publication without a revision to address that concern. SOF ¶ 45.

Once the article was submitted, one of the peer reviewers asked for justification for not analyzing the psych-SOC category alone. Merck submitted a general reply to this comment. Dr. Philip tewswtified that it could have been done, but he does not believe doing so would be scientifically or statistically sound. SOF ¶ 46.

## DR. DIMA QATO' CRITIQUE OF THE 2009 META-ANALYSIS AND HER OPINION THAT MERCK SHOULD HAVE KNOWN SOONER

Dr. Qato issued a report criticizing, among other things, that Merck knew of should have known that the incidence of neuropsychiatric events were much higher than what Merck reported to FDA. SOF ¶ 47. Merck's motion goes on about how Merck made label changes, but these were done at Merck's discretion.

Although the clinical trials were not designed to detect neuropsychiatric adverse events, some neuropsychiatric adverse events were identified. Merck performed a 400-page analysis of this information, but as Dr. Qato demonstrated, an epidemiologist could perform a simple analysis in five to ten minutes to see this data is flawed. SOF ¶ 48. But Merck never did that.

Dr. Qato compared what Merck knew or should have known with what was on

the Singulair label and determined that the label was inadequate.

## 2014 HEARING OF THE NON-PRESCRIPTION ADVISORY COMMITTEE

After the patent for montelukast expired in August 2012, and the generics flooded the market, Merck sought FDA approval to sell Singulair over-the-counter. SOF ¶ 50. In response to Merck's request, the Nonprescription Drugs Advisory Committee held a meeting on May 2, 2014. SOF ¶ 51. Many of the statements of the members of the advisory committee highlight the lack of available information, the fact that there appears to be a signal for neuropsychiatric events in the FAERS database (despite the evidence that Merck may not have submitted all of the appropriate reports to the FAERS), and the fact that the clinical trials conducted by Merck were not intended to obtain any information regarding neuropsychiatric events.

Committee Member Pledge stated, "I have a real concern regarding neuropsychiatric events." SOF ¶ 52. Committee Member Platts-Mills echoed Ms. Pledge's concerns, stating "Yes. The neuropsychiatric issue raises obviously very significant questions, which are really important." SOF ¶ 53.

Committee Member Roumie indicated that the FAERS database may demonstrate a signal. "There does potentially appear to be a signal for the neuropsychiatric events, but currently the state of, I guess, our understanding is there's really not enough evidence here to either back up that it is truly safe or truly not safe." SOF ¶ 54.

Committee Members Towbin and Gerhard point out the lack of interest in designing the clinical trials to capture neuropsychiatric events. Dr. Towbin stated: "I concer strongly that we really just don't know. The strongest data that one could rely on to determine the presence of these would come from clinical trials. And, it's very clear, both from the industry and the FDA side, that the trials were no constructed in a way that would allow us to get a handle on that." SOF ¶ 55. Similarly, Dr. Gerhard said, "I have two points regarding the neuropsychiatric events. I think from my perspective, we really just don't know very much about them. From the clinical trials, as Dr., I believe, Towbin pointed out, we really haven't assessed these events in the

clinical trials." SOF ¶ 56.

## 2020 BLACK BOX WARNING

On March 3, 2020, FDA ordered Merck to include a black box warning on Singulair's label. SOF ¶ 57. That same day FDA issued a press release announcing that it is taking this step because "many health care professionals and patients/caregivers are not aware of the risk" of neuropsychiatric injuries. SOF ¶ 58. Moreover, "for allergic rhinitis, also known as hay fever, we have determined that montelukast should be reserved for those who are not treated effectively with or cannot tolerate other allergy medicines." SOF ¶ 59. For those with asthma, montelukast may still not be the right option. "[H]ealth care professionals [should] consider the benefits and risks of mental health side effects before prescribing montelukast." SOF ¶ 60. FDA also required Merck to create a new patient Medication Guide "to educate patients and parents/caregivers about the medicine." SOF ¶ 61.

On April 29, 2020, Merck submitted a proposed Black Box Warning, which was approved by FDA. SOF ¶ 62.

The FDA required Merck to add the Black Box Warning to its label on March 4, 2020. The label revision was approved and took effect April 29, 2020. In March and April 2020 medical providers across America – particularly pulmonary specialists – were focused on Covid. Nonetheless, Merck took no action, such as sending a "Dear Doctor" letter to prescribers to make sure they were aware of the newly-added Black Box Warning. SOF ¶ 63.

## C.   **PLAINTIFF SPENCER BUENO**

Plaintiff Spencer Bueno was born in California in 1978, and has lived in California his entire life. SOF ¶ 64. He saw advertisements for Singulair in California. SOF ¶ 65.

In 2019, he spent a good deal of his time at the Florida home of his girlfriend (now fiancé), Christiane Scott, while still maintaining his California residence. SOF ¶

66.  He was treated by Dr. Pablo Arango in Pompano Beach, Florida for his allergic rhinitis, who prescribed him Singulair.  SOF ¶ 67.  He was familiar with Singulair, in part, because of the advertisements he saw while in California.  SOF ¶ 68.  He continued to take Singulair until early 2021, prescribed first by Dr. Arango and his partner Dr. Salgoto, then by Dr. Schwartz.  SOF ¶ 70.  While taking Singulair, he traveled back and forth between his home in California and Florida.  SOF ¶ 71.  He was a resident of California and took his montelukast pills in both California and Florida.  SOF ¶ 72.

About a month after he started taking montelukast he and his family noticed a change.  He became hostile and aggressive.  SOF ¶ 73.  He eventually spoke to his counselor, conducted some of his own research, and discovered Singulair could be the cause of his injuries.  He took himself off Singulair in the middle of 2021.  SOF ¶ 74.

