1  Lynne M. Kizis, *Pro Hac Vice*
      *lkizis@wilentz.com*
2  Kevin P. Roddy, CA State Bar No. 128283
      *kroddy@wilentz.com*
3  WILENTZ, GOLDMAN & SPITZER, P.A.
   90 Woodbridge Center Drive, Suite 900
4  Woodbridge, New Jersey 07095
   Tel:   (732) 855-6402

5
   Kimberly Beck, *Pro Hac Vice*
6     *kim@becklawcenter.com*
   BECK LAW CENTER
7  201 E. 5th Street, Suite 1900
   Cincinnati, Ohio
8  Tel:   (888) 434-2912

9  *Attorneys for Plaintiff*

10 Shehnaz M. Bhujwala, CA State Bar No. 223484
      *bhujwala@boucher.la.com*
11 BOUCHER LLP
   21600 Oxnard Street, Suite 600
12 Woodland Hills, CA 91367-4903
   Telephone: (818) 340-5400

13

14 *Local Counsel for Plaintiff*

15

16            **UNITED STATES DISTRICT COURT**

17         **SOUTHERN DISTRICT OF CALIFORNIA**

18 SPENCER BUENO, an individual,          Case No. 3:22-cv-522

19                        Plaintiff,      **PLAINTIFF'S RESPONSE TO
                                          DEFENDANTS' STATEMENT OF
20            vs.                         UNDISPUTED FACTS**

21 MERCK & CO., INC., a New Jersey
   Corporation; MERCK SHARP &
22 DOHME CORP., a New Jersey
   Corporation; ORGANON & CO., a
23 Delaware Corporation; ORGANON LLC,
   a Delaware Limited Liability Company;
24 and DOES 1-10, Inclusive,

25                        Defendants.

26

27

28

| | |
|---|---|
| 1. Singulair is a prescription medication, originally approved by the United States Food and Drug Administration (FDA) on February 20, 1998, indicated for the prophylactic and chronic treatment of asthma in adults and pediatric patients six years and older. | Undisputed. |
| 2. Montelukast is the active ingredient in Singulair. | Undisputed. |
| 3. In approving Singulair, FDA stated that Merck provided "adequate information … to demonstrate that the drug product is safe and effective for use as recommended." | Undisputed. |
| 4. FDA further directed that "[t]he final printed labeling (FPL)" for Singulair "must be identical to the draft physician labeling and patient package insert submitted" and further made clear that "[m]arketing the product with FPL that is not identical to this draft labeling | Undisputed. |
| 5. As part of the FDA's approval process of Singulair, it conducted reviews of the medical and pharmacology data for Singulair. | Disputed. Merck is not required to include all data. It is permitted to provide only summaries of some data. |

| | |
|---|---|
| 6. In its Medical Review, FDA concluded that the "safety of montelukast has been evaluated in an extensive short and long-term clinical program," and that montelukast "appears to be safe at the proposed dose for marketing." | Undisputed the FDA made that statement. |
| 7. In its Pharmacology Review, FDA noted that Merck had conducted tissue distribution studies in rats demonstrating the distribution of Singulair in different body systems. | Undipsuted |
| 8. FDA found that following the administration of an intravenous dose of Singulair, the majority of the drug was found in the GI tract and feces, indicating the body's major route of elimination, and that one hour following administration, very few tissues contained amounts of the drug greater than plasma. | Undisputed |
| 9. FDA specifically commented that one hour following administration there was "only a trace amount detected in brain." | Undisputed |
| 10. FDA noted that the results of the tissue distribution study using an oral dose was "qualitatively similar," and specifically commented that one hour following administration there were "only trace amounts detected in the brain." | Undisputed |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| 11. Between the initial approval and October 2, 2019—when Plaintiff Spencer Bueno was first prescribed generic montelukast— Merck added warnings to the Singulair label by CBE (the "changes being effected" process) more than 20 times—including warnings for neuropsychiatric events. | Disputed. Merck added some warnings, but mostly just changed one word on the list of possible neuropsychiatric events to a different word or rearranged terms. |
| 12. For example, on August 27, 1999, based on post-marketing adverse event reports, Merck submitted a CBE revision to the Singulair label and Patient Package Insert to add the following possible adverse reactions and side effects: "dream abnormalities, drowsiness, irritability, and restlessness." | Undisputed |
| 13. Likewise, on September 12, 2001, based on post-marketing adverse event reports, Merck submitted a CBE submission that added "hallucinations" to the list of adverse reactions in the Singulair label and to the side effects section of the Patient Package Insert. | Undisputed |
| 14. On October 14, 2002, again based on post-marketing adverse event reports, Merck submitted a further CBE revision to the Singulair labeling that warned that "agitation including aggressive behavior, and palpitations" had been reported in those taking Singulair. | Undisputed |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| 15. By December 31, 2002 (or earlier), the Singulair Prescribing Information noted in the Post-Marketing Experience section that the following reactions had been reported: "dream abnormalities and hallucinations, drowsiness, irritability, agitation including aggressive behavior, restlessness, insomnia, and very rarely seizures; … palpitations …" | Undisputed |
| 16. The Patient Information Sheet accompanying the medicine in 2002 listed the following in the Side Effects section: "agitation including aggressive behavior, … bad/vivid dreams, … hallucinations (seeing things that are not there), … irritability, … palpitations, restlessness, seizures (convulsions or fits), … trouble sleeping … a feeling of pins and needles or numbness of arms or legs." | Undisputed that the Patient Information Sheet contained that language.  Disputed that it always accompanied the drug. |

