1    ALEXANDER G. CALFO, SBN 152891
     acalfo@kslaw.com
2    SUSAN V. VARGAS, SBN 177972
     svargas@kslaw.com
3    **KING & SPALDING LLP**
     633 West Fifth Street, Suite 1600
4    Los Angeles, CA 90071
     Telephone:+1 213 443 4355
5    Facsimile:+1 213 443 4310

6    Attorneys for Defendants
     MERCK & CO., INC.; MERCK SHARP
7    & DOHME CORP.[1]; ORGANON &
     CO.; and ORGANON LLC
8

9                    **UNITED STATES DISTRICT COURT**

10                  **SOUTHERN DISTRICT OF CALIFORNIA**

11

12   SPENCER BUENO, an individual,          Case No. 3:22-cv-00522-H-BLM

13                          Plaintiff,      **REPLY MEMORANDUM OF
                                            POINTS AND AUTHORITIES IN**
14          v.                              **SUPPORT OF DEFENDANTS'
                                            MOTION FOR SUMMARY**
15   MERCK & CO., INC., a New Jersey        **JUDGMENT OR, IN THE
     Corporation; MERCK SHARP &             ALTERNATIVE, PARTIAL**
16   DOHME CORP., a New Jersey              **SUMMARY JUDGMENT (ECF 90)**
     Corporation; ORGANON & CO., a
17   Delaware Corporation; ORGANON
     LLC, a Delaware Limited Liability      **Hearing:     August 19, 2024**
18   Company; and DOES 1-10, Inclusive,     **Time:        10:30 a.m.**
                                            **Courtroom:   12A**
19                          Defendants.     **Judge:       Hon. Marilyn L. Huff**

20                                          Action Filed:   March 3, 2022
                                            Action Removed: April 15, 2022
21                                          Trial Date:     November 12, 2024

22

23

24

25

26

27   ─────────────────
[1] Merck Sharp & Dohme Corp. is now known as Merck Sharp & Dohme LLC.
28

1

# TABLE OF CONTENTS

2

**Page**

3  I. REPLY ARGUMENT ......................................................................1

4  A. Florida law applies and bars Bueno's remaining claims...........................1

5  B. Bueno's remaining claims—alleging negligent failure to warn—

6  must fail ...........................................................................2

7  1. Singulair's warning was adequate, and Bueno has no expert

8  who supports his theories about what the label should have said........2

9  2. Bueno cannot prove proximate cause....................................................5

10  a. The untimely and improper declaration from Plaintiff's first

11  subscriber is insufficient....................................................5

12  b. Plaintiff's argument omits his subsequent prescriber .....................6

13  3. Bueno has no admissible expert testimony showing medical

14  causation ...........................................................................6

15  C. Bueno identifies no newly acquired information that would have

16  permitted a CBE label change ...................................................6

17  1. Unidentified AERs are not newly acquired information......................7

18  2. Dr. Qato's recalculation of clinical trial data is not newly

19  acquired information ..........................................................10

20  D. Bueno fails to provide any basis for punitive damages...........................14

21  II. CONCLUSION..............................................................................15

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Cases**                                                                 **Page(s)**

3

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001)......................................................................................8

*Calisi v. Abbott Labs.*,
    No. CIV.A. 11-10671-DJC, 2013 WL 5441355
    (D. Mass. Sept. 27, 2013) .........................................................................3

*Dolin v. GlaxoSmithKline LLC*,
    901 F.3d 803 (7th Cir. 2018) ..................................................................13

*Drescher v. Bracco Diagnostics, Inc.*,
    No. CV-19-00096-TUC-RM (LCK), 2020 WL 699878
    (D. Ariz. Jan. 31, 2020), *report and recommendation adopted*
    2020 WL 1466296 (D. Ariz. Mar. 26, 2020)......................................13

*Garber v. United States*,
    No. 2:15-cv-05867-CAS (JPRx), 2017 WL 797096
    (C.D. Cal. Feb. 27, 2017).........................................................................3

*Gayle v. Pfizer Inc.*,
    452 F. Supp. 3d 78 (S.D.N.Y. 2020),
    *aff'd*, 847 F. App'x 79 (2d Cir. 2021).........................................11–12

*Gibbons v. Bristol-Myers Squibb Co.*,
    919 F.3d 699 (2d Cir. 2019) .....................................................................9

*Guarino v. Wyeth, LLC*,
    719 F.3d 1245 (11th Cir. 2013) ...............................................................1

*Hartranft v. Encore Cap. Grp., Inc.*,
    543 F. Supp. 3d 893 (S.D. Cal. 2021)....................................................6

*Heston v. Taser Int'l., Inc.*,
    431 Fed. Appx. 586 (9th Cir. 2011) .....................................................14

*Himes v. Somatics, LLC*,
    16 Cal.5th 209, 549 P.3d 916 (2024)......................................................5

*Holley v. Gilead Sciences, Inc.*,
    379 F. Supp. 3d 809 (N.D. Cal. 2019).....................................................6

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Holley v. Gilead Sciences, Inc.* (*Holley II*),
   No. 18-cv-06972-JST, 2023 WL 6390598
   (N.D. Cal. Sept. 28, 2023) ................................................................ 7, 11–12

*In re Celexa & Lexapro Mkt. & Sales Pracs. Litig.*,
   779 F.3d 34 (1st Cir. 2015) ......................................................................10

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
   524 F. Supp. 3d 1007 (S.D. Cal. 2021) ........................................... 9, 12–14

*In re Korean Ramen Antitrust Litig.*,
   281 F. Supp. 3d 892 (N.D. Cal. 2017) ........................................................7