Nonetheless, as further described by Dr. David Healy, even though Mr. Bueno has stopped using Singulair, he continues to suffer its effects.  SOF ¶ 75.  He lost his job due to anxiety. SOF ¶ 76.  Then, he attempted suicide by jumping from a moving vehicle. SOF ¶ 77.

He continues to suffer injuries from his Singulair use, but he is now recovering with treatment, which he receives from a counselor in California.  SOF ¶ 78.

### D.  PLAINTIFF'S PRESCRIBER – DR. PABLO ARANGO

Dr. Arango began prescribing Singulair to Plaintiff, Spencer Bueno in 2019. SOF ¶ 79.  In 2019, the Prescriber's Information stated in pertinent part:

HIGHLIGHTS OF PRESCRIBING INFORMATION

\*       \*       \*

"[n]europsychiatric events have been reported with SINGULAIR. Instruct patients to be alert for neuropsychiatric events. Evaluate the risks and benefits of continuing treatment with SINGULAIR if such events occur (5.4 and 6.2)."

* * *

WARNINGS AND PRECAUTIONS

> Neuropsychiatric Events Neuropsychiatric events have been reported in
> adult, adolescent, and pediatric patients taking SINGULAIR. Post-
> marketing reports with SINGULAIR use include agitation, aggressive
> behavior or hostility, anxiousness, depression, disorientation,
> disturbance in attention, dream abnormalities, dysphemia (stuttering),
> hallucinations, insomnia, irritability, memory impairment, obsessive-
> compulsive symptoms, restlessness, somnambulism, suicidal thinking
> and behavior (including suicide), tic, and tremor. The clinical details of
> some post-marketing reports involving SINGULAIR appear consistent
> with a drug-induced effect. Patients and prescribers should be alert for
> neuropsychiatric events. Patients should be instructed to notify their
> prescriber if these changes occur. Prescribers should carefully evaluate
> the risks and benefits of continuing treatment with SINGULAIR if such
> events occur [see Adverse Reactions (6.2)]

SOF ¶ 80. Dr. Dima Qato explained in her report and deposition that these warnings are inadequate. SOF ¶¶ 47-49.

If Merck had strengthened Singulair's warnings, it may have affected Dr. Arango's prescribing decisions. First, if the warnings had said that some of the adverse event reports are consistent with a drug-indicued effect, he would likely not have prescribed Singulair to Spencer Bueno. SOF ¶ 82. If the Singulair Prescirbing Information contained a contraindication for allergic rhinitis for people who felt suicidal while using Singulair, he would likely not have prescribed Singulair to Spencer Bueno. Additionally, if there were stronger warnings, he would have passed those stronger warnings on to Spencer Bueno and a prudent patient, like Spencer Bueno, would have decided never to start taking Singulair. SOF ¶ 81.

## III. RELAVENT PROCEDURAL HISTORY

This is one of several hundred cases pending in California federal court and New Jersey state court. The parties came to an agreement that the experts would not

1  need to submit different expert reports for each case, and the parties would not have to
2  continue to re-depose the same experts. Accordingly, Dr. Qato submitted a report and
3  provided expert testimony to cover all of the cases, including the large subset that
4  involved children who used Singulair.

**IV.ARGUMENT**

5

6  **A.  TAKING SINGULAIR CAUSED MR. BUENO TO DEVELOP**
7  **DEPRESSION, RAGE AND SUICIDALITY.**

8      As described more completely in Plaintiff's opposition to the *Daubert* motions
9  of Dr. Qato and Dr. Healy, Plaintiff has put forth evidence that montelukast is capable
10 of causing these neuropsychiatric injuries generally and that they caused his
11 neuropsychiatric injuries specifically. SOF 49, 79

12 **B.  PLAINTIFFS' NEGLIGENCE AND NEGLIGENT**
13 **MISREPRESENTATION CLAIMS**

14     **1.  California Law Applies to This Case**

15     Spencer Bueno is a life-long California resident who suffered injury in both
16 California and Florida because of Defendants' faulty warnings. California, not
17 Florida, has the greatest interest in having its laws applied to this case.

18     The parties agree that Florida law and California substantive law differ on the
19 issue before the court. Accordingly, "the court must determine what interest, if any,
20 the competing jurisdictions have in the application of their respective laws." *Nelson v.*
21 *F. Hoffmann-La Roche, Inc.,* 642 F. Supp. 3d 1115, 1131 (N.D. Cal. 2022). "The
22 reach of California's lawmaking power in respect of its products liability policy is
23 appropriately confined to the protection of California residents and persons injured
24 within California's borders." *Chen v. Los Angeles Truck Centers, LLC,* 42 Cal.App.5th
25 488, 503 (2019); (*see also Howe v. Diversified Builders, Inc.,* 262 Cal. App. 2d 741,
26 745 (Ct. App. 1968) ("California has no interest in extending to [out-of-state] residents
27 greater rights than are afforded them by their own state of domicile.")).

28     Plaintiff Spencer Bueno is a California resident. He saw television

advertisements about Singulair in California, and he was familiar with the drug when it was prescribed at least in part because of the advertisements he saw in California.

Although his prescriber was in Florida, he used Singulair in both California and Florida. As Mr. Bueno is a resident of California, who experienced injury from the drug in California, California has the greatest interest in applying its laws to this case. That is true regardless of whether he also experienced injury in Florida. Moreover, California has a significant interest in insuring that advertisements that air in California are accurate and not misleading.