| | |
|---|---|
| 17. Based on its continuous review of adverse event reports and the literature, Merck has continued to use the CBE process to update the warnings in the Singulair labeling throughout the product's lifecycle. | Disputed.  There is no evidence of "continuous review" and there is evidence that Merck has not submitted all of the AERs to FAERS. |
| 18. On April 10, 2007, October 2, 2007, and February 25, 2008, Merck submitted CBEs to FDA adding "depression," "suicidal thinking and behavior," and "anxiousness," respectively, to the Adverse Reactions section of the label. | Undisputed |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| 19. Merck's February 25, 2008 CBE supplement also reorganized the labeling format to group adverse reactions by System Organ Classification. | Undisputed. |
| 20. In response to these submissions, FDA requested a meeting with Merck "to discuss potential ways of communicating to the public the recent updates in the package insert regarding behavior-related adverse events." | Undisputed |
| 21. FDA noted that it had conducted an "internal review of the AERS reports for behavior-related adverse events" and determined that "[i]n light of the high-profile nature of suicidality and the spectrum of behavior-related adverse events reported post-marketing, the FDA believes public communication of these behavior- related adverse events is warranted." | Undisputed that FDA made that comment. There is evidence that Merck did not submit all appropriate AERs to FDA. |
| 22. Merck thereafter detailed the measures it had already taken to communicate the new warnings, including by posting the updated labeling to Merck's "Health Care Provider and Consumer websites on or around October 17, 2007," and Merck also detailed its plan for further communicating the new warnings to the public, including by ensuring the sales representatives distributed the new labeling to health care providers. | Undisputed that Merck detailed a plan. There is no evidence that the plan was executed. |
| 23. Merck informed FDA its sales representatives conduct calls on "Specialists … who account for **98%** of the annual prescriptions for SINGULAIR™ by Specialists," and primary care providers ("PCPs") "who account for **89%** of the annual prescriptions for SINGULAIR™ by PCPs." | Undisputed. |
| 24. Merck specifically proposed that, going forward, its sales representatives would | Undisputed. Disputed as to whether that was completed. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| "verbally proactively review the updated post-marketing adverse events and specifically the behavior-related adverse events with the Health Care Providers they have responsibility for calling on." | |
| 25. Moreover, the Merck representatives would leave behind brochures discussing the label updates, as well as leaflets intended for the health care providers' patients. | Disputed as to whether that was completed. |
| 26. In response, FDA "stated that the proposed communication plan and labeling changes were a reasonable approach to address the Agency's concerns." | Undisputed. |
| 27. On March 5, 2008, in response to Merck's submission of CBE labeling revisions "providing for the additions of depression and suicidal thinking and behavior" to the Singulair labeling, FDA informed Merck that the FDA would be "evaluating the risk of suicide adverse events with montelukast sodium" and requested that Merck "[a]nalyze the data from your randomized, double-blind, placebo- controlled clinical trials to evaluate the incidence of suicide adverse events with montelukast sodium compared to placebo." | Undisputed. |
| 28. Merck responded to FDA's request within two weeks, indicating that it had "performed a review of available information pertaining to 'suicide adverse events' (as requested by FDA) in clinical trials of montelukast sodium." | Undisputed. |
| 29. "To meet the rapid timeline requested by FDA, [Merck] conducted a manual review of data from 117 studies as well as an electronic review of the Worldwide | Undisputed |

| | |
|---|---|
| Adverse Experience System (WAES) database." | |
| 30. Merck stated that zero suicide adverse events had been reported in Phase I or II adult and pediatric studies. | Undisputed. |
| 31. Similarly, zero suicide adverse events were reported in adult or pediatric randomized, double-blind, placebo-controlled clinical trials. | Undisputed. |
| 32. One suicide was reported in an open-label study and six reports were found in the WAES database. | Undisputed |
| 33. Of those six reports, three were determined not to have received Singulair and two were found to be not related to Singulair. | Undisputed |
| 34. In addition, Merck located seven reports of intentional overdoses in the WAES database. | Undisputed |
| 35. Merck further noted that while it did not own—and therefore could not include— additional clinical studies with montelukast conducted by a separate entity (MSP Singapore Company, LLC), these data were already submitted to the FDA by that organization in August 2007 via an NDA (new drug application) accepted for filing. | Disputed as to the relationship between MSP Singapore and Defendants as they are all Merck entities. |
| 36. Later in March, FDA announced to the public that it was "investigating a possible association between the use of Singulair and behavior/mood changes, suicidality (suicidal thinking and behavior) and suicide." | Undisputed. |
| 37. FDA explained to the medical community and the public at large that Merck "has updated the prescribing information and patient information for Singulair to include the following post- marketing adverse events: | Undisputed. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| tremor (March 2007), depression (April 2007), suicidality (suicidal thinking and behavior) (October 2007), and anxiousness (February 2008)." | |
| 38.  Also in March 2008, FDA approved Merck's October 2, 2007 CBE supplement seeking to add "suicidal thinking and behavior" (suicidality) to the Singulair labeling as a post-marketing adverse reaction. | Undisputed. |
| 39.  During a teleconference shortly thereafter, FDA asked Merck to amend the CBE labeling supplements to include the word "suicide" in the current labeling. | Undisputed. |
| 40.  Merck complied by submitting an amendment to its CBE submission; the updated labeling included the following neuropsychiatric adverse experiences: "Psychiatric disorders: agitation including aggressive behavior, anxiousness, dream abnormalities and hallucinations, depression, insomnia, irritability, restlessness, suicidal thinking and behavior ([]including suicide), tremor." | Undisputed. |
| 41.  Merck similarly updated its patient product information. | Unknown.  This statement is unclear. |
| 42.  On April 24, 2008, FDA approved these CBE labeling supplements adding "suicide," "anxiousness," and reorganizing the "Adverse Reactions" section by System Organ Classification. | Undisputed. |
| 43.  On March 27, 2008, FDA requested additional information to "further evaluate the risk of | Undisputed. |

| | |
|---|---|
| suicidality (suicidal ideation and behavior) with Singulair." | |
| 44. Specifically, FDA sought "a more thorough evaluation of [Merck's] controlled clinical trial data" and outlined a recommended approach "for this exploration of [Merck's] clinical trial data," which described what clinical trials to include, searching parameters for "'Possibly Suicide-Related' Adverse Events" (PSRAEs), a request for narratives related to specific PSRAEs and a request for specific patient level data. | Undisputed. |
| 45. With respect to the data sought, FDA stated, "we are requesting information from placebo controlled trials only. Please do not submit data from active control only studies, uncontrolled extensions of placebo controlled studies, or combination drug studies." | Undisputed. |
| 46. FDA followed up this request on April 14, 2008, indicating that it was considering an "[e]valuation of other behavior related adverse events associated with use of montelukast," and requesting that Merck "consider methods to review your clinical trial database to evaluate for behavior related adverse events and submit" a proposal to FDA. | Undisputed. |
| 47. FDA also asked Merck to summarize "the process for collection of adverse events in your clinical trials, including details such as use of any specific checklists, ascertainment, and use of MedDRA terms" as well as "information | Undisputed. |

| | |
|---|---|
| you have from nonclinical as well as clinical studies regarding the effects of leukotrienes or montelukast on the central nervous system." | |
| 48.Merck responded promptly, within two weeks, to FDA's request. | Undisputed. |
| 49.In its response, Merck provided "[a] proposal to [FDA] for the evaluation of other behavior related adverse events associated with montelukast"; "[a] summary of the process for collection of adverse events in the montelukast clinical trials"; and "[a] summary of information from both nonclinical and clinical studies regarding the effects of leukotrienes or montelukast on the central nervous system." | Undisputed. |
| 50. In that same submission, Merck provided FDA with a summary referencing 171 publications "derived from reviewing the published scientific literature, of information from nonclinical as well as clinical studies regarding the effects of leukotrienes or montelukast on the central nervous system." | Undisputed. |
| 51. Over the following months, Merck and FDA communicated regularly regarding the parameters and methods for its analysis of behavior-related adverse events. For example, Merck requested clarification from FDA regarding which clinical trials should be included in the analysis, as well as which types adverse events should be included. | Undisputed that Merck requested clarification from FDA. Disputed as to whether the communication occurred regularly. |
| 52. After receiving a response from FDA clarifying its request, Merck wrote again to FDA, providing an "updated ... list of included and excluded studies based on FDA's comment" indicating that it would "adjudicate all [serious adverse events]" | Merck provided FDA with what it termed "updated ... list of included and excluded studies based on FDA's comment" indicating that it would "adjudicate all [serious |