*In re Trasylol Prods. Liab. Litig.*,
   763 F. Supp. 2d 1312 (S.D. Fla. 2010) .......................................................8

*Kamerik v. Depuy Orthopaedics, Inc.*,
   No. CV 11-06920 MMM (MANx), 2013 WL 12322041
   (C.D. Cal. Jan. 28, 2013) ...........................................................................3

*Kaufman v. Wyeth, LLC*,
   No. 1:02–CV–22692, 2011 WL 10483576
   (S.D. Fla. Aug. 15, 2011) ............................................................................3

*Maze v. Bayer Healthcare Pharm. Inc.*,
   No. 4:18-CV-21-TAV-CHS, 2019 WL 1062387
   (E.D. Tenn. Mar. 6, 2019) ........................................................................14

*McCann v. Foster Wheeler LLC*,
   48 Cal. 4th 68 (2010) ..................................................................................2

*Merck Sharp & Dohme Corp. v. Albrecht*,
   587 U.S. 299 (2019) .......................................................................... 9, 12–13

*Nelson v. F. Hoffmann-La Roche, Inc.*,
   No. 21-cv-10074-TLT, 2022 WL 17259056
   (N.D. Cal. Nov. 28, 2022) ...........................................................................2

*Pac. Dawn LLC v. Pritzker*,
   831 F.3d 1166 (9th Cir. 2016) .....................................................................6

*Philip Morris USA v. Williams*,
   549 U.S. 346 (2007) ...................................................................................15

*PLIVA, Inc. v. Mensing*,
   564 U.S. 604 (2011)..........................................................................12

*R.S.B. v. Merck & Co.*,
   No. 20-C-1402, 2021 WL 6128161
   (E.D. Wis. Dec. 28, 2021)..................................................................10

*Rayes v. Novartis Pharms. Corp.*,
   No. 21-55723, 2022 WL 822195
   (9th Cir. Mar. 18, 2022)....................................................................10

*Ridings v. Maurice*,
   444 F. Supp. 3d 973, 993, 1000 (W.D. Mo. 2020)............................12

*Rodman v. Otsuka Am. Pharm., Inc.*,
   564 F. Supp. 3d 879 (N.D. Cal. 2020).............................................2–3

*Roshkovan v. Bristol-Myers Squibb Co.*,
   No. 2:21-cv-08590-FWS-AGR, 2023 WL 6787444
   (C.D. Cal. Sept. 19, 2023)...................................................................9

*Silver v. Bayer Healthcare Pharms., Inc.*,
   No. 2:19-cv-3495-DCN-MHC, 2021 WL 4472857
   (D.S.C. Sept. 30, 2021).....................................................................12

*State Farm Mut. Auto Ins. Co. v. Campbell*,
   538 U.S. 408 (2003)............................................................................2

*Utts v. Bristol-Myers Squibb Co.*,
   251 F. Supp. 3d 644 (S.D.N.Y. 2017) .................................................9

*Wyeth v. Levine*,
   555 U.S. 555 (2009)............................................................... 7, 10–14

**Regulations and Rulemaking**

21 C.F.R. § 201.57 ................................................................................4, 9

21 C.F.R. § 314.3 ............................................................................7–9, 12

21 C.F.R. § 314.70 ............................................................................4, 6, 9

47 Fed. Reg. 46,622-01 (Oct. 19, 1982) ...................................................7

73 Fed. Reg. 49,603-01 (Aug. 22, 2008) ...............................................6–7

**Court Rules**

Fed. R. Evid. 702.................................................................................................4, 6

**Other Authorities**

Brief for United States as Amicus Curiae, *Wyeth v. Levine*,
      2008 WL 2308908 ...............................................................................7

Guidance for Industry, *Dear Health Care Provider Letters*, FDA (Jan.
      2014), https://www.fda.gov/regulatory-information/search-fda-
      guidance-documents/dear-health-care-provider-letters-improving-
      communication-important-safety-information ..................................4–5

Merck & Co., Inc., Merck Sharp & Dohme Corp. LLC, Organon & Co., and Organon LLC (collectively, Defendants) submit this Reply Memorandum in support of their Motion for Summary Judgment against Plaintiff Spencer Bueno.

# I.     REPLY ARGUMENT

## A.     Florida law applies and bars Bueno's remaining claims[2]

Whether Plaintiff's claims can survive depends on which state's laws apply. *See Guarino v. Wyeth, LLC*, 719 F.3d 1245, 1253 (11th Cir. 2013); Opp'n at 13:18–27. The significant ties between the claims asserted and Florida require that Florida law apply.

*First*, this action arises from a medical decision made by Florida physicians for a patient treated in Florida. Opp'n at 14:3.[3] Both of Plaintiff's prescribers practiced in Florida, Plaintiff saw them in Florida (while Plaintiff was living and earning income in Florida), they prescribed montelukast for Plaintiff in Florida, Plaintiff filled the prescriptions in Florida, and he sustained injury in Florida. *See* Defs. SOF ¶¶ 158, 159, 173, 180, 188, 201; *see also* Doc 68-1 at ECF Pages 15, 18–21, 23–25 of 31 (Vargas Decl.); Vargas Reply Decl. ¶ 3, Ex. 100 (Scott Dep. at 154:17–156:19, 156:22–158:19); *id.*, ¶ 4, Ex. 101 (S. Bueno Dep. at 129:16–20, 148:13–16) (testifying that symptomatic episode occurred in Florida). Despite calling himself a California resident, he spends more time living in Florida. Defs. SOF ¶ 201.