**2. Merck Breached its Duty to Provide Adequate Warnings of the Risks it Knew or Should Have Known to Plaintiff's Prescribers**

"Under California law, a brand-name drug manufacturer has a duty to warn of known or reasonably knowable adverse effects arising from an individual's use of its drug." *T.H. v. Novartis Pharmaceuticals Corp*., 4 Cal. 5th 145, 154 citing *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 65 [107 Cal. Rptr. 45, 507 P.2d 653].) A drug manufacturer has a duty to warn physicians of risks that are known or otherwise scientifically knowable. *Carlin v. Suprerior Court*, 13 Cal. 4th 1104, 56 Cal. Rptr. 2d 162, 920 P. 2d 1347, 1349 (Cal. 1996).

That duty extends to those who use a generic equivalent of the brand-name drug manufacturer's drug, as "only the brand-name drug manufacturer has unilateral authority to modify the drug's label by adding to or strengthening a warning." *T.H.* 4 Cal. 5th at 155.

The California Supreme Court has recognized "time and again" that its policy goal of preventing future hard is best served by "imposing the costs of negligent conduct upon those responsible." *Id.* at 168. "A brand-name drug manufacturer" like Merck is in the "best position to warn of a drug's harmful effects" and it is the only one with the authority to unilaterally strengthen the warning. The California Supreme Court in *TH* and several courts following the *TH* decision have accordingly held that brand-name pharmaceutical companies like Merck have a duty to provide adequate

warnings of the drugs they manufacture as well as the generic bioequivalent of those drugs. *Id.* at 169.

Merck's breach of its duty to provide adequate warnings opens Merck up to liability for negligence, as well as negligent misrepresentation even though Merck made the misrepresentations to Plaintiff's prescriber and Mr. Bueno is the one who suffered physical injury. *Id.*

At the time Spencer Bueno was prescribed Singulair by Dr. Arango in 2019, the prescriber's information stated:

HIGHLIGHTS OF PRESCRIBING INFORMATION

\*     \*     \*

"[n]europsychiatric events have been reported with SINGULAIR. Instruct patients to be alert for neuropsychiatric events. Evaluate the risks and benefits of continuing treatment with SINGULAIR if such events occur (5.4 and 6.2)."

\*     \*     \*

WARNINGS AND PRECAUTIONS

Neuropsychiatric Events Neuropsychiatric events have been reported in adult, adolescent, and pediatric patients taking SINGULAIR. Post-marketing reports with SINGULAIR use include agitation, aggressive behavior or hostility, anxiousness, depression, disorientation, disturbance in attention, dream abnormalities, dysphemia (stuttering), hallucinations, insomnia, irritability, memory impairment, obsessive-compulsive symptoms, restlessness, somnambulism, suicidal thinking and behavior (including suicide), tic, and tremor. The clinical details of some post-marketing reports involving SINGULAIR appear consistent with a drug-induced effect. Patients and prescribers should be alert for neuropsychiatric events. Patients should be instructed to notify their prescriber if these changes occur. Prescribers should carefully evaluate the risks and benefits of continuing treatment with SINGULAIR if such events occur [see Adverse Reactions (6.2)]

Dr. Dima Qato explained that this label is inadequate, and that Merck knew or

should have known that the risks of Singulair were greater than what is communicated in this label.  As such, Merck breached its duty to provide an adequate warning to Plaintiff's prescriber.

### 3.    Merck Could Have Made the Warning Adequate

Merck had thousands of opportunities to provide a stronger warning by:

- Contraindicating Singulair the treatment of allergic rhinitis in people who experienced suicidality while taking Singulair.
- Modifying its Prescriber's Information to state that "Adverse Events ***are*** consistent with a drug-induced effect" as requested by FDA, instead of merely stating that "Adverse Events ***appear*** consistent with a drug-induced effect.
- Providing a dear doctor letter to prescribers notifying them that the black box warning had been issued.

Plaintiff first notes that once FDA accepted the proposed language ("Adverse Events **appear** consistent…"), Merck would not have been able to change the language back to what FDA requested until the next time Merck could comply with the requirements of the Changes Being Effected Regulated, which would have been immediately after FDA agreed to accept the "appear" language.

Defendants could have made these changes based on any one of their over 10,000 adverse event reports.  Alternatively, they could have provided an analysis that is not manipulated at any time.

### 4.    Merck's Failure to Provide Adequate Warnings to Plaintiff's Prescriber Caused Plaintiff's Injuries.

In order to succeed in a pharmaceutical case based on a claim based in negligence or negligent misrepresentation, Mr. Bueno will have to point to evidence that Merck's breach of duty to provide an adequate warning was a "substantial factor" in causing his injury.  See *Himes v. Somatics, LLC*, No. S273887, 2024 Cal. LEXIS 3274 (June 20, 2024) *7.  Plaintiff must also demonstrate that the absence of the

warning caused the plaintiff's injury. *Wendell v. GlaxoSmithKline LLC,* 858 F.3d 1227, 1239 (9th Cir. 2017) (reversing summary judgment in favor of pharmaceutical company, Teva, because there was a genuine issue of material fact as to whether different warnings would have changed the prescriber's prescribing practices). Mr. Bueno has such evidence.

**(1)    Mr. Bueno's Prescriber Would Not Have Prescribed Singulair if it Had a Stronger Warning**

All parties to this case agree that Plaintiff can demonstrate proximate cause by putting forth evidence that a stronger warning would have caused his prescriber not to prescribe Singulair. Spencer Bueno's original prescriber of montelukast, Dr. Pablo Arango has provided an affidavit stating that if the warnings had said that some of the adverse event reports are consistent with a drug-indicued effect, he would likely not have prescribed Singulair to Spencer Bueno. SOF ¶ 82. If the Singulair Prescirbing Information contained a contraindication for allergic rhinitis for people who felt suicidal while using Singulair, he would likely not have prescribed Singulair to Spencer Bueno. SOF ¶ 81. Accordingly, Plaintiff has evidence of that the insufficient warning was the proximate cause of Plaintiff's injuries.