| | |
|---|---|
| identified in the studies. | adverse events]" identified in the studies. |
| 53. Merck and FDA corresponded again in June 2008, with FDA instructing Merck to perform specified statistical comparisons of adverse events categorized using MedDRA terminology and requesting that Merck include "[d]ata on patients of all ages" and "all adverse events." | Undisputed that they met in June 2008. Merck provided the MedDRA terms. |
| 54. FDA provided additional recommendations for the analysis but noted that "we generally agree with [Merck's] proposed approach." | Undisputed. |
| 55. FDA nonetheless also requested that Merck submit for its review "a statistical analysis plan for [the] planned suicidality analysis, with consideration given to subgroups which may be at increased risk for suicidality." | Undisputed. |
| 56. Merck submitted to FDA its "statistical analysis plan for the planned suicidality analysis," "intended to be a comprehensive and detailed description of the strategy, rationale, and statistical techniques that will be used for retrospective analysis of adjudicated PSRAEs from the montelukast program," on July 14, 2008. | Undisputed. |
| 57. Merck and FDA engaged in a telephone conference to further discuss the ongoing analysis on July 24, 2008, during which FDA further clarified its position on the data and studies to be included, as well as the statistical analysis plan for the planned suicidality analysis. | Undisputed. |
| 58. On August 14, 2008, Merck submitted to FDA for review and approval its proposed statistical analysis plan for behavior-related adverse experiences. | Undisputed. |
| 59. The statistical analysis plan was | Merck represented that the |

| | |
|---|---|
| "intended to be a comprehensive and detailed description of the strategy, rationale, and statistical techniques that will be used for retrospective analyses of BRAEs from the montelukast program." | statistical analysis plan was "intended to be a comprehensive and detailed description of the strategy, rationale, and statistical techniques that will be used for retrospective analyses of BRAEs from the montelukast program." However, the plan actually took steps to hide and downplay NPEs. |
| 60. On August 15, 2008, Merck submitted to FDA for review and approval an amendment to the statistical analysis plan for the planned suicidality analysis, which incorporated FDA's comments made during the July 24, 2008, teleconference. | Undisputed. |
| 61. Following its review, FDA had "no additional search terms to add to the behavior AE analysis, and had no further comments on either the behavior analysis SAP [statistical analysis plan] or the suicidality analysis SAP." | Undisputed. |
| 62. On October 31, 2008, Merck submitted its suicidality and behavior-related adverse experience analyses to FDA. | Undisputed. |
| 63. Merck's submission, which totaled more than 400 pages, included analyses of data from all but five relevant studies, which were temporarily excluded because they were contained in non- English language databases. | Undisputed. |
| 64. Merck concluded that "the data presented do not influence the assessment of the risk to benefit profile of SINGULAIR™," but noted that it would continue its analysis to include the data from the non-English language sources and thereafter provide an update to FDA. | Undisputed that Merck made that representation. |

| | |
|---|---|
| 65. Two months later, on December 29, 2008, Merck submitted its final response to FDA's request for information regarding suicidality and behavior-related adverse experiences. | Undisputed. |
| 66. This submission included the earlier excluded foreign-language studies, and Merck concluded "that the assessment of the risk to benefit profile of SINGULAIR™ is not changed after reviewing the data presented in this submission." | Undisputed. |
| 67. In January 2009, the FDA communicated to the medical community and to the public at large that it was "continuing to review *clinical trial data*" and "*[p]ost-marketing reports*" to assess "neuropsychiatric events" such as "mood and behavioral adverse events," and had yet to "reach[] a definitive conclusion." | Undisputed. |
| 68. The Agency directed patients and prescribers to "monitor for the possibility of neuropsychiatric events associated" with Singulair. | Undisputed. |
| 69. On April 23, 2009, FDA advised Merck that, after reviewing "the post-marketing data and clinical trial data for montelukast," it requested the addition of "the following language to the Precautions section of the Singulair product label": <br><br> Neuropsychiatric Events Neuropsychiatric Events have been reported in adult, adolescent, and pediatric patients taking SINGULAIR. Post-marketing reports with SINGULAIR use include agitation, aggressive behavior, anxiousness, dream abnormalities and hallucinations, depression, insomnia, irritability, | Undisputed. |

| | |
|---|---|
| restlessness, suicidal thinking and behavior (including suicide), and tremor. The clinical details of some post- marketing reports involving SINGULAIR are consistent with a drug- induced effect. Patients and prescribers should monitor for neuropsychiatric events and consider discontinuing therapy with SINGULAIR if such events occur. | |
| 70.  Ultimately, on August 19, 2009, after further evaluation by Merck and FDA regarding FDA's proposed labeling changes of April 23, 2009, FDA gave final approval to the label changes regarding neuropsychiatric events and required that the labeling language going forward be "identical in content" to that approved by FDA. | Undisputed. |
| 71.  The final text of the relevant warnings in the Product Insert was:<br><br>**Neuropsychiatric Events**<br><br>Neuropsychiatric events have been reported in adult, adolescent, and pediatric patients taking SINGULAIR. Post-marketing reports with SINGULAIR use include agitation, aggressive behavior or hostility, anxiousness, depression, dream abnormalities, hallucinations, insomnia, irritability, restlessness, somnambulism, suicidal thinking and behavior (including suicide), and tremor. The clinical details of some post-marketing reports involving SINGULAIR appear consistent with a drug-induced effect.<br><br>Patients and prescribers should be alert for neuropsychiatric events. Patients should be instructed to notify their | Undisputed. |

| | |
|---|---|
| prescriber if these changes occur. Prescribers should carefully evaluate the risks and benefits of continuing treatment with SINGULAIR if such events occur (see ADVERSE REACTIONS, Post-Marketing Experience). | |
| 72. In addition, the following warning appeared in the Patient Information sheet: Behavior and mood-related changes have been reported: agitation including aggressive behavior or hostility, bad/vivid dreams, depression, feeling anxious, hallucinations (seeing things that are not there), irritability, restlessness, sleep walking, suicidal thoughts and actions (including suicide), tremor, trouble sleeping. Tell your doctor if you experience behavior or mood-related changes while taking SINGULAIR. | Undisputed. |
| 73. In August 2009, FDA updated the medical community and public at large on its "ongoing safety review," again warning that "[n]europsychiatric events have been reported in some patients taking montelukast [Singulair]," that "[p]atients and healthcare professionals should be aware of the potential for neuropsychiatric events with these medications," "[p]atients should talk with their healthcare providers if these events occur," and "[h]ealthcare professionals should consider discontinuing these medications if patients develop neuropsychiatric symptoms." | Undisputed. |
| 74. In October 2009, Merck published in the peer reviewed Journal of Allergy and Clinical Immunology its 2008 | Undisputed that the publication occurred and that Merck made those |