*Second*, counsel's suggestion that Plaintiff saw advertising for Singulair while in California does not establish that California has a greater interest. Opp'n at 13:28–14:2, 14:7–8. The cited testimony does *not* show he saw advertising in California. Pl. SOF ¶ 65. It merely consists of deposition admonitions and information about what he reviewed before his deposition. Moreover, advertising is irrelevant, as California's innovator

---

[2] Dismissing Counts II, V, and VI (strict liability and express & implied warranties), Bueno now only claims negligence and negligent misrepresentation, alleging negligent failure to warn by the branded-drug innovator for the label used by the generic. Opp'n at 1:8–10.

[3] While the Opposition only discusses one prescriber, Dr. Arango, Bueno had another prescriber thereafter: Dr. Schwartz. Defs. SOF ¶¶ 173, 180. Dr. Schwartz also practiced in Florida and prescribed Plaintiff montelukast in Florida. *Id.*

liability focuses exclusively on the contents of the Singulair label that the generic must use. Defendants cannot be liable for anything further (*e.g.*, any claims related to advertising). And any advertising Plaintiff saw years earlier was immaterial to his Florida physician's prescribing decision. *See* Doc. 68-1 at ECF Pages 10–11 of 31.

*Third*, Plaintiff cannot explain why this Court should not follow the reasoning of *Nelson v. F. Hoffmann-La Roche, Inc.*, No. 21-cv-10074-TLT, 2022 WL 17259056, *14 (N.D. Cal. Nov. 28, 2022), which employed the governmental-interest analysis in similar circumstances to apply a foreign jurisdiction's law, barring innovator liability. Plaintiff fails to distinguish *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 97 (2010), which held that Oklahoma law should govern rather than California law because the plaintiff (despite being a current California resident) was harmed in Oklahoma (exposed to asbestos when working there), noting that otherwise, Oklahoma could not assure companies based in and out of Oklahoma that its statute would protect them in the future. *See id.* at 100–01 ("when the law of the other state limits or denies liability for the conduct engaged in by the defendant in its territory, that state's interest is predominant, and California's legitimate interest in providing a remedy for, or in facilitating recovery by, a current California resident properly must be subordinated because of this state's diminished authority over activity that occurs in another state"); *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003) ("'A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State')").

The Court should apply Florida substantive law, barring Plaintiff's claims.

**B.   Bueno's remaining claims—alleging negligent failure to warn—must fail**

**1.   Singulair's warning was adequate, and Bueno has no expert who supports his theories about what the label should have said**

Plaintiff does not dispute that *without expert testimony*, he cannot meet his burden to show the purported inadequacy of the Singulair labeling. *See Rodman v. Otsuka Am. Pharm., Inc.*, 564 F. Supp. 3d 879, 891 (N.D. Cal. 2020) (granting summary judgment

on failure-to-warn claim after excluding plaintiff's expert's labeling opinions because "[w]hether a warning is adequate depends on how a prescribing doctor would understand the label") (internal quotation marks and citations omitted); *Kamerik v. Depuy Orthopaedics, Inc.*, No. CV 11-06920 MMM (MANx), 2013 WL 12322041, *4 (C.D. Cal. Jan. 28, 2013) (granting summary judgment on negligence and warnings-based claims in the absence of expert testimony as the standard of care for manufacturer of complex medical device was "'beyond the common knowledge of [laypeople]'").[4] Yet Plaintiff has *no designated expert* who supports his lay arguments that:

- Singulair should have been contraindicated for patients with allergic rhinitis "who experienced suicidality while taking Singulair."

- The label should have stated that "Adverse Events *are* consistent with a drug-induced effect" rather than "*appear* consistent" with a drug-induced effect.

- Merck should have sent "Dear Doctor" letters to prescribers notifying them of the Black Box Warning.

Opp'n at 16. None of Plaintiff's experts have so opined.[5] While Plaintiff's Opposition proffers pharmacist Dima Mazen Qato, MPH, Ph.D. as an expert, nowhere in her report or deposition does Dr. Qato offer these opinions. Nevertheless, Plaintiff nebulously asserts that Dr. Qato "explained that this label is inadequate" with no accompanying discussion of her purported labeling opinions or her basis for such opinions. Opp'n at

---

[4] *See also Garber v. United States*, No. 2:15-cv-05867-CAS (JPRx), 2017 WL 797096, *8 (C.D. Cal. Feb. 27, 2017) ("[T]he adequacy of defendant's warnings [is] beyond the common knowledge of a layperson. Accordingly, [it] must be established through expert testimony."); *Calisi v. Abbott Labs.*, No. CIV.A. 11-10671-DJC, 2013 WL 5441355, *16 (D. Mass. Sept. 27, 2013) (whether warning was adequate is "beyond the ken of the lay jury"); *Kaufman v. Wyeth, LLC*, No. 1:02–CV–22692, 2011 WL 10483576, *5 (S.D. Fla. Aug. 15, 2011) (granting summary judgment on warnings claims because plaintiff failed to offer "expert testimony to prove the inadequacy of the warning" label of a prescription drug).

[5] While Plaintiff's "warnings expert," Jack E. Fincham, Ph.D., R.Ph., had offered expert opinions concerning contraindications in patients without asthma and "Dear Doctor" letters, Plaintiff withdrew his designation of Dr. Fincham as an expert in this case on or about May 20, 2024. (Vargas Reply Decl., ¶ 5.)