**(2)    Mr. Bueno's Prescriber Would Have Passed on Information about the Stronger Warning, or Changed His Prescribing Procedures and Mr. Bueno Would Have Decided Not to Take the Drug.**

Plaintiff can also put forth evidence of proximate cause by showing that his prescriber, Dr. Arango, would have shared the stronger warning with him and that, based on that stronger warning, a prudent patient would have decided not to take the drug. See *Himes v. Somatics, LLC*, No. S273887, 2024 Cal. LEXIS 3274, at *16 (June 20, 2024).

In Additionally, if there were stronger warnings, he would have passed those stronger warnings on to Spencer Bueno and a prudent patient, like Spencer Bueno,

would have decided never to start taking Singulair.  The California Supreme Court accepted the following Certified question from the Ninth Circuit:

> If a prescription drug or medical device manufacturer has breached its duty under the learned intermediary doctrine to provide an adequate warning (or any warning at all) to the physician, how must the plaintiff prove that the failure to warn caused his or her injury?

*Id.* at *3. The *Himes* Court held that "a plaintiff may establish causation by showing that the physician would have communicated the stronger warning to the patient and an objectively prudent person in the patient's position would have thereafter declined the treatment." *Id.* at *4.

Plaintiff Michelle Himes brought suit against Somatic after she suffered memory loss and brain damage as a result of treatment from Somatic's medical device.  The district court granted Defendant Somatics motion for summary judgment because there was no genuine issue of material fact as to causation.  *Id.* at *6.  Plaintiff's prescriber testified that he would have prescribed the treatment even if he knew the treatment could cause the injuries suffered by Plaintiff.

On appeal, the Ninth Circuit noted that there is a genuine issue of material fact as to whether the prescriber would have communicated the stronger warning to the plaintiff and whether a prudent patient in the same circumstances would have declined treatment.  Accordingly, the Ninth Circuit determined that the resolution of the case on appeal "hinges on the resolution of the causation standard." *Id.* at *7.

It is enough to show merely that a change in the label would have changed his or her prescribing procedures:

> Defendant argues that summary judgment is appropriate on all Plaintiff's remaining claims because Plaintiff's oncologists  stated that they still would have prescribed Aredia or Zometa if they had been aware of the risk of ONJ at the time they started prescribing the drugs. (MSJ at 10-12.) While the evidence supports that Dr. Molina

BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

and Dr. Nakamura would have prescribed Aredia or Zometa even if they knew about the potential association between these drugs and ONJ (see Def. SUF ¶¶ 37, 50), ***changes to treatment and prescription procedures creates a triable question of fact on specific causation.*** *Stanley v. Novartis Pharms. Corp.*, 11 F. Supp. 3d 987, 997 (C.D. Cal. 2014) (emphasis added). *See also Georges v. Novartis Pharmaceuticals Corp.,* No. 06-5207, 2012 U.S. Dist. LEXIS 189174, 2012 WL 9083365, at *5-6 (C.D. Cal. Nov. 2, 2012) (citing several district decisions denying summary judgment where Plaintiff could put forth evidence that the prescriber would have changed a prescription or treatment procedure); *In re Aredia & Zometa Products Liab. Litig. (White), 3*:06-MD-1760, 2009 U.S. Dist. LEXIS 72098, 2009 WL 2497692, at *3 (M.D. Tenn. Aug. 13, 2009) ("[I]t is sufficient for Plaintiff to survive summary judgment to show that one of [plaintiff's] treating physicians . . . would have behaved differently.") (applying California law).

Plaintiff's prescriber Dr. Arango provided an affidavit stating that if the warnings were stronger, he would have passed them on to Plaintiff. As such, Plaintiff has evidence that his prescriber would have communicated the stronger warning to him.

The second portion of the causation analysis involves the response of a prudent patient in light of the stronger warning. *Himes v. Somatics, LLC*, No. S273887, 2024 Cal. LEXIS 3274 (June 20, 2024) *7. This portion of the analysis considers that "once the physician discloses this information, it is "reserved to the patient alone" to weigh the disclosed risks against the patient's own "fears and hopes" in deciding whether to undergo the recommended treatment." *Id.* at *10. (internal citations omitted). The patient's choice in his own medical treatment does not disappear because of the recognition of the learned intermediary doctrine. *Id.* at *11.

The *Himes* Court noted that its role was limited to setting forth general principles of California law. However, to provide guidance, the Court also set forth some considerations that may be relevant to the determination of whether a prudent

patient would undergo the treatment recommended by their physician in light of sufficiently strong warnings. These considerations include, but are not limited to:

> whether the physician weighed and assessed the risks and benefits of the treatment and, after discussing those risks and benefits with the patient, continued to recommend the treatment; whether the treatment was novel or was instead an established method for addressing the patient's condition; the availability and utility of alternative treatments and the degree to which they have previously been tried in an effort to address the patient's condition; the severity of the patient's condition; and the likelihood that the treatment would have resulted in more than marginal benefits to the patient.

*Id.* at 15.