| | |
|---|---|
| FDA- requested-and-approved analyses of suicidality and behavior-related adverse events in the montelukast clinical trial program. The publication confirms that "AE terms for analysis … were prespecified (and agreed to by the FDA)." | representations. Merck proposed the search terms. |
| 75. Merck included in these publications the data underlying its analyses for the medical and scientific community to openly evaluate. | Disputed |
| 76. On April 14, 2010, Merck submitted a proposed labeling change to FDA via CBE, adding "disorientation" in the Postmarketing Experience subsection of the Adverse Reactions section of the label. | Undisputed. |
| 77. Merck noted that it "believes that the postmarketing reports describing 'disorientation' do not suggest that this term by itself meets the criteria warranting placement in the Precaution section of product labeling." | Undisputed. |
| 78. "However, based on the history of labeling discussions between Merck and FDA in 2009 regarding the addition of the precaution for neuropsychiatric events, Merck has included the term 'disorientation' in the precaution for consistency with the other labeled terms from postmarketing experience that are in the psychiatric disorders system organ classification." | Undisputed that Merck made this representation. |
| 79. On July 1, 2010, Merck responded to a series of questions from FDA regarding the CBE submission, including requests that Merck describe its search strategy in identifying cases of disorientation and provide a "causality assessment for the identified cases." | Undisputed. |
| 80. Merck indicated that "[w]hile the | Undisputed that Merck made |

| | |
|---|---|
| mechanism is not understood, and cause and effect has not been established between disorientation and therapy with montelukast based on these spontaneous reports, a possible association cannot be ruled out. In fact, upon review it became apparent that disorientation may be a symptom that accompanies other behavior/mood related adverse experiences for which a possible association also cannot be ruled out." | that representation. |
| 81. After additional discussions between FDA and Merck, FDA approved Merck's disorientation CBE on August 10, 2010. | Undisputed. |
| 82. In 2009, FDA began implementing changes to the formatting of labeling for drugs. The new format, commonly referred to as the Physician Labeling Rule (PLR), "was designed to make information in prescription drug labeling easier for health care practitioners to access, read, and use to facilitate practitioners' use of labeling to make prescribing decisions." | Undisputed. |
| 83. Throughout 2009 and 2010, FDA and Merck engaged in extensive discussions regarding the revisions to the Singulair labeling to meet the new PLR standards. | Undisputed. |
| 84. On April 26, 2010, FDA approved the final labeling for Singulair under the PLR format. | Undisputed |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| 85. As noted above, soon thereafter, FDA approved Merck's CBE submission adding "disorientation" to the labeling. | Undisputed. |
| 86. On September 28, 2008, Parents United for Pharmaceutical Safety and Accountability, a group formed by parents of children allegedly injured by montelukast, filed a citizen petition with FDA (the "Citizen Petition"), requesting that FDA "immediately add a 'black-box' warning regarding the risks of psychiatric disorders and their link to suicide to the product labels of Singulair." | Undisputed. |
| 87. The Citizen Petition requested that FDA require Merck to include language in the requested black box warning stating that "Patient [sic] may display symptoms consistent with **psychiatric disorders** as the result of an adverse reaction to Singulair." | Undisputed. |
| 88. In addition, the Citizen Petition requested that the Singulair label state, among other new warnings related to psychiatric events, that: "**Suicide must be considered an anticipated outcome of experiencing a psychiatric disorder as an adverse reaction to Singulair**." | Undisputed. |
| 89. The Citizen Petition also requested that FDA "mandate a 'Dear Doctor' letter to warn physicians of these adverse effects." | Undisputed. |
| 90. On February 3, 2009, the same group filed a "corrected letter that supplements our | Undisputed. |

| | |
|---|---|
| September 28, 2008 petition." | |
| 91. On February 3, 2009, the group stated that "FDA should revoke Singulair's approval for use in children," citing a variety of studies and adverse event reports that purportedly demonstrated about psychiatric disorders and the link to suicide."Singulair's danger to this population. | Undisputed. |
| 92. Also on February 3, 2009, FDA acknowledged receipt of the Citizen Petition. | Undisputed. |
| 93. On July 23, 2009, FDA provided an initial response to the Citizen Petition, stating that "FDA has been unable to reach a decision on your petition  because it raises significant and complex issues requiring extensive review and analysis by Agency officials." | Undisputed. |
| 94. FDA indicated that it would respond to the petition "as soon as possible." | Undisputed. |
| 95. On June 7, 2011, FDA responded to the Citizen Petition rejecting the requests made, including requests to "revise Singulair's labeling to include additional language regarding psychiatric disorders and symptoms, including the addition of a 'black box' warning (boxed warning) | Undisputed |
| 96. FDA explained that "[i]n 2008, FDA initiated a safety review of leukotriene modifiers, including Singulair, and the potential association of these drugs to neuropsychiatric events, including suicidality (i.e., link to suicide)[,]" during | Undisputed |

| | |
|---|---|
| which it "evaluated controlled clinical trial data and Adverse Event Reporting System (AERS) data regarding neuropsychiatric events." | |
| 97. It noted that Merck specifically "submitted results from 41 placebo-controlled clinical trials in patients 6 years of age and older, of which 9,929 were treated with montelukast and 7,780 were treated with a placebo." | Undisputed. |
| 98. FDA provided the following reasons for its rejection of the Citizen Petition:<br><br>In its review of spontaneous post-marketing reports, the agency noted a broad set of neuropsychiatric adverse events; some of these reports appeared consistent with a drug-induced effect. However, the agency also concluded that the events were typically non-serious and reversed with the cessation of therapy.<br><br>&#42;  &#42;          &#42;<br><br>Although a possible association between the drug and post-marketing neuropsychiatric adverse events could not be absolutely ruled out, a strong signal for neuropsychiatric events was not identified in the clinical database. The clinical data did not show a causal association between Singulair and suicide or suicidal behavior, and there was no quantitative signal for an association of suicide with Singulair treatment in the spontaneous reports.<br><br>&#42;  &#42;          &#42;<br><br>Our analysis of data from adult and pediatric controlled clinical trials showed that the number of psychiatric-related discontinuations in pediatric | Undisputed. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| patients was actually greater in the placebo group than the group taking Singulair. **Thus, the data do not appear to establish any causal association between the use of Singulair and 'psychiatric disorders.'**<br><br>\* \* \*<br><br>Although your Supplement discusses various potential adverse events that could be linked to the use of Singulair, the safety and effectiveness of Singulair has been established by extensive clinical studies, as noted above, and is supported by FDA's own review of data… . Furthermore, current Singulair labeling already reflects the potential adverse reactions listed in your Supplement. | |
| 99. FDA's response provided a detailed description of labeling revisions requested by FDA in April 2009 "based on its review" to "include new information about neuropsychiatric events reported in patients using Singulair, including new information located in the PRECAUTIONS section of the labeling." | Undisputed. |
| 100. FDA further described changes to the labeling approved in April 2010 to convert the labeling to Physician Labeling Rule format. | Undisputed. |
| 101. FDA concluded, "[w]e believe that Singulair's current labeling accurately characterizes the safety information analyzed in our 15-month study of leukotriene modifiers, and also reflects the additional information the Agency has reviewed since receiving your petition," i.e., "all AERS reports of serious outcomes in all age groups and published literature." | Undisputed. |