15–16 (generally citing Qato's 17-page expert report); *see also id*. at 8–9, 12. The Court should reject Plaintiff's attempt—through sleight-of-hand—to wrongly portray his present labeling theories as tethered to any expert opinion in this case. These are issues that required medical expert testimony, both as to the merits of the proposed warnings and their purported effect on a prescribing medical professional. Without expert support, Plaintiff's only remaining claims, alleging inadequate warnings, must fail.

Plaintiff does not dispute that the labeling critiques that *do* appear in Dr. Qato's report—which concern children and adolescents, as well as "food effects"—have no relevance to Bueno or the facts of this case.[6] Plaintiff further ignores Dr. Qato's failure to address the significant warnings regarding neuropsychiatric risks already highlighted in the operative Singulair labeling when Plaintiff used the medicine—or to identify any purported inadequacies in that labeling language. Mot. at 21–22. Critically, Plaintiff's opposition to Defendants' Rule 702 motion does not dispute that Dr. Qato—whose report fails to cite any FDA labeling regulations whatsoever—lacks experience interpreting or applying FDA regulations as well as drafting or evaluating pharmaceutical labeling outside of the litigation context. *See* Doc. 89-1 at IV.A.1. Without such qualifications, Dr. Qato lacks the expertise to opine, as required under California's innovator liability theory, as to whether proposed labeling language would satisfy the detailed federal regulatory requirements governing unilateral label changes—including the strict standards governing the addition of contraindications. *See*, *e.g.*, 21 C.F.R. § 314.70(c)(6)(iii)(A); 21 C.F.R. § 201.57(c)(5) (permitting manufacturers to unilaterally add a contraindication to reflect "newly acquired information" that demonstrates "[k]nown hazards and not theoretical possibilities" if evidence shows that a particular class of patients "have a substantial risk of being harmed" and "no potential benefit makes the risk acceptable"); *see also* Guidance for Industry, *Dear Health Care Provider Letters*, FDA (Jan. 2014), https://www.fda.gov/regulatory-information/search-

---

[6] Opposing Defendants' Rule 702 motion to exclude Dr. Qato, Plaintiff similarly fails to respond to Defendants' arguments that her labeling opinions are vaguely described, unsupported, and do not "fit" the facts of this case. *See generally* Opp'n at 15–16.

3:22-cv-00522-H-BLM

1   fda-guidance-documents/dear-health-care-provider-letters-improving-communication-

2   important-safety-information (providing guidance on when to issue a DHCP letter).[7]

3   Because Plaintiff's labeling theories amount to nothing more than attorney argument

4   without expert support, his warnings-based claims cannot survive summary judgment.

### 2. Bueno cannot prove proximate cause

6   The parties agree that—if California law applies (it does not)—Plaintiff must

7   prove that the claimed failure to provide his prescribing physicians an adequate warning

8   caused his injury. *Himes v. Somatics, LLC*, 16 Cal.5th 209, 549 P.3d 916, 921 (2024).

### a. The untimely and improper declaration from Plaintiff's first subscriber is insufficient

11   Dr. Arango now declares that he likely would not have prescribed Singulair had

12   there been a contraindication for allergic rhinitis patients who felt suicidal while using

13   Singulair. Pl.'s Ex. 29 at 3808–09, ¶ 5. But Plaintiff never reported suicidality to Arango.

14   *See* Vargas Reply Decl. ¶ 4, Ex. 102 (Arango Dep. at 112:25–113:24, 119:6–120:4,

15   123:17–124:22, 128:18–129:11, 133:2–134:13, 161:5–162:4); *see also* Defs. SOF ¶¶

16   176–177, 189–190. Plaintiff's sole incident potentially involving a suicide attempt was

17   in December 2022—three years after he last saw Arango (November 2019). *See* Defs.

18   SOF ¶ 168; Vargas Reply Decl. ¶ 4, Ex. 101 (S. Bueno Dep. at 273:3–7); *see also* Defs.

19   SOF ¶ 188 (roughly 21 months after he last filled a prescription).

20   Dr. Arango also declares he likely would not have prescribed Singulair if the

21   warning in place said that the listed adverse event reports "are consistent"—versus

22   "appear consistent"—with a drug-induced effect. Pl.'s Ex. 29, ¶ 4. That contrived

23   distinction contradicts his deposition. He was shown FDA's 01/13/2009 communication

24   that said "are consistent," and conceded it did *not* change the way he prescribed

25   montelukast. Vargas Reply Decl. ¶ 6, Ex. 102 (Arango Dep. at 105:8–107:19 & Ex. 11).

---

[7] Dear Health Care Provider ("DHCP") letters are "correspondence—often in the form of a mass mailing from the [pharmaceutical] manufacturer . . . or from FDA—intended to alert physicians and other health care providers about important new or updated information regarding a human drug or biologic[.]" *Id*. (Guidance for Industry).

Further, such hypotheticals are expert testimony, but Plaintiff never designated Dr. Arango or provided an expert disclosure. Defendants object and move to strike.

### b.    Plaintiff's argument omits his subsequent prescriber

Plaintiff says nothing to show causation as to Dr. Schwartz. All claims based on prescriptions by Dr. Schwartz should be foreclosed. "[W]here a non-moving party fails to address an argument raised by the moving party in the opposition brief, the Court may consider any arguments unaddressed by the non-moving party as waived." *Hartranft v. Encore Cap. Grp., Inc.*, 543 F. Supp. 3d 893, 913 (S.D. Cal. 2021) (citing *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016)).

### 3.    Bueno has no admissible expert testimony showing medical causation

Defendants' Rule 702 Motion, ECF No. 89-1, and their concurrent reply, show that the unreliable causation opinion of Dr. David Healy is inadmissible. It is unsupported by reliable scientific data or analysis, depends on uninformed speculation, and will tend to mislead rather than assist the jury. Because Plaintiff cannot establish specific medical causation, Defendants are entitled to summary judgment.