Under the facts of this case, a jury could determine that a prudent patient in Mr. Bueno's position would not have decided to take Singulair. First, the contraindication that should have been added to the label would have instructed the prescriber not to prescribe it to him at all. A prudent patient who understood that would not likely have taken Singulair. Additionally, Mr. Bueno suffered only from allergic rhinitis. There are a plethora of alternative treatments available for him. Even if he received no treatment at all, he would have suffered only from a severely congested nose. In light of the risks of possible anxiety, depression, suicidality and other neuropsychiatric injuries, a jury could find that a prudent patient would not have determined that the benefits outweigh the risks.

In short, there is evidence that Mr. Bueno's prescriber would not have prescribed Singulair if Merck had adequately warn of its dangers. Additionally, even if the prescriber would have still recommended the drug (which he would not), Mr. Bueno can point to ample evidence that Dr. Arango would have communicated the stronger warning to him and that a prudent patient would not have taken the drug.

Plaintiff Spencer Bueno can set forth evidence of every element of negligent

1    failure to warn and negligent misrepresentation. Nonetheless, Defendant wins
2    summary judgment anyway. Defendant argues that even if Plaintiff can win
3    as a matter of California law, he should lose because California law is void as
4    preempted by federal law. Many of the same arguments Merck makes here
5    have been unsuccessful in the US Supreme Court. See Wyeth v. Levine, 555
6    U.S. 555, 129 S. Ct. 1187 (2009). Other arguments are simply inconsistent
7    with the law. Accordingly, California law continues to exist here to allow a
8    California resident to have his case heard by a California jury.

9            **C.    MERCK'S PREEMPTION AFFIRMATIVE DEFENSE FAILS**

10          To say that federal law preempts state law is to say that state law is void. It is as
11   if the California law never existed. Preemption is thus narrowing applied. California
12   law is preempted only if it is "impossible for a private party to comply with both state
13   and federal requirements." *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480, 133 S. Ct.
14   2466, 2477 (2013).

15          "A drug manufacturer will not ordinarily be able to show that there is an actual
16   conflict between state and federal law such that it was impossible to comply with
17   both." Merck Sharp & Dohme Corp. v. Albrecht, 587 U.S. 299, 315, 139 S. Ct. 1668,
18   1677 (2019). Accordingly, "when a state regulates in an area of historic state
19   power," *Knox v. Brnovich*, 907 F.3d 1167, 1174 (9th Cir. 2018), the Courts within the
20   Ninth Circuit presume that the state law is not preempted. *Geo Grp., Inc. v. Newsom*,
21   50 F.4th 745, 766. This presumption against preemption holds true even if the state law
22   "'touche[s] on' an area of significant federal presence," such as immigration. Id.
23   (quoting *Knox*, 907 F.3d at 1174 (quoting *Puente Arizona v. Arpaio*, 821 F.3d 1098,
24   1104 n.5 (9th Cir. 2016)).

25          Here, state law required Merck to provide a stronger warning – an adequate
26   warning – on its prescription drug. Federal law did not prevent it from providing a
27   stronger warning. The US Supreme Court was clear that brand name pharmaceutical
28   companies can use the Changes Being Effected regulation ("CBE") to unilaterally

change the label of its drug; therefore, California law requiring a stronger warning is not preempted.

### 1. Federal Law Does Not Preempt California Law in this Case.

California law is not void in this case, nor should it be "treated as if it never existed." Here, California law requires Merck, a brand-name drug company to provide a stronger warning. In the factually and legally similar case of Wyeth v. Levine, 555 U.S. 555, 129 S. Ct. 1187 (2009), the Supreme Court held a similar state law was not preempted.

In *Wyeth*, the US Supreme Court held that Vermont law requiring a brand-name drug company to provide adequate warning on its prescription drug was not preempted by federal law. Plaintiff Levine brought suit against *Wyeth*, the company that makes the anti-nausea medication Phenegran, claiming that the drug should have a stronger label regarding a particular method of administration (pushing the drug into the vein with a syringe, also called "IV push"). She further claimed that if the warning was stronger, she would have received Phenergan via a different method, and therefore would not have developed gangrene, ultimately requiring amputation of her arm.

Defendant Wyeth claimed that Levine's state law failure to warn claims were preempted in that it was impossible for Wyeth to comply with its state law duties to strengthen the warning while complying with its federal labeling duties. The Court rejected that argument because Wyeth could unilaterally make changes to strengthen the warning without running afoul of federal law. The Changes Being Effected regulation ("CBE") "permits certain preapproval labeling changes that add or strengthen a warning to improve safety." 555. "The federal statute and regulations neither prohibited the stronger warning label required by the state judgment, nor insulated Wyeth from the risk of state-law liability." *Wyeth v. Levine*, 555 U.S. 555, 593 Thomas, J., concurring.

The Supreme Court noted that FDA has limited resources to monitor drugs that

are on the market. "Manufacturers have superior access to information about their drugs, especially in the post marketing phase as new risks emerge." *Id.* at 578-579. State tort claims incentivize drug manufacturers to "disclose safety risks promptly." *Id.* at 579. The California Supreme Court has also emphasized the importance of incentivizing drug manufacturers to update their warnings. *TH v. Novartis Pharmaceuticals Corp.* 4 Cal. 5th 145, 168-169

The motion points to a number of documents that reflect FDA approved adding this term or changing one word to another or the like. However, FDA regulatory scheme does not insulate a drug manufacturer "from liability under state law simply because the FDA has approved a particular label." *Id.* at 593, Thomas concurring. Similarly, here, Merck could have changed the warning on Singulair unilaterally using the CBE.