| | |
|---|---|
| 102. The Agency further endorsed the current labeling, stating that "[w]e believe [it] more accurately represents the existing data than your proposed changes," "appropriately informs health care professionals and patients about the potential for adverse events raised in your Petition," and "fully addresses the concerns you have raised." | Disputed as to the characterization. Undisputed that the response states: "[w]e believe [it] more accurately represents the existing data than your proposed changes," "appropriately informs health care professionals and patients about the potential for adverse events raised in your Petition," and "fully addresses the concerns you have raised." |
| 103. FDA further rejected proposed changes to the existing formatting of the Singulair labeling, including "certain bolded and capitalized words and phrases." | Undisputed. |
| 104. FDA noted that:<br><br>Currently, the patient information does include certain bolded language, although not the same language that you proposed. Your Petition fails to substantiate how your proposed language and font would be more effective than current labeling. Furthermore, you present no evidence that current labeling is ineffective. | Undisputed. |
| 105. FDA denied the request for distribution of an FDA-approved Medication Guide regarding the risks of neuropsychiatric disorders and suicide, stating:<br>As discussed above in section II.A, reported neuropsychiatric events are generally nonserious and reversed with the cessation of therapy … . A causal association between reports of neuropsychiatric disorders leading to suicide and the taking of Singulair has not been established. Such potential risks do not present the serious and significant | Undisputed. |

| | |
|---|---|
| public health concerns required for a Medication Guide. We also note that accurate information about these risks is already presented in the current FDA-approved product labeling. | |
| 106.　　In response to the request for a "black-box" warning in the Singulair labeling regarding the risks of psychiatric disorders and their link to suicide, FDA stated:<br>You further request that FDA require a boxed warning for Singulair that discusses the risks of neuropsychiatric disorders and the link to suicide. A boxed warning is the most serious warning placed in the labeling of a prescription drug; it is reserved for certain limited circumstances and is ordinarily based on clinical data. As noted above, neuropsychiatric events with Singulair were generally nonserious and typically reversed upon cessation of therapy, and the data did not suggest that Singulair was associated with suicide or suicidal behavior. You do not provide any evidence of a causal relationship between Singulair and suicidal behavior. For this reason, and the reasons stated above, we deny your request for a boxed warning …. | Undisputed. |
| 107.　　In denying the Citizen Petition, FDA also noted that "[w]e want to assure you that FDA will continue to monitor reports of adverse events related to Singulair to determine whether any new safety issues or trends can be identified, and will take action as appropriate." | Undisputed. |
| 108.　　On an annual basis Merck provided additional reports of adverse drug experiences with | Undisputed. |

| | |
|---|---|
| Singulair that included "[a] narrative summary and analysis of the information in the report"; "[a]n analysis of the 15-day Alert reports submitted during the reporting interval"; and "[a] history of actions taken since the last report because of adverse drug experiences." | |

| | |
|---|---|
| 109.    In 2014, FDA discussed safety issues related to Singulair at two advisory committee meetings: the May 2014 Nonprescription Drugs Advisory Committee Meeting and the September 2014 Pediatric Advisory Committee Meeting. | Undisputed. |
| 110.    On February 21, 2014, FDA's Office of Surveillance and Epidemiology issued a Pharmacovigilance Review for Singulair that concluded "[i]n summary, a review of post-marketing data for montelukast did not identify any new safety issues that have not been previously recognized and reviewed by the FDA." | Undisputed. |
| 111.    FDA indicated that it had "update[d] previous reviews" through "a search of the entire FAERS [FDA Adverse Event Reporting System] database" as well as the "published literature for serious events reported with montelukast including death [and] neuropsychiatric events[.]" | Undisputed. |

| | |
|---|---|
| 112.    On September 2, 2014, FDA's Office of Surveillance and Epidemiology issued its Pediatric Postmarketing Pharmacovigilance and Drug Utilization Review that concluded: "[t]he pediatric safety profile described in these reports is consistent with the known safety profile and the current montelukast label. We did not identify any new safety concerns in children 0 to < 17 years old treated with montelukast." | Undisputed. |
| 113.    FDA did not request or require any labeling changes to the Singulair Prescribing Information as a result of its 2014 analyses and discussions of Singulair safety data. | Undisputed. |
| 114.    On June 30, 2016, Merck submitted another CBE revision to the Singulair labeling, adding "tic" to the Neuropsychiatric Events (Section 5.4) and Post-Marketing Experience (Section 6.2) sections of the label. | Undisputed. |
| 115.    Merck noted that it "believes that the postmarketing reports describing 'tic' do not suggest that this term by itself meets the criteria warranting placement in the Warnings and Precaution section of product labeling," but that "based on the history of labeling discussions between Merck and FDA in 2009 regarding the inclusion of information related to neuropsychiatric events, Merck is also planning to include the term 'tic' in the Warnings and Precautions section under Neuropsychiatric Events | Undisputed. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| (Section 5.4)." | |
| 116.　　FDA approved Merck's "tic" CBE on December 13, 2016. | Undisputed. |
| 117.　　On January 2, 2018, in response to "a letter from an outside group raising continued concerns with Singulair and neuropsychiatric events," FDA requested Merck undertake (1) "an assessment of whether excoriation, hyperkinesia, and obsessive compulsive disorder are associated with the use of Singulair;" (2) "an assessment of whether there are any risk factors for neuropsychiatric adverse reactions with Singulair;" and (3) "an assessment of continued or worsening symptoms including but not limited to neuropsychiatric symptoms, following discontinuation of Singulair and whether the method of discontinuation of Singulair (e.g. tapering or sudden withdrawal) had an impact on symptoms." | Undisputed. |