## C.    Bueno identifies no newly acquired information that would have permitted a CBE label change

Plaintiff does not dispute that preemption forecloses his warnings-based claims unless Defendants could have unilaterally changed the labeling through the "changes being effected" ("CBE") regulation. *See* Opp'n at 24; 21 C.F.R. § 314.70(b)(2)(v)(A). Plaintiff claims, however, that prior to 2008, Merck could have revised its warnings even without "newly acquired information." Opp'n at 25–26 (citing *Holley v. Gilead Sciences, Inc.*, 379 F. Supp. 3d 809 (N.D. Cal. 2019)). Not so. While specific language requiring "newly acquired information" was added to the CBE regulation in 2008, the FDA explained in its Final Rule that this change merely "codif[ied]" its "longstanding view" that "a CBE supplement is appropriate to amend the labeling for an approved product *only to reflect newly acquired information*." 73 Fed. Reg. 49,603-01, 49,603–49,604, 49,606 (Aug. 22, 2008) (emphasis added); *id*., Cmts. 1, 6 (confirming that "[t]his

rule is intended to describe FDA's existing labeling standards and policies" and "FDA does not consider this amendment to substantively change the standards for submission of CBE"). The United States similarly stressed to the Court in *Wyeth v. Levine*, 555 U.S. 555 (2009) that the CBE regulation permitted unilateral labeling changes "based *only* on newly available information, *not* based on information that was previously submitted to FDA." Br. for U.S. as Amicus Curiae, 2008 WL 2308908, *9 (emphasis modified); *id*. at *22 (noting FDA explained in 1982 that "substantive changes may be made without prior FDA approval *only*" to address "*newly discovered* risks") (citing 47 Fed. Reg. at 46,623) (emphasis modified). No other courts have followed the distinction in *Holley* between pre-2008 and post-2008 claims; indeed, in a later decision, the *Holley* court abandoned it. *See Holley v. Gilead Sciences, Inc.* (*Holley II*), No. 18-cv-06972-JST, 2023 WL 6390598, *7 n.6 (N.D. Cal. Sept. 28, 2023) ("Gilead now argues, and *Plaintiffs do not dispute*, that 'newly acquired evidence' is also required for pre-2008 claims") (emphasis added). A pharmaceutical manufacturer must therefore have "newly acquired information" to change its labeling both pre-2008 and post-2008. Because Plaintiff has identified none in either timeframe, his warnings-based claims are preempted.

### 1.  Unidentified AERs are not newly acquired information

Plaintiff vaguely alleges that "[a]pproximately ten thousand reports regarding neuropsychiatric adverse events were in the FDA database," and "any one of those [reports] was sufficient to justify a label change." Opp'n at 27–28. This argument fails on multiple grounds.

*First*, Plaintiff's vague references to a number of unidentified adverse event reports ("AERs") does not satisfy his burden on summary judgment of proffering *evidence* to show there is a genuine issue for trial. *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892, 899 (N.D. Cal. 2017) (emphasis added); *see infra* at section I.D.

*Second*, Plaintiff references neuropsychiatric AERs that "were in the FDA database." Opp'n at 28. Plaintiff therefore concedes that these data were "previously submitted to the Agency" and cannot constitute newly acquired information. 21 C.F.R.

§ 314.3(b). As support, Plaintiff cites to a transcript from an FDA Advisory Committee meeting, which discusses FDA's analysis of adverse event reporting trends associated with montelukast using FDA's Adverse Event Reporting System ("FAERS")—the latest in an "extensive number of reviews" by FDA "examining post-market reports of neuropsychiatric events with montelukast." Pl.'s Ex. 13 at 2899. Plaintiff also cites to a discussion of a May 2, 2014 FDA Briefing Document during the deposition of Merck's regulatory expert. *See* Pl.'s Ex. 8 at 154:1–166:5. In the briefing document, FDA reviewers analyze AERs from Merck's internal database (MARRS), the FDA's database (FAERS) as well as reports submitted to the World Health Organization. Vargas Reply Decl., ¶ 7, Ex. 103 [5/2/14 FDA Br. Doc.].[8] Thus, not only did FDA know of the referenced AERs, but it repeatedly analyzed them with respect to neuropsychiatric risks. Critically, following the 2014 FDA review referenced by Plaintiff, FDA concluded that its "review of post-marketing data for montelukast did not identify any new safety issues that have not been previously recognized and reviewed by the FDA." SOF ¶ 168, Ex. 75, FDA 2/21/2014 Pharmacovigilance Review at 5. FDA's own review of these AERs

---

[8] Plaintiff references this FDA briefing document in conjunction with its vague and unsupported statement that "there is evidence that Merck did not provide all AERs to the FDA office of Surveillance and Epidemiology." Opp'n at 5. Far from supporting this unfounded accusation, the briefing document confirms Merck provided data from MARRS to the FDA as requested, which the FDA specifically analyzed. The FDA notes that while MARRS has larger number of AERs, "ex-US non-serious and listed serious adverse experiences are not reportable to the FDA." Vargas Reply Decl., ¶ 8, Ex. 103 [5/2/14 FDA Br. Doc.] at 53. Nowhere does the FDA suggest that Merck failed to comply with its regulatory obligations to provide AERs to the FDA. In any case, Plaintiff's unsupported allegations that Merck failed to submit AERs to the FDA are preempted fraud-on-the-FDA claims that seeks to enforce a duty that "exist[s] solely by virtue of the FDCA [Food, Drug and Cosmetic Act] …." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 (2001); *see also In re Trasylol Prods. Liab. Litig.*, 763 F. Supp. 2d 1312, 1329–30 (S.D. Fla. 2010) (finding "evidence or testimony that Bayer failed to adequately or timely provide information to the FDA pursuant to FDA reporting obligations that run to the FDA" relevant to a preempted fraud-on-the-FDA claim and therefore irrelevant and inadmissible). Plaintiff fails to provide any concrete, evidentiary basis to suggest lack of compliance with federal regulatory reporting obligations beyond sheer conjecture.