The arguments Merck makes here are similar to those rejected by the Supreme Court in Wyeth. Wyeth argued that it could not change its already strong label, including a warning that, "gangrene requiring amputation" could result from exposure of arterial blood to Phenergan…" Pet. Br. 24 And "INT[RA-]ARTERIAL INJECTION MAY RESULT IN GANGRENE OF THE AFFECTED EXTREMITY." Pet Br. 30. The Phenergan label had seven warnings on its label. The Supreme Court held that Wyeth could unilaterally strengthen the label through the CBE.

Merck here claims that it could not have strengthened its warning beyond language such as "[n]europsychiatric events have been reported with SINGULAIR. Instruct patients to be alert for neuropsychiatric events."

The defendant in *Wyeth v. Levine*, like the defendants here, over-emphasize FDA's role in approving labeling. *Wyeth* said "when FDA approved the Phenergan labeling…it did so with full information about the risks and benefits…" Pet Br. 43 In this case, Merck similarly says "[Singulair's] warnings represented the cumulative results of over a decade of review and analyses by FDA and Defendants." MSJ 29:21-22.

The Supreme Court did not find these arguments persuasive. Writing for the majority in Wyeth, Justice Stevens framed the question before the court as "whether the FDA's approvals [of Phenergan's labels] provide Wyeth with a complete defense to Levine's tort claims. *Id.* at 558-559. His answer is clear. "We conclude that they do not." *Id*. at 559.

2. **All Parties in this Case Agree that Merck Could Have Changed its Label if it Could Comply with the Changes Being Effected Regulation**

All parties to this case appear to agree that Defendants had authority to unilaterally change the drug label so long as they met the requirements of the Changes Being Effected Regulation.

a) **Changes Being Effected Regulation Pre-2008: No Requirement of Newly Acquired Information.**

The Changes Being Effect Regulation that was applicable from 1998 when Defendants began selling montelukast in the United States to 2004, is located at 21 CFR 314.70(c)(2)(i)(1998) (hereinafter "1998-2004 CBE"), which provides that the brand-name drug manufacturer may notify the FDA and contemporaneously, unilaterally change the label without prior approval "To add or strengthen a contraindication, warning, precaution, or adverse reaction." There was no mention in the regulation regarding newly acquired information.

In 2005 the CBE was revised and moved to 21 CFR 314.70(c)(6)(iii) (hereinafter "2005-2007 CBE"). The 2005-2007 CBE provides that a brand-name drug manufacturer may notify the FDA and unilaterally change the label without prior FDA approval:

**(A)** To add or strengthen a contraindication, warning, precaution, or adverse reaction;

**(B)** To add or strengthen a statement about drug abuse, dependence, *psychological effect*, or overdosage;

21 CFR 314.70(c)(6)(iii)(A)-(B) (emphasis added). Again, the statute contains no reference to "newly acquired information."

Effective June 2006, the regulation was revised again to state that the brand-name drug maker can unilaterally make:

> (iii) Changes in the labeling, except for changes to the information required in §
> 201.57(a) of this chapter (which must be made pursuant to paragraph
> (b)(2)(v)(C) of this section), to accomplish any of the following:
>> (A) To add or strengthen a contraindication, warning, precaution, or
>> adverse reaction;
>> (B) To add or strengthen a statement about drug abuse, dependence,
>> psychological effect, or overdosage;

Still, the regulation made no reference to "newly acquired information."

Finally, in the middle of 2008, ten years after montelukast first hit the market, the Changes Being Effected Regulation was amended to require "Newly Acquired Information." Specifically, the mid-2008 version states that a brand-name drug maker can, without prior FDA approval, make:

> **(iii)** Changes in the labeling to reflect newly acquired information, except for
> changes to the information required in § 201.57(a) of this chapter (which must
> be made under paragraph (b)(2)(v)(C) of this section), to accomplish any of the
> following:
>> **(A)** To add or strengthen a contraindication, warning, precaution, or
>> adverse reaction for which the evidence of a causal association satisfies
>> the standard for inclusion in the labeling under § 201.57(c) of this
>> chapter;
>> **(B)** To add or strengthen a statement about drug abuse, dependence,
>> psychological effect, or overdosage;

Prior to 2008, Merck could have strengthened its label, as required by California law even if it did not have "Newly Acquired Information" as that term was defined in the

CFR.  *See accord, Holley v. Gilead Scis., Inc.* 379 F. Supp. 3d 809, 828 (since the drugs at issue were approved before 2008 the pharmaceutical company defendant could have strengthened the label via CBE regardless of whether it had "newly acquired information").

On numerous occasions between 1998 when Singulair was approved and 2008 when the CBE was amended to require something that fit the definition of "Newly Acquired Information," Merck had reasonable evidence of risks stronger than what was identified in the Prescribing Information.  It could have submitted a label change based on the many adverse event reports that were piling up or it could have provided to the FDA the very simply calculation Dr. Qato provided.  Accordingly, Merck could have revised its warnings to "add or strengthen a contraindication, warning, precaution, or adverse reaction" any time prior to 2008.

> **b)** **After the 2008 Amendment Newly Acquired Information Was Required and Merck Had It.**

The 2008 revision to the CBE required, for the first time, "Newly Acquired Information."  The CFR defines NAI as:

> Data, analysis, or other information not previously submitted to the Agency, which may include (but is not limited to) data derived from new clinical studies, reports of adverse events, or new analysis of previously submitted data (e.g., meta-analyses) if the studies, events, or analyses real risks of a different type or greater severity or frequency that previously included in submissions to FDA.