| | |
|---|---|
| 118.     Merck responded to FDA's January 2, 2018 request on April 26, 2018. Merck informed FDA that it had undertaken an analysis of its data from 42 interventional clinical trials and of postmarketing adverse event data contained in its worldwide adverse event database from the date of product licensure through January 5, 2018 to answer FDA's questions regarding the adverse event terms excoriation, hyperkinesia and obsessive compulsive disorder:  that analysis revealed (1) "no new safety concern … between excoriation and montelukast;" (2) "[t]he cases of hyperkinesia reported from clinical trials and the postmarketing database do not describe any new  aspects of increased muscle activity that are not covered by the terms already included as adverse events;" and (3) the reports of obsessive-compulsive disorder "[o]verall … did not convincingly describe this condition" as "[t]he obsessive-compulsive symptoms were not described in the majority of cases and did not report evidence of meeting the criteria for this diagnosis." Merck, however, nonetheless "intend[ed] to update the Company Core Data Sheet (CCDS) to include information related to obsessive-compulsive symptoms." | Undisputed that Merck made that representation. |
| 119.     Merck further reported that, "based on a review of the literature," it had "identified no risk factors for neuropsychiatric adverse reactions with montelukast" and that, based on a review of "its clinical trial data and postmarketing data for persistent adverse events," "[n]o new safety | Undisputed that Merck made that representation. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| concerns regarding persistence of adverse events after withdrawal of montelukast were identified." | |
| 120.     On September 17, 2018, after the review Merck undertook pursuant to FDA's January 2, 2018 request, Merck added by CBE the term "obsessive-compulsive symptoms" to the Neuropsychiatric Events (Section 5.4) and Post-Marketing Experience (Section 6.2) sections of the label. | Undisputed. |
| 121.     Merck noted that it "believes that the postmarketing reports describing 'obsessive-compulsive symptoms' do not suggest that this term by itself meets the criteria warranting placement in the Warnings and Precaution section of product labeling," but that "based on the history of labeling discussions between Merck and FDA in 2009 regarding the inclusion of information related to neuropsychiatric events, Merck is also planning to include the term 'obsessive- compulsive symptoms' in the Warnings and Precautions section under Neuropsychiatric Events (Section 5.4)." | Undisputed. |
| 122.     FDA approved Merck's "obsessive-compulsive symptoms" CBE on January 7, 2019. | Undisputed. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| 123.　　　On February 13, 2019, Defendants added by CBE the term "dysphemia (stuttering)" to the Neuropsychiatric Events (Section 5.4) and Post-Marketing Experience (Section 6.2) sections of the label. | Undisputed. |
| 124.　　　Merck noted that it "believes that the post marketing reports describing 'dysphemia (stuttering)' do not suggest that this term by itself meets the criteria warranting placement in the Warnings and Precaution section of product labeling," but that "based on the history of labeling discussions between Merck and FDA in 2009 regarding the inclusion of information related to neuropsychiatric events, Merck is also planning to include the term 'dysphemia (stuttering)' in the Warnings and Precautions section under Neuropsychiatric Events (Section 5.4)." | Undisputed. |
| 125.　　　FDA approved this CBE on August 9, 2019. | Undisputed |
| 126.　　　On September 27, 2019, FDA held a joint Pediatric Advisory Committee (PAC) and Drug Safety and Risk Management (DSaRM) Advisory Committee Meeting to present its findings in response to a November 2017 request by stakeholders that "FDA re-evaluate the risk of neuropsychiatric events with | Undisputed. |

| | |
|---|---|
| montelukast." | |
| 127. In response to this 2017 request, "FDA initiated another review of data in the FDA Adverse Event Reporting System (FAERS) database, drug utilization database, and recent literature." | Undisputed. |
| 128. FDA reviewed the FAERS database in September 2018 and August 2019. | Undisputed |
| 129. FDA's Division of Epidemiology conducted "three separate literature reviews pertaining to montelukast use, other asthma medications, and NAEs, including suicidality" on December 28, 2017; January 5, 2018; and July 1, 2019. | Undisputed |
| 130. FDA's literature search revealed 71 publications published between January 1, 2014 and July 1, 2019. FDA excluded 67 of those studies that did not "provide[] data analyses germane to the association between montelukast use and neuropsychiatric outcomes." | Undisputed. |

| | |
|---|---|
| 131.     FDA's literature review determined that "the association between NAEs [neuropsychiatric adverse events] and montelukast exposure in pediatric patients is not well-studied in observational data. None of the reviewed studies were adequately powered to study the effects of montelukast by age (pediatric and adult) … Furthermore, all studies excluded patients with pre-existing psychiatric disorders[.]" | Undisputed. |
| 132.     FDA determined that "the observational studies in the literature did not provide conclusive evidence regarding the association between neuropsychiatric events and montelukast exposure in pediatric subjects." | Undisputed. |
| 133.     Because this review revealed "limited new data to evaluate this safety issue" the FDA conducted an observational study using the Sentinel Distributed Database, a national medical product monitoring system based on a distributed data network of electronic health care and administrative claims data." | Undisputed |
| 134.     Using data from January 1, 2000 and September 30, 2015, FDA's Sentinel Distributed Database study investigated "if there is an increased risk of depressive disorders, self-harm, and suicides associated with montelukast use compared to ICS [inhaled corticosteroids] use" and "to examine the clinically relevant determinants that may increase the risk of neuropsychiatric events in montelukast users." | Undisputed. |

| | |
|---|---|
| 135. FDA concluded at the time of the September 27, 2019, Advisory Committee Meeting that its recent "analysis of the FAERS database, case reports, and the observational data did not find sufficient data to support the addition of excoriation, hyperkinesia, or withdrawal neuropsychiatric events to the product label" and that its Sentinel Distributed Database study did "not reveal[] new information that changes the benefit/risk of montelukast nor [did it] shed[] light on potential mechanisms, risk factors, or long-term sequelae." | Undisputed. |
| 136. Stated differently, FDA's Sentinel Distributed Database study did not identify any risk factors, i.e., co-morbidities, that predispose montelukast users to neuropsychiatric events. | Undisputed. |
| 137. FDA further explained that the Sentinel Distributed Database study found no statistical association between montelukast and serious neuropsychiatric adverse events—*i.e.*, depressive disorders, self-harm and suicides. Thus, while FDA "considered the benefit-risk assessment for each individual indication" and determined that it "was no longer favorable for montelukast use as the first treatment choice in patients with AR [allergic rhinitis]," FDA found that "[a] modification to the asthma indication was not warranted at this time." | Undisputed. |

| | |
|---|---|
| 138. FDA described "[t]he absence of risk for these outcomes"—i.e., the absence of an association between montelukast and serious neuropsychiatric adverse events—as "consistent with results from clinical trials and well-conducted observational studies." | Undisputed. |
| 139. FDA also concluded at the time of the September 27, 2019 Advisory Committee Meeting that "[b]ased upon our review, we do not believe there is new information to elevate the risk of neuropsychiatric events associated with montelukast to a Boxed Warning." | Disputed. |
| 140. FDA further noted that it "has completed numerous reviews over the years to evaluate this safety issue and issued communications intended to disseminate information to healthcare providers and patients." | Undisputed. |
| 141. On March 4, 2020, FDA required a boxed warning on the Singulair label "about serious mental health side effects for asthma and allergy drug montelukast (Singulair)." | Undisputed. |
| 142. In an FDA-authored publication that explained its reasoning behind its decision, FDA confirmed that it "has continued to monitor and address reports of [neuropsychiatric] events associated with montelukast use" "[o]ver the past decade." | Undisputed. |

| | |
|---|---|
| 143.     Consistent with its position at the September 27, 2019 Advisory Committee Meeting, FDA explained that its "re-examin[ation] [of] the available data," including case reports submitted to FDA as well as observational and animal studies in the literature, "did not provide additional clarity on the risk" and that "uncertainties surrounding the risk of [neuropsychiatric] events" remain | Undisputed |
| 144.     FDA explained that its decision to nevertheless require a black box warning for montelukast despite these "uncertainties" "was driven by the change in benefit-risk assessment" for patients with mild disease—i.e., allergic rhinitis (hay fever). | Undisputed |
| 145.     More specifically, FDA concluded that allergic rhinitis "is typically a mild, symptomatic disease with a number of treatment options available by prescription and over the counter" and that "the treatment landscape and benefit-risk assessment of montelukast for [allergic rhinitis] had changed since its initial approval." | Undisputed. |
| 146.     FDA thus "reserved" the use of montelukast for "patients with [allergic rhinitis] who have an inadequate response or intolerance to alternative therapies." | FDA recommended that such use be reserved. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| 147. But "[b]ecause of the potentially serious nature of asthma," FDA "maintain[ed] that the benefit-risk decision regarding montelukast treatment in asthma should be evaluated on an individual basis." | Undisputed. |
| 148. More recently, in December 2023, FDA published findings from yet another study of montelukast in FDA's Sentinel Distributed Database, the results of which "found no association between montelukast use and self-harm compared to [inhaled corticosteroid use]." | Undisputed |
| 149. FDA reiterated that it implemented the boxed warning for montelukast after determining that "for the allergic rhinitis indication, montelukast should be reserved specifically for those patients who have an inadequate response to or intolerance to alternative therapies." | Undisputed. |
| 150. Plaintiff Bueno alleges he was prescribed montelukast from 2019 to 2021. | Undisputed. |