therefore uncovered no "newly acquired information." *See Roshkovan v. Bristol-Myers Squibb Co.,* No. 2:21-cv-08590-FWS-AGR, 2023 WL 6787444, *6–7 (C.D. Cal. Sept. 19, 2023) (dismissing on preemption grounds for failure to allege newly acquired information, finding AERs in the public FAERS database were already known to FDA and "suggest[] that the FDA was aware of the [AERs] but did not take further action").

*Third*, Plaintiff misrepresents the regulatory requirements for "newly acquired information" by claiming that "any one" of the AERs would justify a label change under the CBE regulation "as it is up to [the manufacturer's] judgment." Opp'n at 28. It is axiomatic that "manufacturers cannot propose a change that is not based on reasonable evidence." *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 315 (2019); *In re Incretin etc.*, 524 F. Supp. 3d 1007, 1016 (S.D. Cal. 2021). Any newly acquired information must "reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3(b). Here, not only does Plaintiff fail to point to any specific AERs, he does not explain how those unidentified AERs allegedly revealed risk of a different type or greater severity or frequency than already reflected in the substantial warning contained in the operative August 2019 label. *See* ECF Doc. 90-84, Ex. 81. Nor does he explain how the AERs reflect "newly acquired information" demonstrating "reasonable evidence of a causal relationship" between any given neuropsychiatric event and montelukast—or, in the case of a contraindication, demonstrating that a particular class of patients "have a substantial risk of being harmed" and "no potential benefit makes the risk acceptable." 21 C.F.R. § 314.70(c)(6)(iii)(A); 21 C.F.R. § 201.57(c)(5); *see Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 663–65 (S.D.N.Y. 2017) (analyzing "newly acquired information" and noting that "'the mere existence of reports of adverse events … says nothing in and of itself about whether the drug is causing the adverse events'") (applying California law) (citation omitted), *aff'd sub nom. Gibbons v. Bristol-Myers Squibb Co*., 919 F.3d 699 (2d Cir. 2019); *see also* Pl.'s Ex. 13, 9/27/2019 FDA Pediatric Advisory Committee Meeting at 2900 (warning that FAERS "has limitations," including a lack of "certainty that a reported

event was actually due to the product" and the inability to calculate incidence rates "because we do not know the total number of events occurring in the population or the total number of exposures").[9] For all these reasons, Plaintiff's reference to unidentified AERs do not meet the regulatory requirements for "newly acquired information."

### 2. Dr. Qato's recalculation of clinical trial data is not newly acquired information

Plaintiff's attempt to portray Dr. Qato's critique of Merck's published analysis of its clinical trial data as "newly acquired information" fares no better. Opp'n at 28–29.

*First*, Plaintiff does not substantively respond to the body of authority confirming that *post-hoc*, litigation-driven expert opinions such as Dr. Qato's cannot constitute "newly acquired information." Mot. at 31–32. Nor does Plaintiff explain how an expert report that was "not available to or possessed by [the manufacturer]" until *after* filing suit could have triggered an obligation to amend the labeling *before* Plaintiff's alleged injury. *See In re Celexa & Lexapro Mkt. & Sales Pracs. Litig.*, 779 F.3d 34, 41 (1st Cir. 2015) ("CBE changes rest on the *existence* of 'newly acquired information.'") (emphasis added). Although "new analyses of previously submitted data" can be "newly acquired information" in certain situations, this does not include "an analysis conducted by an expert in preparation for litigation with the benefit of hindsight." *R.S.B. v. Merck & Co.*, No. 20-C-1402, 2021 WL 6128161, *2, *4 (E.D. Wis. Dec. 28, 2021) (citing *Wyeth*, 555 U.S. at 569). Nor does *Wyeth* stand for the proposition that an expert's litigation-driven

---

[9] Plaintiff cites to *Rayes v. Novartis Pharms. Corp.*, No. 21-55723, 2022 WL 822195, *1–2 (9th Cir. Mar. 18, 2022) for the proposition that "adverse event reports can be 'newly acquired information.'" Opp'n at 27–28. In *Rayes*, the Ninth Circuit found that the plaintiff sufficiently alleged "newly acquired information" *at the pleading stage* by specifically identifying AERs of retinal vasculitis or retinal vascular occlusion during the clinical trials and after product launch, when the product label allegedly misstated the incidence of these events. *Id*. *Rayes* does not stand for the proposition that vague references to unidentified AERs can constitute "newly acquired information" at *summary judgment*, when FDA thoroughly and repeatedly analyzed the AERs directly relevant to Plaintiff's alleged injuries for over a decade and failed to implement the labeling language that Plaintiff claims is necessary to comply with state law.

manipulation of data analyzed and submitted to the FDA can constitute newly acquired information long after Plaintiff's alleged injury. *See Wyeth*, 555 U.S. at 569 (positing that hypothetically, "'[i]f the sponsor submits adverse event information to FDA, and *then later conducts a new analysis of data* showing risks of a different type or of greater severity or frequency than did reports previously submitted to FDA,'" that new analysis "'meets the requirement for 'newly acquired information'''") (emphasis added).