21 CFR 314.3.  Here, Plaintiff can point to two forms of "newly acquired information."  Specifically,

1. Merck's adverse event reports;
2. The more mathematically rigorous calculations of existing Merck clinical trials.

Case No. 3:22-cv-00522-H-BLM

BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Defendant's arguments here again closely mirror the Defendant's unsuccessful arguments in Wyeth. Like the Merck Defendants here, Defendant Wyeth argued that FDA already knew everything there was to know, and therefore it had no newly acquired information, as required by the post-2008 version of the CBE. Wyeth argued that the adverse event reports could not be NAI because all the adverse events "are in the FDA database." Pet Br. 62. Merck similarly says Dr. Qato's calculations are not NAI because "Dr. Qato relies solely on documents *submitted to FDA*." MSJ 29:23-30:1 (emphasis in original). In the dissent "The FDA has long known about the risks associated with IV push in general and its use to administer Phenergan in particular. Whether wisely or not, the FDA has concluded--over the course of extensive, 54-year-long regulatory proceedings--that the drug is "safe" and "effective" when used in accordance with its FDA-mandated labeling." Wyeth v. Levine 555 U.S. 555, 606.

The *Wyeth* Court held "NAI is not limited to merely new data, but it could also be a "new analysis of previously submitted data." FR 49604. The Wyeth Court went on to determine that Wyeth had newly acquired information, as required by the 2008 version of the CFR to unilaterally strengthen the label. Specifically, Wyeth had at least 20 Adverse Event Reports prior to Levine's injury involving Phenegrane administration by IV push method resulting in amputation. "Wyeth could have analyzed the accumulating data and added a stronger warning about IV-push administration of the drug." *Id.* at 569-70. Wyeth could have conducted this analysis, which would then be newly acquired information even though the Adverse Event reports were in FDAs adverse event tracking system. *Id.*

### (1)    <u>Adverse Event Reports</u>

The Wyeth Court held that an analysis of the 20 adverse events that were reported to Wyeth prior to the time of Levine's injuries would have satisfied the requirement of NAI. 569-570. *Accord,* Rayes v. Novartis Pharms. Corp., No. 21-55723, 2022 U.S. App. LEXIS 7130, at *2-3 (9th Cir. Mar. 18, 2022) holding that

adverse event reports can be "newly acquired information.")

Approximately ten thousand reports regarding neuropsychiatric adverse events were in the FDA database. Merck could have determined that any one of those was sufficient to justify a label change as it is up to their judgment. If an analysis of 20 adverse event reports in Wyeth was sufficient, certainly the analysis of the hundreds of reports here were sufficient to fit the NAI requirement.

### (2)    New Analysis of Existing Data

Dr. Qato provided a simple analysis that an reasonable epidemiologist could do with very little effort, but Merck preferred not to conduct even a simple or basic analysis.

Defendants make much of the fact that this analysis was not in Merck's hand prior to litigation. In other words, Merck takes issue with the fact that it did not actually do this analysis. However, that was true of the Newly Acquired Information in Wyeth as well. See also *Holley v. Gilead Scis., In*c., 379 F. Supp. 3d 809, 821 (N.D. Cal. 2019). The *Holley* Court noted:

> Although Wyeth had previously worked with the FDA to change
> Phenergan's labeling after the first incident of gangrene and amputation
> resulted from a Phenergan injection in 1967, the Court found persuasive
> that, "[i]n later years, as amputations continued to occur, Wyeth could
> have analyzed the accumulating data and added a stronger warning
> about IV-push administration of the drug."

*Holley v. Gilead Scis*., Inc. 379 F. Supp. 3d 809, 819-820, citing *Wyeth* at 569-570.

In *Krantz v. Regeneron Pharms, Inc.,* 2024 U.S. Dist. LEXIS 75979, *22-23, Defendants argued that Plaintiff had no "newly acquired information" because all of the clinical trials and scholarly articles relied on by the plaintiff had been provided to the FDA. Citing Wyeth, the Krantz Court held that Plaintiff had identified NAI. Newly Acquired Information need not be new data. New analysis of existing data can also fit the definition of NAI.

1    Even Merck own regulatory expert agrees that a new analysis can be NAI even
2    if it is of data already submitted to FDA.  "So the regulation describes newly acquired
3    information as data, analysis, or other information not previously submitted to the
4    agency.  And that could include data from new clinical trials, it could include reports
5    of adverse events, it could include new analysis or previously – of data that was
6    previously submitted."  Plaintiff must be able to successfully argue that an analysis
7    that is the NAI does not need to be in the hand of the Defendant in order to defeat
8    summary judgment.  To hold otherwise would be to allow Merck to remain willfully
9    blind about the risks of suicidality with impunity.

10                    **(3)    <u>Newly Acquired Information Could Have</u>**
11                           **<u>Manifested at Any Time</u>**

12           Defendants cite *Mahnke v. Bayer Corp.*, 2020 U.S. Dist. LEXIS 76572, 2020
13    WL 2048622, at *3 (C.D. Cal. 2020), for the proposition that Courts "have narrowly
14    confined the CBE inquiry to new information that became "available to [the defendant]
15    after the FDA approved the relevant label … but before [Bueno] last used [the
16    product].'"  MSJ 29:21-23.

17           This position is directly contradicted by the language of 21 CFR 314.3, which
18    defines NAI as "Data, analysis, or other information not previously submitted to the
19    ***Agency***…if the studies, events, or analyses reveal risks of a different type or greater
20    severity or frequency that previously included in submissions to FDA."  (emphasis
21    added).  Here, the term "agency" refers to FDA.  NAI, by definition, is data, analysis
22    or information that was not given to FDA.  Why would the Court care when the drug
23    company obtained the information?  If the information has not yet been given to the
24    FDA, it can be Newly Acquired Information.

25           Further, 21 CFR 314.3 explicitly states that "new analysis of previously
26    submitted data" may fit the definition of NAI.  This example set forth directly in the
27    statute contemplates that the data would have been previously submitted.