| | |
|---|---|
| 151. The **HIGHLIGHTS OF PRESCRIBING INFORMATION** section on the first page of the labeling in effect at that time included the following warning:<br><br>Neuropsychiatric events have been reported with SINGULAIR. Instruct patients to be alert for neuropsychiatric events. Evaluate the risks and benefits of continuing treatment with SINGULAIR if such events occur (5.4 and 6.2). | Undisputed. |
| 152. Further, the detailed **WARNINGS AND PRECAUTIONS** section of that label set forth the following warning:<br><br>**5.4    Neuropsychiatric Events**<br><br>Neuropsychiatric events have been reported in adult, adolescent, and pediatric patients taking SINGULAIR. Post-marketing reports with SINGULAIR use include, but are not limited to, agitation, aggressive behavior or hostility, anxiousness, depression, disorientation, disturbance in attention, dream abnormalities, hallucinations, insomnia, irritability, memory impairment, obsessive-compulsive symptoms, restlessness, somnambulism,  suicidal thinking and behavior (including suicide), tic, and tremor. The clinical details of some post-marketing reports involving SINGULAIR appear consistent with a drug-induced effect.<br><br>Patients and prescribers should be alert for neuropsychiatric events.  Patients should be instructed to notify their prescriber if these changes occur. Prescribers should carefully evaluate the | Undisputed. |

| | |
|---|---|
| risks and benefits of continuing treatment with SINGULAIR if such events occur [*see Adverse Reactions (6.2)*]. | |
| 153.   The **Post-Marketing Experience** section of the December 2018 label (Section 6.2) included the prefatory statement that "[t]he following adverse reactions have been identified during post-approval use of SINGULAIR. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure." | Undisputed. |

| | |
|---|---|
| 154.    The relevant warning that followed stated:<br><br>Psychiatric disorders: including, but not limited to, agitation, aggressive behavior or hostility, anxiousness, depression, disorientation, disturbance in attention, dream abnormalities, hallucinations, insomnia, irritability, memory impairment, obsessive-compulsive symptoms, restlessness, somnambulism, suicidal thinking and behavior (including suicide), tic, and tremor *[see Warnings and Precautions (5.4)]*. | Undisputed |
| 155.    The **Patient Counseling Information** section (Section 17) provided that "Patients should be instructed to notify their physician if neuropsychiatric events occur while using SINGULAIR." | Undisputed. |

- 38 -

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| 156. In addition, the relevant warnings in the **Patient Information Sheet** provided:<br><br>**SINGULAIR may cause serious side effects.**<br><br>   • **Behavior and mood-related changes**. Tell your healthcare provider right away if you or your child have any of these symptoms while taking SINGULAIR:<br><br>      ○ agitation including aggressive behavior or hostility<br><br>      ○ attention problems<br><br>      ○ bad or vivid dreams<br><br>      ○ depression<br><br>      ○ disorientation (confusion)<br><br>      ○ feeling anxious<br><br>      ○ hallucinations (seeing or hearing things that are not really there)<br><br>      ○ irritability<br><br>      ○ memory problems<br><br>      ○ obsessive-compulsive symptoms<br><br>      ○ restlessness<br><br>      ○ sleep walking suicidal thoughts and actions (including suicide)<br><br>      ○ tremor<br><br>      ○ trouble sleeping uncontrolled muscle movements | Undisputed. |

| | |
|---|---|
| 157.     Bueno established care with Dr. Arango in October 2019 for chronic sinusitis. | Undisputed. |
| 158.     Dr. Arango prescribed Bueno 10 mg montelukast on October 2, 2019, in Miami Beach, Florida. | Undisputed. |
| 159.     Bueno filled this prescription at a CVS in Hallandale Beach, Florida on October 2, 2019; November 6, 2019; January 23, 2020; February 20, 2020; March 16, 2020; June 10, 2020; and September 6, 2020. | Undisputed. |
| 160.     Bueno's prior medications had not controlled his condition, hence his visit to Dr. Arango. | Undisputed. |
| 161.     Given Bueno's continuous sinusitis, his severe symptoms, and the fact that he had an inadequate response to prior therapies, Dr. Arango decided to try maximum medical therapy, including montelukast. | Disputed. |
| 162.     Dr. Arango prescribed montelukast after weighing its risks against its benefits, deciding the benefits outweighed the risks for Bueno. | Disputed.  Dr. Arango prescribed montelukast after weighing its risks as he understood them, based on the inadequate label – against its benefits. |
| 163.     Dr. Arango relied on literature to educate himself about the risks of montelukast, particularly as he had researched this area of medicine during his residency. | Undisputed |
| 164.     When Dr. Arango first treated Bueno, in October 2019, he was aware of the risks, benefits, and prescribing information for montelukast. | Disputed |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| 165.    In fact, Dr. Arango was aware of potential neuropsychiatric effects of montelukast as far back as 2008 or 2009. | Disputed |
| 166.    Dr. Arango's understanding regarding neuropsychiatric events remained the same before first prescribing montelukast to Bueno in 2019 and after the black box warning was introduced in 2020. | Disputed. |
| 167.    Dr. Arango did not treat Bueno after November 2019. | Undisputed. |
| 168.    While Dr. Arango authorized refills of montelukast for Bueno through December 2020, Bueno never contacted Dr. Arango about treatment after November 2019. | Undisputed. |
| 169.    Consistent with his representation in his Answers to Interrogatories that his injuries began "[n]ot long after starting montelukast," Bueno testified that his symptoms onset one to two months after starting the medication in 2019. | Undisputed. |
| 170.    Bueno claims he received a one-month sample pack of Singulair in 2011 from Dr. Salgado. | Undisputed. |
| 171.    Dr. Salgado testified there is no record of him giving Bueno a sample pack of Singulair, and it was his regular practice to document giving patients samples of medication. | Undisputed. |
| 172.  Bueno's own expert admits he does not believe Bueno received this sample pack. | Undisputed. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| 173. Bueno established care with Dr. Schwartz in April 2020 for his anxiety and history of taking Zantac. | Undisputed. |
| 174. Bueno did not tell Dr. Schwartz he had any other psychiatric concerns prior to this appointment, including sleep disturbance. | Undisputed |
| 175. He did report that he was taking montelukast for allergies. | Undisputed. |
| 176. Dr. Schwartz next saw Bueno in September 2020. | Undisputed. |
| 177. Bueno indicated he had no suicidal ideations. | Disputed. |
| 178. Bueno made no mention of depression or sleep disturbance to Dr. Schwartz. | Undisputed |
| 179. Rather, Bueno told Dr. Schwartz that montelukast was working for his symptoms, and he wanted to continue using it. | Undisputed. |
| 180. Dr. Schwartz renewed Bueno's montelukast prescription on September 29, 2020 because she believed it was an appropriate treatment for Bueno, weighing the risks and benefits and noting his experience on the medication to date. | Dr. Schwartz renewed Bueno's montelukast prescription based on her understanding of the risks from the inadequate warning. |