Plaintiff's argument that Merck should have employed the same "crude" calculations as Dr. Qato fares no better. Plaintiff does not dispute that FDA scientists requested and directed the very analysis that Dr. Qato now critiques—including preapproving the methodology used in the analysis, the data included, the clinical endpoints, and the selection and categorization of adverse events—all memorialized in a Statistical Analysis Plan ("SAP") that Dr. Qato failed to even review.[10] Mot. at 32–34. Plaintiff's assertion that "Merck preferred not to conduct even a simple or basic analysis" because it performed the complex epidemiological analysis outlined in the FDA-approved SAP—rather than the "crude," "five to ten minute[]" estimates done by Dr. Qato—is nonsensical. Opp'n at 8, 28. Plaintiff's intimation that in order to comply with state law, Merck should have done what Dr. Qato did and *not* as FDA directed is the epitome of preemption. Moreover, "asserting that a manufacturer could or should have done more studies—i.e., 'that a manufacturer should have created the "newly acquired information"'—is insufficient to avoid preemption under the CBE regulation." *Holley II*, 2023 WL 6390598 at *8.[11]

_____

[10] Dr. Qato also failed to review the hundreds of pages of communications between FDA and Merck regarding what data to include and the statistical methodology to employ. Vargas Reply Decl. ¶ 9, Ex. 104 (Qato Dep. at 249:11-20). Nor did Dr. Qato review or attempt to replicate the statistical methodology specified in the FDA-approved SAP and has no reason to believe Merck deviated from that FDA-approved methodology. *See* Defs. SOF ¶ 211; Vargas Reply Decl. ¶ 9, Ex. 104 (Qato Dep. at 235:17-236:12).

[11] *See also Gayle v. Pfizer Inc.*, 452 F. Supp. 3d 78, 88 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 79 (2d Cir. 2021) (rejecting the implication that a defendant's "alleged failure" to reanalyze data "amounts to 'newly acquired evidence,'" because accepting such allegations would allow "any litigant" to defeat preemption "by merely alleging that a

*Second*, Plaintiff does not dispute the fact that Merck submitted all the information that Dr. Qato relies on to the FDA. Indeed, Dr. Qato does not cite to a single document not in the FDA's possession; every aspect of Merck's analysis of the clinical trial data— "the researchers' methodology, inclusion criteria, data, conclusion and perceived analytical limitations"—was "available for the FDA's scrutiny and review." *In re Incretin*, 524 F. Supp. 3d at 1025; *see also* Mot. at 34–35; *Holley II*, 2023 WL 6390598 at *9 (finding no newly acquired information when plaintiffs did not explain "how the information they contend is 'new' differs from what was presented to the FDA"); *Ridings v. Maurice*, 444 F. Supp. 3d 973, 993, 1000 (W.D. Mo. 2020) (failure-to-warn claims preempted where purported safety information relied upon clinical studies and therefore reflected information provided to FDA). Plaintiff cannot credibly argue that Merck's over 400-page analyses of its clinical trial data—used by the FDA in its comprehensive 15-month safety review of neuropsychiatric adverse events and ultimately published for public consumption—was "new" to the FDA.[12]

Plaintiff's misplaced reliance on *Wyeth v. Levine* does not change this outcome. *See* Opp'n at 22–24. *Wyeth* addressed the *second* step of the two-prong preemption inquiry: whether "clear evidence" existed that "the drug manufacturer fully informed the FDA of the justifications for the warning required by state law" and the FDA would have rejected the warning that the plaintiff argues was tortiously omitted. *See Albrecht*,

---

manufacturer should have created the 'newly acquired information'"); *see also PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621 (2011) (noting that if "conjectures suffice[d] to prevent federal and state law from conflicting for Supremacy Clause purposes" this would "render[] conflict pre-emption all but meaningless").

[12] Plaintiff protests that the Court need not limit its assessment of "newly acquired information" to information that emerged after the FDA approved the operative label, but before Plaintiff used montelukast, as long as the information was "not previously submitted to the Agency." 21 C.F.R. § 314.3(b). But courts truncate the analysis precisely because information that arose prior to the most recent label change "would have been reflected in the label already and would not be 'newly acquired.'" *Silver v. Bayer Healthcare Pharms., Inc*., No. 2:19-cv-3495-DCN-MHC, 2021 WL 4472857, *9 (D.S.C. Sept. 30, 2021) (citations omitted). Regardless, this distinction has no relevance here as Plaintiff failed to identify any information not submitted by Merck to FDA.

587 U.S. at 302–03; *Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803, 812 (7th Cir. 2018). But Merck's motion argued that Plaintiff failed the "threshold inquiry" of identifying scientific information that would justify proposing a label change under the CBE regulation in the first instance. *See In re Incretin*, 524 F. Supp. 3d at 1018. If no such "newly acquired information" exists, "then the state law claim is preempted." *Id*. Only "[i]f the answer is yes," will the court then consider the question of "clear evidence." *Id*. ("[T]he preemption framework provides two potential avenues by which Defendants may establish that federal and state laws irreconcilably conflict.").