28           Moreover, the *Wyeth* Court determined that the Defendant had newly acquired

information in that it could have conducted an analysis of 20 AERs that had already been submitted to the FDA.

When FDA published its proposal to modify the CBE to include NAI, in federal registrar, one commented "requested that FDA make it clear that information previously known to the manufacturer, but not submitted to FDA, can be eligible for inclusion in a CBE amendment."  FDA published the following response:

> The term "newly acquired information" is defined in the final rule as "information not previously submitted to FDA * * *." Accordingly, if information was previously known to the manufacturer, but not submitted to FDA, it would be "newly acquired information" that may qualify for inclusion in a CBE supplement (provided other requirements for a CBE supplement have been met).

73 FR 49603, 49606.  The Court in *Burton v. Abbvie, Inc.,* No. CV 22-5920 FMO (MARx), 2023 U.S. Dist. LEXIS 170907, at *7 (C.D. Cal. Sep. 25, 2023) came to the same conclusion:

> In other words, that the information was available at the time the FDA approved the label does not, on its own, show that the information was submitted to the FDA.  Indeed, the FDA has made it clear that "if information was previously known to the manufacturer, but not submitted to FDA, it would be 'newly acquired information' that may qualify for inclusion in a CBE supplement[.]" See "Final Rule, Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices," 73 Fed.Reg. 49603, 49606 (2008).

This Court has addressed similar arguments in *Whaley v. Merck,* No. 3:21-cv-01985-H-BLM, 2022 U.S. Dist. LEXIS 73391 (S.D. Cal. Apr. 11, 2022) in the context of a motion to dismiss.  Merck argued that Commander Whaley was "required to

identify newly acquired information available to them between the FDA's approval of the August 2019 label for Singulair and Commander Whaley's last use of generic montelukast in November 2019." *Id.* at 34. Plaintiffs urged the Court to look to Wyeth's guidance, specifically that risk information accumulates over time. *Id.* at 34-35. According to this Court, "Plaintiffs have the better argument at this stage" (meaning the motion to dismiss stage). *Id.* at 35.

Plaintiff submits that is the better argument at the summary judgment stage as well. "Data, analysis, or other information" fits the definition of Newly Acquired Information set forth in section 314.3 is indeed Newly Acquired Information. There is no additional requirement – not part of the definition set forth in the CFR – that the data must have become available to the defendant after the most recent label change. This is the more logical position; the one that comports with the plain language of the statute; the one consistent with Supreme Court guidance; and the one this Court found persuasive (at least at the motion to dismiss stage) in *Whaley*.

### c) Merck Could have made the Warning Adequate Without Offending Federal Law

#### (1) Contraindicate Use of Singulair for Treatment of Allergic Rhinits in People Who Suffer Suicidality While on Depression

Although contraindications are uncommon, they are appropriate in circumstances like this when the adverse event may result in death.

#### (2) Adverse Experience Reports Are Consistent with a Drug-Induced Effect

FDA clearly agreed with this language as they proposed it. Merck could have proposed this very language in a CBE submission any time after 2009.

**(3)** **Merck Could have Sent a Dear Doctor Letter With Regard to the Black Box Warning.**

Based on the timing when the Black Box Warning was issued, Merck should have set a "Dear Doctor" letter notifying prescribers of the Black Box. The FDA required Merck to add the Black Box Warning to its label on March 4, 2020. The label revision was approved and took effect April 29, 2020. In March and April 2020 medical providers across America – particularly pulmonary specialists – were focused on Covid.

**D.** **THERE IS EVIDENCE OF MALICIOUS BEHAVIOR, JUSTIFYING PUNITIVE DAMAGES, IN THAT MERCK HAS NOT PROVIDED ALL INFORMATION TO FDA.**

There is evidence that Merck has not provided all relevant post-marketing adverse event reports to FDA. Again, a representative from the Nonprescription Drug team discovered that there were thousands of AERs in Merck's database than were in FDA's database. That issue has not been resolved.

Defendants will likely argue that "FDA knew" that there were thousands reports submitted to Merck that were not in FAERS. There would be two flaws with this position. First, Defendants are obligated to send their AERs to the Office of Safety and Epidemiology by uploading them to an electronic system. A completely different department, not part of the Office of Safety and Epidemiology obtained this information. Second, even if Defendants somehow met their obligation to "provide adverse event reports to FDA" by sending information to a different department via a different means, the person who prepared the report knew that the thousands of reports existed. That person did not know the content of the reports.

Accordingly, regardless of whether Merck is deemed to have shifted the burden to Plaintiff by showing "clear evidence" that FDA would not permit the proposed label changes, California law is not preempted in this case. Plaintiff can meet his burden

under the Albrecht burden shifting analysis by pointing to evidence that Merck failed to provide all relevant information to FDA.

## V.CONCLUSION

Plaintiff has pointed to evidence that satisfies every element of his negligence and negligent misrepresentation claims.  Further, California law is not void as preempted by federal law because it was not impossible for Merck to strengthen the warning as required by California law.  He has also been able to point to malicious conduct, allowing his prayer for punitive damages.  Accordingly, Defendants' motion for summary judgment should be denied.

Executed this 8th day of July 2024

s/ Kimberly L. Beck

Kimberly L. Beck

**Attestation**

I, Kimberly Beck, am the ECF User whose ID and password are being used to file this Brief in Opposition.  I hereby attest that all other signatories to this document concur in its filing.

DATED:  July 8, 2024

Respectfully submitted,

By: _____/s/ Kimberly Beck_____
KIMBERLY BECK