| | |
|---|---|
| 181. Dr. Schwartz was familiar with the April 2020 FDA-approved prescribing information for montelukast at the time. | Undisputed. |
| 182. At the time, Dr. Schwartz knew serious neuropsychiatric events were reported with use of Singulair. Dr. Schwartz was aware of reported neuropsychiatric events even before the black box warning was issued. | Undisputed. |
| 183. At the time, Dr. Schwartz knew that, because of the risk of neuropsychiatric events, the benefits of Singulair may not outweigh the risks in some patients, particularly when the symptoms of disease are mild and adequately treated with alternative therapies. | Undisputed |
| 184. At the time, Dr. Schwartz knew Singulair should be reserved for patients with allergic rhinitis who have an inadequate response or intolerance to alternative therapy. | Undisputed |
| 185. At the time, Dr. Schwartz knew physicians should advise patients to be alert for changes in behavior or new neuropsychiatric symptoms when taking Singulair, and if changes or suicidal thoughts occur, they should contact their healthcare provider immediately. | Undisputed |
| 186. Dr. Schwartz discussed the risks and benefits with Bueno, including potential neuropsychiatric issues, and instructed him to call the office or 911 if he has any acute issues. | Disputed |
| 187. Nonetheless, Bueno never reported any concerns to Dr. Schwartz about his use of montelukast or any new onset concerns or changes after he started | Undisputed |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| montelukast. | |
| 188. Bueno filled the renewed prescription for montelukast at a Walgreens in Pompano Beach, Florida on September 29, 2020 and March 5, 2021. | Undisputed. |
| 189. Bueno saw Dr. Schwartz again in December 2020 regarding his anxiety, night terrors, abdominal pain, change in libido, and vitamin D deficiency. | Undisputed. |
| 190. However, Bueno reported no depression or suicidal ideation. | Disputed |
| 191. She did not refill his montelukast because he still had enough from the prior prescription. | Undisputed. |
| 192. Bueno never returned to or contacted Dr. Schwartz thereafter. | Undisputed |
| 193. Dr. Schwartz uses a variety of sources to familiarize herself with the risks and benefits of the medications she prescribes, including UpToDate, Epocrates, the American College of Physicians, courses, and articles. | Undisputed. |
| 194. Dr. Schwartz testified she would not have continued Bueno on montelukast if she thought it was not working for him. | Undisputed. |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| 195. Bueno never told Dr. Schwartz he had depression, confusion, hostility, aggression, self-harm, suicidal ideation, ticks, tremors, or obsessive-compulsive disorder. | Undisputed |
| 196. He also never expressed concerns about the side effects of montelukast. | Disputed |
| 197. Dr. Schwartz had no reason to believe Bueno's anxiety symptoms were related to his use of montelukast. | Disputed |
| 198. Dr. Schwartz's conduct fell within the scope of the 2020 FDA prescribing information for montelukast. | Disputed |
| 199. Bueno acknowledged that he filled most, if not all, of his prescriptions at CVS or Walgreens | Undisputed. |
| 200. The only other pharmacy Bueno claims to have potentially used, Costco, produced a Certification of No Records. | Undisputed. |
| 201. Bueno readily acknowledges that he spends more time living in Florida than California. | Disputed |
| 202. He further acknowledges that he was prescribed the medicine in Florida by treating physicians he saw in Florida, he ingested the medicine in Florida, and he was allegedly injured by the medicine in Florida. | Disputed |

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS

| | |
|---|---|
| 203.      Stretching Dr. Dima Mazen Qato's report to the extreme suggests that at most she vaguely and without any connection to the facts of this case opines that Defendants should have: (1) warned "about increases in neuropsychiatric risks" due to "variability in the pharmacokinetics of montelukast in pediatric populations"; (2) "modified instructions in dosage and administration to a lower dose of montelukast in adolescents; and (3) warned about "food effects" on levels of montelukast. | Disputed |
| 204.      Dr. Qato's report fails to identify a single piece of "new" information evidencing a clinical risk that was not already disclosed to FDA, considered by FDA, and incorporated into the August 2019 Warning. Indeed, Dr. Qato cited and relies solely upon documents submitted to FDA—including approval packages and medical reviews conducted by FDA scientists—in support of her labeling opinions. | Disputed |
| 205.      She conceded that her opinions rest exclusively upon data FDA already considered when it approved Singulair or during its numerous safety reviews. | Disputed |
| 206.      Dr. Qato takes issue with Defendants' analysis of behavior-related adverse events in its clinical trials—the results of which were not only provided to the FDA in a 400-plus page submission, but also published in 2009 in the peer-reviewed Journal of Allergy and Clinical Immunology (the Philip Paper). | Undisputed |

| | |
|---|---|
| 207. Dr. Qato merely calculated what she described as "crude estimates" of odds ratios using select summary data from tables in this published article. | Disputed |
| 208. Dr. Qato deems Defendants' detailed analyses of its clinical trial data in 2008 "flawed" for various reasons, ranging from the selection of the preferred terms for adverse events; the inclusion of data for certain age groups and indications; and comparing montelukast-treated patients with those receiving placebo, rather than an "active control" group that received a comparable asthma treatment. | Disputed |
| 209. Dr. Qato protests that Merck's analysis compared montelukast users to placebo recipients, rather than contrasting montelukast users with an "active control" group that received a comparable asthma treatment. | Disputed |
| 210. Dr. Qato further takes issue with the way the Philip Paper selected and categorized behavior-related adverse events ("AEs"). | Undisputed |
| 211. Dr. Qato did not review this statistical analysis plan, despite agreeing that it would be helpful to do so | Undisputed |
| 212. Dr. Qato admitted that FDA reported results similar to the findings in the Philip Paper. | Disputed |
| 213. Plaintiff's allegations that FDA did not appreciate the significance of these data because the analyses were "flawed" in their design are therefore belied by the record. | Disputed |

| | |
|---|---|
| 214. Dr. Qato further conceded that FDA disagreed with several of her opinions, which she based on the same data FDA reviewed. | Disputed |
| 215. Plaintiffs' opposition to Defendants' motion to dismiss admits "the warranty claims survive if Plaintiffs used brand[ed Singulair], … but will be dismissed if Plaintiffs used only generic." | Undisputed |
| 216. No expert opinion attributes injury to any ingestion of Singulair by Bueno in 2011. | Undisputed |

Executed this 9th day of July 2024

*s/ Kimberly L. Beck*

Kimberly L. Beck

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED FACTS