As the Supreme Court explained, the record in *Wyeth* was "limited concerning what newly acquired information Wyeth had or should have had about the risks of IV-push administration of Phenergan because Wyeth did not argue before the trial court that such information was required for a CBE labeling change." *Wyeth*, 555 U.S. at 569. *Wyeth* therefore did not turn on the existence of "newly acquired information," but on whether "clear evidence" of preemption existed. *See Drescher v. Bracco Diagnostics, Inc.*, No. CV-19-00096-TUC-RM (LCK), 2020 WL 699878, *4 (D. Ariz. Jan. 31, 2020), *report and recommendation adopted* 2020 WL 1466296 (D. Ariz. Mar. 26, 2020) (explaining that the "stringent standard" set forth in *Wyeth* and *Albrecht* only applies if newly acquired information permits a label change under the CBE regulations). *Wyeth* ultimately held that FDA-approval of an existing label—without more—did not establish impossibility preemption, particularly when the existing label did not specifically warn of the high risks of "IV-push administration" and no evidence existed that "'either the FDA or the manufacturer gave more than passing attention'" to the issue. 555 U.S. at 560–61, 572. *Wyeth* does not save Plaintiff's claims from preemption, in the absence of "newly acquired information" and in the wake of FDA's intensive and decades-long review of neuropsychiatric adverse events, which culminated in the substantial warning in the operative labeling. *See In re Incretin*, 524 F. Supp. 3d at 1018, 1029–1033 (finding "clear evidence" preemption where the FDA and manufacturers "devoted considerable time and attention" to the safety issue, and distinguishing *Wyeth*,

where FDA and manufacturer "gave no more than passing attention" to the issue); *Maze v. Bayer Healthcare Pharm. Inc.*, No. 4:18-CV-21-TAV-CHS, 2019 WL 1062387, *3–4 (E.D. Tenn. Mar. 6, 2019) (dismissing for lack of newly acquired information and distinguishing *Wyeth*, which involved "whether a nonexistent warning should be included on a label at all," where case concerned "the adequacy of the FDA-approved, repeated stroke warning that the Yaz label has included all along").

**D.     Bueno fails to provide any basis for punitive damages**

Plaintiff's punitive-damages argument fails because even if Defendants' warning were ultimately deemed inadequate, that finding alone cannot warrant punitive damages. Claims for punitive damages are unfounded where a manufacturer warns of the potential risk that resulted in the plaintiff's injury, even if that warning might subsequently be deemed to be insufficient. *See Heston v. Taser Int'l., Inc.*, 431 Fed. Appx. 586, 589 (9th Cir. 2011). While an inadequate warning "may amount to negligence, it does not rise to the level [of] 'willful or wanton' conduct" required to support punitive damages. *Id.*

Plaintiff offers no response to *Heston*, nor does he provide any contrary authority. Rather, Plaintiff tries to distract from this fatal flaw by constructing a false narrative about Merck's reports to FDA, presumably to suggest that Defendants' conduct went beyond negligence. These contentions are both false and legally insufficient.

Plaintiff provides no evidence in support of his statements that "Merck has not provided all relevant post-marketing adverse event reports to FDA" and "there were thousands of AERs in Merck's database than were [*sic*] in FDA's database." Opp'n at 32:13–15. As an initial matter, Plaintiff's false speculation that Merck did not submit all required AERs to FDA is a preempted fraud-on-the-FDA claim. *See supra* n.8. Nor does the evidence support it—Plaintiff cites deposition testimony generally discussing which types of events must be reported per regulation, *not* Merck's AERs or its regulatory compliance. *See* SOF 27. Moreover, the cited portion of an FDA pediatric advisory committee transcript only discusses the events reported in FAERS (the FDA's adverse event database) rather than Merck's database or actions. Further, to the extent the

1    evidence reiterates findings from reports, because those reports are not offered as
2    evidence, such evidence is barred by the hearsay rule and the best evidence rule.

3         Plaintiff further argues that "Defendants are obligated to send their AERs to the
4    Office of Safety and Epidemiology by uploading them to an electronic system." Opp'n
5    at 32:19–20; SOF 25. But the cited testimony again does not support this statement and
6    only provides, in pertinent part, that "Drug manufacturers submit the reports through the
7    FDA regulations that regulate that. They have specific regulations by which they submit
8    their post-marketing reports." Regardless, this shows nothing factual about Defendants.

9         Further, what Plaintiff falsely alleges as possible nondisclosure was history by
10   2014—years before the October 2019 start of Plaintiff's prescriptions. Plaintiff's
11   SOF 27 references an FDA report from 2014, confirming that the FDA was aware of all
12   the adverse event reports at issue. *See supra* n.8; Vargas Reply Decl., ¶ 8, Ex. 103 (5/2/14
13   FDA Br. Doc.). Punitive damages, however, may only be awarded for conduct that
14   caused harm, or potential harm, to the plaintiff—not others. *Philip Morris USA v.*
15   *Williams*, 549 U.S. 346, 353–354 (2007).

16        All other contentions in this section regarding Merck's conduct (Opp'n at 32:16–
17   25) are unsupported by evidence and not even asserted in Plaintiff's Statement of Facts.
18   Hence, those must also fail for lack of evidence. Because Plaintiff therefore fails to
19   create a triable issue of material fact, he cannot seek punitive damages.

20   ## II.    CONCLUSION

21        For the foregoing reasons and those set forth in the moving and supplemental
22   papers, Defendants respectfully request that this Court grant their motion for summary
23   judgment and enter judgment for Defendants on all of Bueno's claims.

24
25   Dated:  July 23, 2024              KING & SPALDING LLP
                                        */s/ Susan V. Vargas*
26                                      Alexander G. Calfo
                                        Susan V. Vargas
27                                      Attorneys for Defendants
                                        MERCK & CO. INC.,
28                                      MERCK SHARP & DOHME;
                                        ORGANON & CO., and ORGANON LLC